**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Email: jlieberman@pomlaw.com
 ahood@pomlaw.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT LEMATTA, Individually and on behalf of all others similarly situated, | Case No: 1:20-cv-02744 |
| Plaintiff, | **CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| CASPER SLEEP INC., PHILIP KRIM, GREGORY MACFARLANE, NEIL PARIKH, DIANE IRVINE, ANTHONY FLORENCE, JACK LAZAR, BENJAMIN LERER, KAREN KATZ, DANI REISS, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, JEFFERIES LLC, BOFA SECURITIES, INC., UBS SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., PIPER SANDLER & CO. and GUGGENHEIM SECURITIES, LLC, | Honorable Margo K. Brodie  **JURY TRIAL DEMANDED** |
| Defendants. | |

Lead Plaintiff Saleh Doron Gahtan ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's consolidated second amended complaint against Defendants (as defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Casper Sleep Inc. ("Casper" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Casper securities in or traceable to the Company's public offering conducted on or around February 7, 2020 (the "IPO"), or who purchased Casper securities from March 19, 2020, through May 12, 2020, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      For Casper's IPO, Defendants pitched the Company to investors as a high-growth, data-driven seller of sleep products. Casper's IPO Registration Statemen reassured investors that the Company continued to expand its market share in a massive and rapidly-growing addressable market. The IPO Registration Statement represented that Casper would generate substantial profits once it exited its current growth mode, stating that the Company already "maintained

1

'first purchase profitable' e-commerce economics" and that "all" of its retail stores were "four-wall profitable" after just a single year of operation.

3.     In addition, the Registration Statement represented that Casper's profit margins were significantly improving as the Company achieved economies of scale, implemented various business initiatives and continued to refine its marketing and sales strategies.  For example, the Registration Statement represented that Casper's gross profit margins had improved by 830 basis points between the fourth quarter of 2018 and the third quarter of 2019 (the most recent quarterly results provided), from 42.4% to 50.7%.

4.     The Registration Statement stated that these margin improvements were continuing "to date" (*i.e.*, as of the IPO) and specifically highlighted Casper's price optimization efforts, the sale of "higher margin products" and the purported improvement of its supply and distribution chain.  According to the Registration Statement, Casper "historically experienced that gross margin, by product, tends to increase over time as we realize cost efficiencies as a result of economies of scale, sourcing strategies and product re-engineering programs." Thus, investors could be reassured that the Company was on a solid path to profitability even as it continued to implement its growth initiatives.

5.     Casper's abilities to dually achieve profitability and improve its margins were of paramount importance to investors. While the IPO allowed Company to raise tens of millions of dollars from outside investors, the Company maintained a relatively minor cash cushion.  As of September 30, 2019, Casper had just $54.6 million in cash and cash equivalents on hand.  At the same time, Casper averaged more than $20 million in quarterly cash burn.  As a result, Casper's growth initiatives had little room for error, and the Company needed to continue to improve its  profit  margins in order to achieve its business goals and ultimately generate positive cash flows – exactly what the Registration Statement represented was occurring at the time of the

IPO. Any significant deviation from the profitability and cash flow representations made to investors in the Registration Statement could have catastrophic consequences for the Company's business, operations and even long-term viability. If Casper's profit margins experienced significant deterioration, even temporarily, Casper could be permanently dislodged from the path to profitability portrayed in the Registration Statement, potentially necessitating a highly dilutive capital raise or even bankruptcy. Furthermore, the erosion in Casper's cash position would significantly impair the Company's operations and curtail its ability to grow revenues and increase its market share.

6. Unbeknownst to investors at the time of the IPO, but known to the knowledgeable former employees cited herein, this worst-case scenario was in fact playing out behind the scenes with dire consequences for Casper's business, operations and prospects.

7. Compounding matters, Casper had misjudged consumer demand leading up to the IPO and, as a result, amassed millions of dollars' worth of unsold and out-of-date mattress inventory. In order to clear space for newer models, Casper was engaged in exceptionally aggressive discounting and promotional tactics, further pressuring the Company's margins and leading to ballooning losses.

8. On May 12, 2020, after the Company reported that its performance was not even close to the hype that characterized the run-up to IPO, and that it would run out of cash by year's end, Casper shares fell by $1.53 per share from the previous day's close, or 20%, on heavy trading volume, thus damaging investors.

9. By June 4, 2020 (the day before the first complaint in this matter was filed), Casper stock closed at just $8.18 share, 32% below the IPO price. The stock has continued its downward trajectory since and currently trades at only about $7.00 per share as of late October 2020.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act, and Section 27 of the Exchange Act, as the alleged misstatements entered and the subsequent damages took place in this judicial district, and the Company conducts substantial business in this district.

13.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Plaintiff, as set forth in his previously-filed certification (ECF No. 12-2), incorporated by reference herein, purchased Casper securities in or traceable to the IPO.

15.     Defendant Casper purports to sell mattresses, sleep aids and other sleep-related products and services. Casper is incorporated in the State of Delaware and its headquarters are located at Three World Trade Center, 175 Greenwich Street, Floor 39, New York, New York 10007. Casper's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CSPR."

4

16.     Defendant Philip Krim ("Krim") was the Chief Executive Officer ("CEO") and a director of Casper at the time of the IPO.

17.     Defendant Gregory Macfarlane ("Macfarlane") was the Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") of Casper at the time of the IPO. Less than three months after the IPO, Casper announced defendant Macfarlane was resigning from the Company.

18.     Defendant Neil Parikh was the Chief Strategy Officer and a director of Casper at the time of the IPO.

19.     The defendants identified in ¶¶16-18 above are sometimes referred to herein as the "Officer Defendants." The Officer Defendants were key members of the IPO working group and executives of Casper who pitched investors to purchase the shares sold in the IPO. Each of the Officer Defendants reviewed, helped prepare, and signed the Registration Statement for the IPO and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's common stock to investors in the IPO for their own financial benefit and financial benefit of Casper. Defendant Casper and the Officer Defendants are strictly liable for the false and misleading statements made in the Registration Statement.

20.     Each of the Officer Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged

5

herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

21. Casper is liable for the acts of the Officer Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

22. The scienter of the Officer Defendants and other employees and agents of the Company is similarly imputed to Casper under *respondeat superior* and agency principles.

23. Defendant Diane Irvine was a director of Casper at the time of the IPO.

24. Defendant Anthony Florence was a director of Casper at the time of the IPO.

25. Defendant Jack Lazar was a director of Casper at the time of the IPO.

26. Defendant Benjamin Lerer was a director of Casper at the time of the IPO.

27. Defendant Karen Katz was a director of Casper at the time of the IPO.

28. Defendant Dani Reiss was a director of Casper at the time of the IPO.

29. The defendants identified in ¶¶23-28 above are sometimes referred to herein as the "Director Defendants," and the Officer Defendants and Director Defendants are collectively referred to as the "Individual Defendants."

30. Each of the Individual Defendants:

(a) signed the Registration Statement, solicited the investing public to

purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Casper investors, all motivated by their own and the Company's financial interests;

(b)  directly participated in the management of the Company;

(c)  was directly involved in the day-to-day operations of the Company at the highest levels;

(d)  was privy to confidential proprietary information concerning the Company and its business and operations;

(e)  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating some or all of the false and misleading statements and information alleged herein;

(f)  was directly or indirectly involved in the oversight or implementation of the Company's internal controls; and

(g)  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or approved or ratified these statements in violation of the federal securities laws.

31.  Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Jefferies LLC, BofA Securities, Inc., UBS Securities LLC, Citigroup Global Markets Inc., Piper Sandler & Co. and Guggenheim Securities, LLC (collectively, the "Underwriter Defendants") served as underwriters for the IPO and sold 8.35 million shares of Casper common stock in the IPO at $12 per share. The Underwriter Defendants collectively received over $6.5 million in fees and

commissions for soliciting and selling the shares in the IPO.

32.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared millions of dollars in fees collectively. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Casper, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Casper and the Individual Defendants that Casper would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Casper had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Casper and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Casper, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential,

current corporate information concerning Casper's most up-to-date operational and financial results and prospects.

(d)    In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Casper's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Casper securities would be sold; (iii) the language to be used in the Registration Statement; what disclosures about Casper would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Casper's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Casper's existing problems as detailed herein.

(e)    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

33.    Casper and the Underwriter Defendants entered into an underwriting agreement with respect to the shares being offered in the IPO (the "Underwriting Agreement"). Subject to the terms and conditions of the underwriting agreement, each of the Underwriter Defendants

severally agreed to purchase from Casper the number of shares set forth opposite its name below:

| Underwriter | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | 2,672,000 |
| Goldman Sachs & Co. LLC | 2,672,000 |
| Jefferies LLC | 835,000 |
| BofA Securities, Inc. | 584,500 |
| UBS Securities LLC | 584,500 |
| Citigroup Global Markets Inc. | 417,500 |
| Piper Sandler & Co. | 417,500 |
| Guggenheim Securities, LLC | 167,000 |
| Total | 8,350,000 |

34.    Defendants Casper, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Company Background

35.    Casper, a mattress and sleep aid company, was founded in 2014 as an online retailer. More recently, however, Casper has expanded into partnerships with retailers and opened its own brick-and-mortar locations. The Company purports to implement a "cutting-edge" and data-driven omni-channel sales platform and marketing strategy in order to target and match potential customers with innovative sleep products tailored to their specific needs, optimize product price points, and maximize operating efficiencies.

36.    Between its founding and 2019, Casper expanded from its first product – the Casper mattress – to offer soft goods, bedroom furniture and products that promote ambience for sleep such as lighting, sound, scents, temperature, and humidity; sleep technology, such as tracking devices, medical machines, bedside clocks, and connected devices; sleep supplements, such as sprays, pills and vitamins; and sleep services, such as digital apps, meditation, sleep programming, and counseling.

37.     Casper has also stated its intention to grow internationally and claimed to be building towards an international presence in more than twenty countries. At the time of the IPO, Casper distributed products directly to customers in seven countries through its e-commerce platform, sixty Casper retail stores, and eighteen retail partners. Casper's retail partnerships included Amazon, Costco, and Target.

38.     At all relevant times, Casper's success depended heavily on customers' brand awareness of its products in a market saturated by competitors, including Tempur Sealy, Serta Simmons Bedding, and Sleep Number.

39.     To that end, Casper has characterized its own "powerful brand as a market-defining opportunity and an immeasurably valuable asset." In 2019, the Company spent approximately $155 million on sales and marketing activities, the most significant component of its operating expenses and an indication of the high cash flow needed for Casper to grow revenues and increase its market share.

40.     The hypercompetitive nature of the mattress market and the resulting need to maximize sales prices – while minimizing costs and overhead – explains why Casper has publicly emphasized the importance omni-channel sales and marketing platform to gain "a data-based understanding of price elasticity dynamics, promotional strategies and other price management tools to drive optimized pricing."

41.     In the same vein, Casper represents that its third-party manufacturing and distribution relationships confer a competitive advantage by allowing the Company to minimize overhead and control inventory flow. The Company has highlighted these supposed "significant long-term investments" in developing its distribution capabilities as a key component of its growth plain.

42.     Casper's attempt to soothe the market was important because, as of September 30, 2019, the Company had only $54.6 million in cash and cash equivalents on hand. Casper was also generating over $20 million in negative cash flows on average every quarter (excluding financing activities), placing the Company in a precarious cash position if it did not continue to improve its gross margins following the IPO. The Registration Statement reassured investors that improvements in Casper's profitability metrics were in fact occurring. Accordingly, flush with cash from the IPO, Casper would be well positioned to fund its operations and growth plans until it achieved positive operating cash flows, avoiding the need to return to the capital markets for a dilutive equity raise or, worse yet, the abrupt curtailment of Casper's growth initiative.

**FE1**

43.     Former Employee ("FE") 1 worked as head of enterprise partnerships and new ventures for Casper from August 2017 to October 2019.  FE1 carried the corporate rank of vice president at Casper, and reported directly to the C-Suite.

44.     As a vice president, FE1 was in charge of enterprise partnerships and new ventures, and reported extensively to other senior executives, including Defendants Krim and Parikh.

45.     FE1 stated that at the time of FE1's departure in 2019, Casper was not a profitable company, due to tensions between the goals of growing the Company, and becoming profitable.

46.     FE1 confirmed that Casper's corporate officers, including Defendants Krim and Parikh, were well-aware of everything that went on internally related to profitability. To cite one example of this, FE1 explained that some senior level executives were expressly brought on by Casper to help them toward the goal of achieving profitability, but that the new hires were unable to right the ship. Furthermore, at all-hands meetings every week during FE1's tenure at

Casper, numbers were displayed on a screen that showed the Company was losing money and was in fact not profitable, and that executives acknowledged the situation.

47.     Compounding matters, FE1 described a glut of older-model Casper mattresses that the Company was left to offload to retail chains such as TJ Maxx and Target while attempting to avoid oversaturating the market with Casper products. These efforts involved aggressive discounts of 10 to 15%, which, according to FE1, cut into profitability in a big way.

48.     In particular, FE1 said that discounted sales to retail stores included the predictable effect of cannibalizing direct, online sales to consumers.

49.     FE1 also stated that, in direct contrast to Casper's sunny forecasts regarding international expansion, the Company struggled to gain a foothold in foreign markets between 2017 and 2019. Two specific obstacles known internally were preexisting global competition outside the U.S. and Casper's lack of any Asian manufacturing facilities, owing to the fact that it would not be profitable for Casper to ship U.S.-made mattresses to Asia.

50.     FE1 attributed the divergence between Casper's public statements and its private reality to the prestige attached to the pursuit of international ventures.

51.     Eventually, and prior to FE's departure from Casper at the end of 2019, Company insiders had resigned themselves to doubling down on the U.S. market.

**FE2**

52.     FE2 worked for Casper as a store keyholder from September 2019 to September 2020. Based in Jacksonville, Florida, FE2 reported to Store Manager Shaun Hayes, who reported to Southeast Regional Manager Phil Amandola.

53.      FE2 corroborates FE1 on both the Company's non-profitability at the time of the IPO *and* the Company's retail discounts ranging from 10 to 15%, including the deleterious effect of these markdowns on Casper's ability to conduct direct sales.

13

**FE3**

54.    FE3 worked for Casper as an area manager in charge of retail stores from November 2019 to August 2020. FE3 was based in the Washington, D.C. area, traveled extensively, and reported to Jeff Liu ("Liu"), vice president of global retail, who reported to Defendant Krim.

55.    FE3 corroborates FE1 and FE2 on the Company's lack of profitability in advance of the IPO.

56.    Specifically, FE3 states the profit and loss of Casper's stores was trending downwards for the entire time that FE3 was there, in part due to overspending on marketing. FE3 elaborated that it was common knowledge internally that the stores were actively losing money month over month, but that the Company rationalized this by saying it was focused on brand awareness, and that, in essence, it takes money to make money.

57.    FE3 revealed that beginning in November 2019, Casper mounted a concerted effort to make the books look good for the close of the quarter before the IPO.

58.    FE3 states that Casper did this by engaging in major cuts to employee payroll and hours, as well as slashing the 18-to-24 months new retail stores had for repaying the costs of getting set up – *a figure cited in the Company's offering documents* – to a mere 8-to-10 months.

59.    Like FEs 1 and 2, FE3 noted the cannibalization of direct sales through discounts to retailers. In the case of Casper's SouthPark Mall location in Charlotte, North Carolina, the store was two miles from a Costco selling a mattress for a lower price. FE3 said Casper employees simply didn't have a good answer for smart shoppers who asked why they should buy a more expensive item from Casper when they could get it at Costco for less, except possibly in a few cases where a higher-end (and presumably higher-quality) mattress was only available through Casper and not its partners, or a lower price was only available to Costco members.

**FE4**

60.     FE4 worked for Casper as a supply chain business analyst from 2017 to January 2019.  FE4 was based in New York, and reported to Sri Gade, Casper's director of business sales.

61.     FE4's focus was enterprise resource planning, or ERP, meaning that FE4 handled data in and out of all the sales for Casper. FE4's specific job was taking care of the business systems, which involved all the supply chains and operations software.

62.     Echoing FEs 1-3, FE4 stated that Casper was not making a profit at the time of the IPO.

63.     FE4 knew that, in reality, Casper was never actually profitable – even if its internal custom metrics suggested otherwise – as demonstrated by the fact that employees never got a profitability-pegged 401(k) match.

64.     And, like FE1, FE4 denied the existence of an international market for Casper products and agreed with FE1 that the U.S. market was Casper's end-all, be-all.

**FE5**

65.     FE5 worked for Casper as an operations coordinator in New York from October 2017 to June 2019.  Like FE3, FE5 reported to Liu, who himself reported to Defendant Krim.

66.     Like FEs 1-4, FE5 was aware, while working at Casper, that the Company was not profitable.  In fact, FE5 states that if not for the 10 % discounts also cited by FEs 1 and 2.

67.     FE5 learned of Casper's unprofitability directly from Defendant Krim, who said in a meeting regarding quarterly results attended by FE5 that the Company was not yet profitable.

68.     Also, like FE4, FE5 was informed that employees would receive a 401(k) match in the event the Company had two consecutive profitable quarters. Because employees weren't getting the benefit, they knew Casper was not profitable.

69.     Corroborating FEs 1 and 4, FE5 confirms that Casper's international expansion never moved past the aspirational stage.

**FE6**

70.     FE6 worked for Casper Sleep as an operations manager from June or July 2019 to March 2020. Based at the company's outlet store in Camarillo, California, outside Los Angeles, FE6 reported to Store Manager Kyle Rod ("Rod"), who reported to Stephen Jaurequi, the west region multi-unit manager.

71.     FE6 confirmed that Casper sold mattresses made in 2018 at extremely deep discounts – as much as 50 to 60% off the original price in a bid to get through as much inventory as possible. FE6 overheard calls between headquarters and Rod in which Rod was ordered to move product quickly so as to allow for the store's inventory to be replenish.

72.     FE6 further corroborates the predictable blow to sales dealt by Casper's discounted sales to outlets, which also boasted more generous return policies than Casper's own brick-and-mortar stores.

73.     In addition, not long before the IPO, in November or December of 2019 or in early 2020 – around the holidays – Casper ordered a substantial cut in the price of the older mattresses sold through FE6's outlet store.

74.     FE6 corroborates FE3on Casper's attempts to simulate profitability through cuts: in October 2019, the Company ended its policy of providing medical, dental, and vision plan coverage to employees like FE6, who were left to pay for their own healthcare.

**FE7**

75.     FE7 worked for Casper Sleep as vice president of digital product from December 2018 to April 2020. He was based in New York City at the company's World Trade Center headquarters. FE7 reported to Eleanor Morgan, then the chief experience officer. After Morgan's

departure, FE7 reported to Emilie Arel, Casper Sleep's president and chief commercial officer. He also at times reported to Greg Macfarlane, the CFO, and, mainly prior to Arel's arrival, to Defendant Krim. FE7 was a member of Casper Sleep's senior leadership team.

76.    FE7 had about 20 direct or indirect reports. FE7 was involved with the product management and design teams, particularly the "experience for software" for the Company, meaning the public-facing website as well as software used for integration with wholesale providers and point of sale programs used at the registers at Casper retail stores.

77.    FE7 described Defendant Krim as a "micromanager."

78.    FE7 corroborates FE3 and FE6 concerning the Company's reliance on cuts to better position itself financially. FE7 described job losses targeted to remove high-salary employees just before the IPO.

**False and/or Misleading Statements Disseminated in Connection with the IPO**

79.    In the run-up to its IPO, Casper claimed to be on the path to profitability. In particular, the Company stated that it had achieved 50.7% in gross margins for the three months ended September 30, 2019, up from 42.8% for the year ended December 31, 2016.

80.    In addition, Casper maintained that its core operations were profitable. For example, the Company represented that as of September 30, 2019, its existing stores that had been operating for one year or longer were "all four-wall profitable," which it defined as gross profit, less operating expenses (excluding one-time costs and non-allocable expenses). The Company claimed that its growing e-commerce operations were likewise profitable, stating that from 2017 through September 30, 2019 it had maintained "'first purchase profitable'" e-commerce economics, defined as gross profit dollars, less marketing dollars over the time period.

81.     Finally, at the time of the IPO, Casper claimed that it continued to drive "operational efficiencies through a focus on reducing product return rates, price optimization, investing in our supply chain, improving the efficiency and enhancing performance of our marketing investments, and realizing economies of scale."

82.     The Registration Statement emphasized Casper's "rapid growth" trajectory, claiming that the Company had achieved a 45.5% compound annual growth rate ("CAGR") between 2016 and 2018, increasing annual net revenues from $169.1 million for fiscal 2016 to $357.9 million by fiscal 2018. The Registration Statement also claimed that "the most exciting opportunities for Casper's growth story lie ahead" in the reporting periods following the IPO.

83.     As of December 31, 2018, Casper had $26.9 million in cash and cash equivalents on hand. During that same year, the Company had a negative net cash flow of $53.3 million, requiring it to raise capital through financing activities in 2019. Moreover, the Company took on a substantial amount of debt in the lead-up to the IPO. As of September 30, 2019, the Company had over $40 million in senior secured and subordinate debt, as well as a substantial amount of preferred stock outstanding. As a result, it was of the utmost importance to investors that: (1) Casper's mature and stable retail store and e-commerce operations were, in fact, profitable; (2) the Company's margins were, in fact, improving; and (3) the Company was, in fact, on a sustained path to profitability. In addition, any potential business disruption risks that could threaten the Company's cash flows, margins or operating activities, even in the short-term, significantly undermined the Company's value proposition and its portrayal as a high-growth stock.

84.     On January 10, 2020, the Company filed its Registration Statement on Form S-1 for the IPO, which, after several amendments, was declared effective by the SEC on February 5, 2020. On February 7, 2020, Casper filed its Prospectus on Form 424B4 with the SEC. In the

IPO, defendants sold 8.35 million shares of Casper common stock at $12 per share, generating over $100 million in gross proceeds.

85.     The Registration Statement contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation

87.     The Registration Statement highlighted the Company's purported core profitability. For example, it stated that the Company's retail stores were "four-wall profitable," a bespoke profitability metric designed by Casper that purportedly showed its stores were profitable, excluding growth initiatives and non-allocable expenses. By this metric, the Company would ostensibly generate profits once it exited its current growth phase. The Registration Statement stated in pertinent part as follows:

> We currently operate 60 retail stores in the United States and Canada. *As of September 30, 2019, our existing stores that have been operating for one year or longer are all four-wall profitable, calculated as gross profit, less operating expenses (excluding one-time build-out costs and non-allocable marketing and overhead expenses), for each store. In addition, as of September 30, 2019, our stores that have been operating for one year or longer have averaged approximately $1,600 in annual net sales per sellable square foot, which we believe is reflective of our high volumes of consumer traffic, our ability to successfully engage with consumers to drive sales, and an effective pricing strategy.*

(Emphasis added.)

88.     The Registration Statement also stated that Casper's retail stores were generating increasing amounts of cash and, based on observable trends, expected to cover the costs of new store builds over an 18- to 24-month period as the Company continued expanding retail

locations. The Registration Statement stated in pertinent part as follows:

> The average capital expenditure was $760,000 for the 26 new retail stores opened in the nine months ended September 30, 2019. *Consistent with our experience to date, we target for our future retail stores a cash-on-cash payback period ranging from 18 to 24 months.* Consumers have proven to be highly engaged when they experience our retail stores and spend, on average, more than 25 minutes in store when they visit. *Across our retail channel, our AOV [average order value] increased from $437 in 2017 to $720 in 2018 and to $820 for the nine months ended September 30, 2019.* For the nine months ended September 30, 2019, we sold an average of 2.4 units per transaction in our retail channel. Our presence in physical retail stores has proven complementary to our e-commerce channel, as we believe interaction with multiple channels has created a synergistic "network effect" that increases system-wide sales as a whole. *Driving continued success in our retail store expansions will be an important contributor to our future growth and profitability.*

(Emphasis added.)

89.    The Registration Statement likewise represented that Casper's e-commerce operations were profitable and experiencing increased average order value (or "AOV") in the lead-up to the IPO. The Registration Statement stated in pertinent part as follows:

> Across our e-commerce channel, our average order value, or AOV, which is defined as net revenue divided by total orders placed, increased from $583 in 2017 to $686 in 2018 and to $710 for the nine months ended September 30, 2019. For the nine months ended September 30, 2019, we sold an average of 1.8 units per transaction in our e-commerce channel. *From 2017 through September 30, 2019, while growing our e-commerce channel, we have maintained 'first purchase profitable' ecommerce economics, defined as gross profit dollars, less marketing dollars, over a specific time period.*

(Emphasis added.)

90.    In addition, the Registration Statement stated that the Company's multi-channel marketing and new retail store strategy had offered complementary revenue growth and "'first purchase profitable' e-commerce economics." The Registration Statement stated in pertinent part as follows:

***Expand Direct-to-Consumer Presence and Network of Retail Partnerships***

20

*We complement our strong online presence by expanding our physical retail footprint to deliver additional consumer touchpoints and increase sales and margin*. A greater physical retail presence helps us to not only increase consumer awareness and education, but also to offer convenient product trial opportunities, multiple purchase options, and flexibility in delivery. As of December 31, 2019, we operate 60 retail stores, up from 23 stores at the end of 2018, and are working with 18 retail partners, up from 11 partners at the end of 2018.

*We plan to continue the rollout of new Casper retail stores to strengthen our footprint in existing cities, while selectively entering into new cities in the United States, Canada, and other international markets. Our new store opening process is highly scalable, and we believe there is a significant opportunity for us to further expand our retail store base*. We expect that our typical new stores will have between 1,750 and 2,250 square feet of selling space. Over time, we believe there is an opportunity to have more than 200 Casper retail stores in North America alone. We believe our multi-channel expansion creates synergies and that these channels, to date, have proven to be complementary, not cannibalistic. In fact, for the nine months ended September 30, 2019, our direct-to-consumer sales in cities where we have opened retail stores have grown over 100% faster on average than cities without a Casper retail store. *From 2017 through September 30, 2019, while expanding our e-commerce channel, we have maintained 'first purchase profitable' e-commerce economics*.

(Emphasis added.)

91.     The Registration Statement represented that Casper had implemented a number of strategic initiatives designed to improve the Company's margins. The Registration Statement further stated that these strategic initiatives had already significantly improved the Company's margins in the lead-up to the IPO and that the Company was taking advantage of an "opportunity for continued improvement in gross margins" at the time of the IPO. The Registration Statement reassured investors that Casper's "[o]verall business profitability will be driven" by "continued net revenue growth," "gross margin improvements," and operational efficiencies. The Registration Statement stated in pertinent part as follows:

We are committed to improving productivity and profitability through a number of operational initiatives designed to grow our revenue and expand our margins. *To date, Casper has had significant results improving gross margins, achieving 50.7% in gross margin for the three months ended September 30, 2019, up from 42.8% for the year ended December 31, 2016. Overall business profitability will*

21

*be driven by continued net revenue growth in conjunction with gross margin improvements, continued marketing efficiencies, and generating operating leverage. We believe there is opportunity for continued improvement in gross margins, marketing efficiencies, and operating leverage through these key initiatives:*

- *Optimize Price.* **Through investment in human capital and technology we intend to continue building a data-based understanding of price elasticity dynamics, promotional strategies and other price management tools to drive optimized pricing for Casper and our retail partners.** Based on the strength of our brand and the value proposition of our products, we believe we have pricing power in the market.

- *Reduce Product Returns.* As a young company, we are still learning about the factors affecting customer returns and believe we have the opportunity to reduce customer return rates. *We have identified several opportunities that span policy change, process improvement and consumer education to reduce return rates and increase overall customer satisfaction.*

- *Invest in Supply Chain.* We plan to continue to make significant investments in our supply chain to meet the requirements of our growing business. Our supply chain is instrumental to both supporting growth and improving business performance. *While we currently partner with a number of third-party manufacturing and logistics companies, we are evaluating opportunities to build our own internal capabilities in these areas.*

- *Drive Marketing Efficiencies.* **Marketing investments are the result of a disciplined process and are measured against both growth and profitability targets. Historically, we have been able to drive nearly $3 of revenue, net of promotions for every $1 of marketing spend. As we continue to grow and scale, we believe we will continue to improve the efficiency of our marketing investments. We believe that with larger budgets and deeper experience, we will benefit from lower media rates and increased data that will improve our proprietary models, multi-channel synergies as our retail stores and retail partnerships grow consumer awareness, purchase occasions as our product and services assortment expands, and purchases from previous repeat consumers.**

- *Achieve Operating Leverage.* **Casper has invested ahead of our growth in all areas of our business, including human capital, technology, and multichannel and international distribution. As we continue to grow, we have the opportunity to leverage these investments and realize economies of scale.**

(Emphasis added.)

92.    In addition, the Registration Statement provided preliminary results for the year ended

December 31, 2019, which indicated that favorable year-over-year revenue and margin trends were sustainable and continuing. For example, the Registration Statement stated that for the year ended December 31, 2019, Casper had achieved: (i) net revenue "between $437.3 million and $441.3 million, an increase of $81.4 million or 23% at the midpoint of the range" over the prior year; (ii) gross profit "between $213.0 million and $217.5 million, an increase of $57.5 million or 36% at the midpoint of the range" over the prior year; (iii) gross margin "between 48.7% and 49.3%, an increase of 490 bps at the midpoint of the range" over the prior year; (iv) a net loss of "between $96.4 million and $91.4 million, an increase of $1.8 million or 2% at the midpoint of the range as compared to" to the prior year; and (v) adjusted EBITDA "between $(74.9) million and $(70.4) million, an improvement of $9.8 million or 12% at the midpoint of the range, as compared to" the prior year. Thus, the Registration Statement represented that Casper's margins were expanding in tandem with revenues, as its adjusted earnings improved and its net losses remained essentially flat year over year.  Moreover, the Registration Statement highlighted the Company's continued growth strategy, which purportedly had set the stage for higher profit margins as a result of its past investment activities. The Registration Statement stated in pertinent part as follows:

**Our Growth Strategy**

We have achieved rapid growth, generating 45.5% net revenue CAGR from 2016 to 2018, and 20.3% year-over-year net revenue growth for the nine months ended September 30, 2019. We have also expanded our gross margin from 42.8% in 2016 to 44.1% in 2018 and to 50.7% for the three months ended September 30, 2019, while making significant long-term investments in human capital, research and development, brand-building, and distribution. Our continued investment in, and expansion of, the Casper brand, distribution, and product offerings will further increase opportunities to acquire new customers and expand relationships with our existing customer base.

93.     Further, the Registration Statement emphasized Casper's global operations and claimed that it was poised to expand into several new international markets. The Registration

Statement stated in pertinent part as follows:

**Expand into New Countries**

Our vision of becoming the world's most loved and largest sleep company leads to further global growth opportunities. Casper currently operates in seven countries – the United States, Canada, the United Kingdom, Germany, Austria, Switzerland, and France – with product and service offerings tailored to each market by channel but maintaining a consistent brand and consumer experience. We carefully balance brand, creative consistency and global standardization – including leveraging back and middle office, and technology support – balancing local preferences and market tastes in product, sizing, and distribution in order to both ensure strong consumer relevance and maximize company synergies. We intend to expand into new international markets organically, through acquisitions, and through other partnership opportunities, depending on the best product and channel strategy for each country or region. We envision expanding our total international footprint to more than 20 countries, with East Asia as a key focus area.

94.    The Registration Statement also claimed that the Company's operations and growth strategy were supported by a highly qualified supply chain and distribution network. In particular, the Registration Statement highlighted the integral role played by the Company's logistics partners. The Registration Statement stated in pertinent part as follows:

**Supply Chain**

*We manage a global supply chain of highly qualified, third-party manufacturing and logistics partners to produce and distribute our products. We work with partners who deliver production flexibility and scalability, can support new products, help our growing channel strategies, deliver low costs, and meet other required operational needs*. . . . We work with our manufacturing partners to ensure product quality and manufacturing process efficiency.

\* \* \*

**Distribution and Inventory Management**

Approximately two-thirds of our mattresses are shipped directly to our customers from our manufacturers. This inventory strategy allows us to minimize inventory investment while providing an average order to delivery period of less than three days. *We also work with multiple third-party logistics providers to warehouse our products and manage shipments to our customers. These providers manage distribution activities including product receipt, warehousing, certain limited*

*product inspection activities, and coordinating outbound shipping. They are strategically located in key markets to provide fast order-to-delivery times. Our warehouse management system at these distribution centers interfaces with our order management and enterprise resource planning systems to ensure inventory visibility and management. We believe our domestic and international providers have sufficient expansion capacity to meet our future needs*.

(Emphasis added.)

95.     The statements identified in ¶¶85-94 were inaccurate statements of material fact because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a)     that Casper's profit margins were actually declining, rather than growing;

(b)     that Casper was changing an important distribution partner, costing it 130 basis points of gross margin in the first quarter of 2020 alone;

(c)     that Casper was holding a glut of old and outdated mattress inventory that it was selling at steeply discounted clearance prices, further impairing the Company's profitability;

(d)     that Casper was suffering accelerating losses, further placing its ability to achieve positive cash flows and profitability out of reach;

(e)     that Casper's core operations were not profitable, but were causing the Company to suffer over $40 million in negative cash flows during the first quarter of 2020 alone and doubling its quarterly net loss year over year;

(f)     that, as a result of (a)-(e) above, Casper's ability to achieve profitability, implement its growth initiatives, and expand internationally had been misrepresented in the Registration Statement, as the Company needed to shutter its European operations, halt all international expansion, jettison over one fifth of its global corporate workforce, and significantly curtail new store openings in

order to avoid an imminent cash and liquidity crisis, let alone achieve positive

operating cash flows; and

(g)     that, as a result of (a)-(f) above, Casper's revenue growth rate was not sustainable

and had not positioned the Company to achieve profitability.

96.     Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, also required disclosure of any known events or uncertainties that had caused, or were reasonably likely to cause, Casper's disclosed financial information not to be indicative of future results. The risks posed by the Company's deteriorating margin rate, accelerating losses, loss of a key distribution partner, glut of outdated inventory and ongoing extraordinary promotional activity were known and were likely to (and in fact did) materially and adversely affect Casper's results and prospects. The omitted material facts alleged herein were reasonably expected to (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.

97.     In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, required, in the "Risk Factors" section of the Registration Statement, a discussion of the most significant factors that made the offering risky or speculative and that each risk factor adequately describe the risk. Because the omitted material facts alleged herein were not disclosed, as well as the consequent material adverse effects on the Company's future results and prospects, defendants violated Item 105.

98.     Moreover, the purported risk factors that defendants did provide in the Registration Statement were themselves materially misleading. For example, the Registration Statement stated that a "failure to increase [Casper's] revenue sufficiently to keep pace with [its] investments and other expenses could prevent [it] from achieving or maintaining profitability or positive cash flow on a consistent basis," but failed to disclose that the Company was already

suffering widening deficits and materially impaired margins at the time of the IPO, or the reasons for those impairments. Similarly, while the Registration Statement stated that promotions were "occasionally offered" by the Company, it stated that these promotions were highly seasonal and occurred in connection with increased sales during Casper's second and third fiscal quarters and failed to mention the deep discounting that was then occurring in the midst of the Company's first fiscal quarter and the IPO, as it had been forced to unload a glut of old and outdated inventory. These boilerplate, generic expressions of future contingent risk failed to apprise investors of the specific and imminent threats facing the Company and the occurrence of adverse events that were already impacting the Company's business, operations, financial results and prospects at the time.

### The Truth Slowly Emerges

99.      On March 19, 2020, Defendants held an earnings call to announce results for the first quarter of 2020.  During the call, Defendant Krim stated, in pertinent part:

> We closed our IPO in the first quarter and are pleased to welcome many new shareholders to Casper. ***The IPO raised approximately $88 million in net proceeds, putting us in an even stronger competitive position***. We ended the quarter with a cash position of $116 million, ***providing us with a strong balance sheet and cash to operate in this environment***.

100.     The statements identified in ¶99 were inaccurate statements of material fact because they failed to disclose that the sharp contraction in Casper's gross margins, its worsening cash flows and deteriorating cash situation had irredeemably compromised Casper's ability to continue its purported growth rate and achieve its growth initiatives.  However, the Company did admit that it expected adjusted EBITDA losses of between $30 and $27 million during 1Q20, a 69% increase from 4Q19 and a 62% increase over the Company's average quarterly adjusted EBITDA losses for fiscal 2019

101.    On April 21, 2020, Casper announced that it was taking significant actions to improve its cash position and business model, notwithstanding the fact that the Company had raised more than $100 million in gross offering proceeds from the IPO less than three months previously. The Company stated that it was reducing the size of its global operations and sales team and completely winding down its European operations, leading to the loss of 21% of its entire corporate workforce globally. These drastic measures were necessitated by the Company's ballooning losses and deteriorating cash position. The Company also stated that defendant Macfarlane, the Company's CFO and COO, was resigning – an extraordinary move so soon after the IPO.

102.    On May 12, 2020, Casper issued a release providing its financial results for the quarter ended March 31, 2020 – the same quarter during which defendants conducted the IPO. The Company stated that it had suffered a net loss of $34.5 million, a 98% increase year over year, and an adjusted EBITDA loss of $22.9 million, a 60% increase year over year. In addition, the Company stated that its gross margin had actually fallen during the quarter by 190 basis points.

103.    On an earnings call to discuss Casper's first quarter 2020 results, Defendant Krim stated that the decrease in net margin was due to a change in one of Casper's logistics providers and an abnormally high number of clearance sales needed to get rid of old mattress inventory that had built up prior to the IPO. Defendant Krim also stated that the Company was substantially reducing the number of planned retail openings, further crimping its growth prospects.

104.    Also on May 12, 2020, Casper filed its quarterly report on Form 10-Q in which it stated that its cash and cash equivalents had only increased $48.5 million during the quarter, despite the fact that the Company received over $88 million in net cash proceeds from the IPO.

28

The Form 10-Q stated that during the quarter Casper had suffered over $40 million in negative cash flows from operating and investing activities. As the Company had only $116 million in cash on hand as of March 31, 2020, at this rate Casper was on track to run out of cash entirely within a year.

105.    In response to this news, on May 12, 2020, Casper shares fell by $1.53 per share from the previous day's close, or 20%, on heavy trading volume. On May 13, 2020, analysts at Wedbush published a report concluding that Casper was "leaving sales on the table."  It noted that Casper's 1Q20 gross margins of 46.9% missed forecasts "as extended clearance period discounting on the company's old product line weighed on performance and it incurred a charge associated with a change in logistics provider."

106.    As of market close on June 4, 2020, Casper stock was trading at just $8.18 per share, 32% below the IPO price.

107.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

108.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Casper securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Included in the Class are all persons and entities who purchased Casper shares pursuant and/or traceable to the Company's Registration Statements issued in connection with the Company's IPO and 2020 Offering and all persons and entities who purchased Casper shares during the Class Period at artificially inflated prices and were

29

damaged thereby. Excluded from the Class are Defendants, the officers and directors of Casper, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Individual Defendants have or had a controlling interest.

109.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Casper securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

110.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

111.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

112.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Securities and/or Exchange Acts were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Casper;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Casper to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and SEC filings;

- whether the prices of Casper' securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

113.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

114.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Casper shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

- As a public issuer, Casper filed periodic public reports with the SEC;

- Casper regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Casper was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

115.   Based on the foregoing, the market for Casper securities promptly digested current information regarding Casper from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

116.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
## Violations of Section 11 of the Securities Act
## Against All Defendants

117.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This claim is not based on and does not sound in fraud.

118.    This claim is brought by Plaintiff and on behalf of other members of the Class who purchased or otherwise acquired Casper securities pursuant to or traceable to the Company's Offerings. Each member of the Class acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Registration Statements. Casper is the issuer of the securities through the Registration Statements, on which the Individual Defendants were signatories.

119.    Defendants issued and disseminated, and caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the Registration Statements, which misrepresented or failed to disclose, among other things, the facts as set forth above. By reason of the conduct alleged herein, each Defendants violated and/or controlled a person who violated Section 11 of the Securities Act, 15 U.S.C. §77k.

120.    Casper is the issuer of the securities sold via the Registration Statement. As issuer of these securities, the Company is strictly liable to Plaintiff and the Class members for the material misstatements and omissions contained therein.

121.    At the times they obtained their shares of the Company, Plaintiff and the members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

122.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statements that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of both Registration Statements. It is therefore timely.

123.    At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the Offerings securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.

124.    By reason of the foregoing, Plaintiff and the other members of the Class are entitled to damages as measured by the provisions of Section 11(e), 15 U.S.C. 77K(e), from the Defendants and each of them, jointly and severally.

## COUNT II
### Violations of Section 15 of the Securities Act Against the Individual Defendants

125.    Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

126.    This claim is asserted against the Individual Defendants, each of whom was a control person of the Company at relevant times.

127.    The Individual Defendants were control persons of the Company by virtue of, inter alia, their positions as senior officers and/or directors of the Company, and they were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statements.

128.    The Individual Defendants did not make reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were accurate complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

129.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statements and within three years after Casper securities were sold to the Class in connection with the Offerings. It is therefore timely.

34

130.     By reason of the above conduct, for which the Company's is primarily liable, as set forth above, Individual Defendants are jointly and severally liable with and to the same extent as Casper pursuant to Section 15 of the Securities Act, 15 U.S.C. 77o.

## COUNT III
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Casper and the Officer Defendants)

131.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This claim is asserted against Casper and the Officer Defendants and is premised upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

132.     During the Class Period, Casper and the Officer Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Casper securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Casper securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Casper and the Officer Defendants, and each of them, took the actions set forth herein.

35

133.    Pursuant to the above plan, scheme, conspiracy and course of conduct, Casper and each of the Officer Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Casper securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Casper financials and business prospects.

134.    As high-ranking officers and directors at Casper, the Officer Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Casper and the Officer Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Casper and the Officer Defendants.  Said acts and omissions of Casper and the Officer Defendants were committed willfully or with reckless disregard for the truth.  In addition, Casper and each of the Officer Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

135.    Information showing that Casper and the Officer Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Casper and the Officer Defendants' knowledge and control.  As the senior managers and/or directors of Casper, the Officer Defendants had knowledge of the details of Casper internal affairs.

136.    The Officer Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Officer Defendants were able to and did, directly or indirectly, control the content of the statements of

Casper.  As officers and/or directors of a publicly held Company, the Officer Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Casper businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading public statements, the market price of Casper securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Casper business and financial condition which were concealed by Casper and the Officer Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Casper securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Casper and the Officer Defendants, and were damaged thereby.

137.    During the Class Period, Casper securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Casper and the Officer Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Casper securities at prices artificially inflated by Casper and the Officer Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Casper securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Casper securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

138.    By reason of the conduct alleged herein, Casper and the Officer Defendants

knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

139.    As a direct and proximate result of Casper and the Officer Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure or materialization of the risk that the Company had been disseminating misrepresentations to the investing public.

## COUNT IV
### (Violations of Section 20(a) of the Exchange Act Against the Officer Defendants)

140.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

141.    During the Class Period, the Officer Defendants participated in the operation and management of Casper, and conducted and participated, directly and indirectly, in the conduct of Casper business affairs.  In part because of their senior positions but also due to their direct knowledge, they knew the adverse non-public information about Casper's false financial representations.

142.    As officers and/or directors of a publicly owned Company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to Casper's financial condition and results of operations, and to correct promptly any public statements issued by Casper which had become materially false or misleading.

143.    Because of their positions of control and authority as senior officers, the Officer Defendants were able to, and did, control the contents of the public statements which Casper disseminated in the marketplace during the Class Period concerning Casper results of operations.  Throughout the Class Period, the Officer Defendants exercised their power and

authority to cause Casper to engage in the wrongful acts complained of herein. The Officer Defendants therefore, were "controlling persons" of Casper within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Casper securities.

144.    Each of the Officer Defendants, therefore, acted as a controlling person of Casper. By reason of their senior management positions and/or being directors of Casper, each of the Officer Defendants had the power to direct the actions of, and exercised the same to cause, Casper to engage in the unlawful acts and conduct complained of herein. Each of the Officer Defendants exercised control over the general operations of Casper and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

145.    By reason of the above conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Casper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 30, 2021        **POMERANTZ LLP**

By /s/ *Louis C. Ludwig*
Jeremy A. Lieberman
J. Alexander Hood
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Email: jlieberman@pomlaw.com
      ahood@pomlaw.com

Patrick V. Dahlstrom
Louis C. Ludwig (*Pro Hac Vice*)
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com
      lcludwig@pomlaw.com

*Lead Counsel*

**THE SCHALL LAW FIRM**
Brian Schall
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*