**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT LEMATTA, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CASPER SLEEP INC., PHILIP KRIM, GREGORY MACFARLANE, NEIL PARIKH, DIANE IRVINE, ANTHONY FLORENCE, JACK LAZAR, BENJAMIN LERER, KAREN KATZ, DANI REISS, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, JEFFERIES LLC, BOFA SECURITIES, INC., UBS SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., PIPER SANDLER & CO. and GUGGENHEIM SECURITIES, LLC, <br><br> Defendants. | Case No: 1:20-cv-02744 <br><br> **LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Honorable Margo K. Brodie |

**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Phone: (212) 661-1100
Fax: (212) 661-8665

10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Phone: (312) 377-1181

*Counsel for Plaintiff and the Class*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

FACTS ....................................................................................................................... 1

ARGUMENT ............................................................................................................. 1

    I.   Applicable Legal Standards Do Not Favor Dismissal of the SAC ........................ 6

    II.  The SAC Adequately Alleges Material Misrepresentations By
       Defendants ......................................................................................................... 8

        A.  Relevant Standard ..................................................................................... 8

        B.  The Alleged Misrepresentations and Omissions are Actionable .............. 8

        C.  Defendants' Materiality Arguments are Improper at the Pleading Stage.. 14

    III.  The Inference Of Scienter Is Cogent And Compelling ..................................... 15

        A.  Relevant Standard ................................................................................... 15

        B.  The SAC's Scienter Allegations Favor Denying Defendants'
            Motion ................................................................................................... 16

        C.  Defendants Offer No Competing Inference ............................................ 18

    IV.  The SAC Adequately Alleges Control Person Claims........................................ 19

CONCLUSION ......................................................................................................... 19

## TABLE OF AUTHORITIES

*Arista Records LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) .................................................. 7

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ..................................................................................... 6

*ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ................................. 15

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ............................................................................ 14

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007) ............................................................... 6

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) ...................................................................................... 13

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014) .. 20

*Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629 (S.D.N.Y. 2010) ................................. 18

*Darquea v. Jarden Corp.*, No. 06 CV 0722 (CLB), 2007 U.S. Dist. LEXIS 40247,
(S.D.N.Y. May 31, 2007) .......................................................................................................... 19

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ................................................................. 7

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...................................................................................................... 14

*Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004) ............................... 9

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526 (S.D.N.Y. 2017).... 11

*Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................... 5, 8

*Gabelli v. SEC*, 133 S. Ct. 1216 (2013) .................................................................................... 9

*Glaser v. The 9 Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................... 14

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) ................................................................. 11

*Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212 (S.D.N.Y. 2008) .............. 6

*In re Barrick Gold Sec. Litig.*, No. 13–cv–3851, 2015 U.S. Dist. LEXIS 43053
(S.D.N.Y. Apr. 1, 2015) ............................................................................................................ 16

*In re Eletrobras Sec. Litig.*, No. 15-cv-5754 (JGK), 2017 U.S. Dist. LEXIS 44350
(S.D.N.Y. Mar. 25, 2017) .......................................................................................................... 11

*In re GE Sec. Litig.*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012) ....................................... 14

*In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 U.S. Dist. LEXIS 171110 (S.D.N.Y. Dec. 2, 2013) ....................................................................................... 10

*In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011) ................ 6, 8

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010) ........................... 12

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561 (S.D.N.Y. 2012)................. 12

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) ........................................... 8, 10

*In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528 (S.D.N.Y. 2016) ................. 7

*In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) ................... 13

*Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC, 2012 U.S. Dist. LEXIS 128416 (S.D.N.Y. Sept. 7, 2012) ...................................................................................... 6

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011)............................................. 6

*Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245 (2d Cir. 2014) ............................... 6, 8

*McMahan & Co. v. Wherehouse Entm't., Inc.*, 900 F.2d 576 (2d Cir. 1990) ........................... 9

*Mills v. Polar Molecular Corp.,* 12 F.3d 1170 (2d Cir.1993) .................................................. 7

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ..................................................................... 17

*SEC v. Gabelli*, 653 F.3d 49 (2d Cir. 2011)........................................................................... 15

*SEC v. Saltsman*, No. 07-CV-4370 (NGG) (RML), 2016 U.S. Dist. LEXIS 101757 (E.D.N.Y. Aug. 2, 2016) ....................................................................................... 13

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008) ........................................................................................................ 15

*Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308 (2007)................................. 6, 8, 12, 18

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ...................................................... 14

*Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323 (S.D.N.Y. 2011) ...................................... 14

iii

**INTRODUCTION**

Following Casper Sleep's February 7, 2020 IPO, it became apparent that the sharp contraction in Casper's gross margins, its worsening cash flows, and its deteriorating cash situation had irredeemably compromised the Company's ability to continue its purported growth rate and achieve its growth initiatives, thereby rendering Defendants' challenged statements as false and/or misleading *at the time they were made*. This is all the Securities Act of 1933 requires.

For Casper's IPO, Defendants pitched the Company to investors as a high-growth, data-driven seller of sleep products. Casper's IPO Registration Statemen reassured investors that the Company continued to expand its market share in a massive and rapidly-growing addressable market. The IPO Registration Statement represented that Casper would generate substantial profits once it exited its current growth mode, stating that the Company already "maintained 'first purchase profitable' e-commerce economics" and that "all" of its retail stores were "fourwall profitable" after just a single year of operation.

Further, the Registration Statement represented that Casper's profit margins were significantly improving as the Company achieved economies of scale, implemented various business initiatives and continued to refine its marketing and sales strategies. For example, the Registration Statement represented that Casper's gross profit margins had improved by 830 basis points between the fourth quarter of 2018 and the third quarter of 2019 (the most recent quarterly results provided), from 42.4% to 50.7%.

The Registration Statement stated that these margin improvements were continuing "to date" (i.e., as of the IPO) and specifically highlighted Casper's price optimization efforts, the sale of "higher margin products" and the purported improvement of its supply and distribution chain. According to the Registration Statement, Casper "historically experienced that gross margin, by product, tends to increase over time as we realize cost efficiencies as a result of economies of

1

scale, sourcing strategies and product re-engineering programs." Thus, investors could be reassured that the Company was on a solid path to profitability even as it continued to implement its growth initiatives. The Registration Statement stated that these margin improvements were continuing "to date" (*i.e.*, as of the IPO) and specifically highlighted Casper's price optimization efforts, the sale of "higher margin products" and the purported improvement of its supply and distribution chain. According to the Registration Statement, Casper "historically experienced that gross margin, by product, tends to increase over time as we realize cost efficiencies as a result of economies of scale, sourcing strategies and product re-engineering programs." Thus, investors could be reassured that the Company was on a solid path to profitability even as it continued to implement its growth initiatives.

Unbeknownst to investors at the time of the IPO, but known to the knowledgeable former employees cited in the SAC, Casper's profit margins were experiencing significant deterioration, and its cash positions were eroding. Even worse, Casper had misjudged consumer demand leading up to the IPO and, as a result, amassed millions of dollars' worth of unsold and out-of-date mattress inventory. In order to clear space for newer models, Casper was engaged in exceptionally aggressive discounting and promotional tactics, further pressuring the Company's margins and leading to ballooning losses.

On May 12, 2020, after the Company reported that its performance was not even close to the hype that characterized the run-up to IPO, and that it would run out of cash by year's end, Casper shares fell by $1.53 per share from the previous day's close, or 20%, on heavy trading volume, thus damaging investors. By June 4, 2020 (the day before the first complaint in this matter was filed), Casper stock closed at just $8.18 share, 32% below the IPO price. And while the current coronavirus pandemic was in full swing at the time of Casper's *disclosures* (which were themselves composed of significantly older information), COVID was not having an adverse

2

impact on markets either before the IPO or at the time the IPO occurred in early February.

Accordingly, because the significantly detailed allegations of Plaintiff's Consolidated Second Amended Complaint (or SAC) adequately state Plaintiff's claims, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss.

## FACTS

Casper, a mattress and sleep aid company, was founded in 2014 as an online retailer. More recently, however, Casper has expanded into partnerships with retailers and opened its own brick-and-mortar locations. ¶35. [1] The Company purports to implement a "cutting edge" and data-driven omni-channel sales platform and marketing strategy in order to target and match potential customers with innovative sleep products tailored to their specific needs, optimize product price points, and maximize operating efficiencies. *Id.*

Between its founding and 2019, Casper expanded from its first product – the Casper mattress – to offer soft goods, bedroom furniture and products that promote ambience for sleep such as lighting, sound, scents, temperature, and humidity; sleep technology, such as tracking devices, medical machines, bedside clocks, and connected devices; sleep supplements, such as sprays, pills and vitamins; and sleep services, such as digital apps, meditation, sleep programming, and counseling. ¶36.

Casper has also stated its intention to grow internationally and claimed to be building towards an international presence in more than twenty countries. At the time of the IPO, Casper distributed products directly to customers in seven countries through its e-commerce platform, sixty Casper retail stores, and eighteen retail partners. ¶37. Because Casper's success depended heavily on customers' brand awareness of its products in a market saturated by competitors, characterized its own "powerful brand as a market defining opportunity and an immeasurably

---

[1] All uses of "¶" refer to the SAC, unless otherwise noted.

valuable asset." ¶¶38-39. In 2019, the Company spent approximately $155 million on sales and marketing activities, the most significant component of its operating expenses and an indication of the high cash flow needed for Casper to grow revenues and increase its market share. ¶39.

The hypercompetitive nature of the mattress market and the resulting need to maximize sales prices – while minimizing costs and overhead – explains why Casper has publicly emphasized the importance omni-channel sales and marketing platform to gain "a databased understanding of price elasticity dynamics, promotional strategies and other price management tools to drive optimized pricing." ¶40. Casper represents that its third-party manufacturing and distribution relationships confer a competitive advantage by allowing the Company to minimize overhead and control inventory flow. *Id.* The Company has highlighted these supposed "significant long-term investments" in developing its distribution capabilities as a key component of its growth plan. *Id.*

Casper's attempt to soothe the market was important because, as of September 30, 2019, the Company had only $54.6 million in cash and cash equivalents on hand. ¶42. Casper was also generating over $20 million in negative cash flows on average every quarter (excluding financing activities), placing the Company in a precarious cash position if it did not continue to improve its gross margins following the IPO. *Id.* The Registration Statement reassured investors that improvements in Casper's profitability metrics were in fact occurring. *Id.* Accordingly, flush with cash from the IPO, Casper would be well positioned to fund its operations and growth plans until it achieved positive operating cash flows, avoiding the need to return to the capital markets for a dilutive equity raise or, worse yet, the abrupt curtailment of Casper's growth initiative. *Id.*

On April 21, 2020, Casper announced that it was taking significant actions to improve its cash position and business model, notwithstanding the fact that the Company had just raised more than $100 million in gross offering proceeds from the IPO. ¶101. The Company stated that it was

4

reducing the size of its global operations and sales team and completely winding down its European operations, leading to the loss of 21% of its entire corporate workforce globally. *Id.* These drastic measures were necessitated by the Company's ballooning losses and deteriorating cash position. *Id.* The Company also stated that Defendant Macfarlane, the Company's CFO and COO, was resigning – an extraordinary move so soon after the IPO.

Then on May 12, 2020, the Company stated that it had suffered a net loss of $34.5 million, a 98% increase year over year, and an adjusted EBITDA loss of $22.9 million, a 60% increase year over year. ¶102. In addition, the Company stated that its gross margin had actually fallen during the quarter by 190 basis points. *Id.* Defendant Krim stated that the decrease in net margin was due to a change in one of Casper's logistics providers and an abnormally high number of clearance sales needed to get rid of old mattress inventory that had built up prior to the IPO. ¶103. Defendant Krim also stated that the Company was substantially reducing the number of planned retail openings. *Id.*

Casper's contemporaneously-filed quarterly report on Form 10-Q stated that its cash and cash equivalents had only increased $48.5 million during the entire quarter, despite the fact that the Company received over $88 million in net cash proceeds from the IPO. ¶104. The Form 10-Q stated that during the quarter Casper had suffered over $40 million in negative cash flows from operating and investing activities. *Id.* As the Company had only $116 million in cash on hand as of March 31, 2020, at this rate Casper was on track to run out of cash entirely within a year. *Id.*

In response to this news, on May 12, 2020, Casper shares fell by $1.53 per share from the previous day's close, or 20%, on heavy trading volume. ¶105. On May 13, 2020, analysts at Wedbush published a report concluding that Casper was "leaving sales on the table" and noting that Casper's 1Q20 gross margins of 46.9% missed forecasts "as extended clearance period discounting on the company's old product line weighed on performance and it incurred a charge

associated with a change in logistics provider." *Id.* As of market close on June 4, 2020, Casper stock was trading at just $8.18 per share, 32% below the IPO price. ¶106.

## ARGUMENT

### I.   Applicable Legal Standards Do Not Favor Dismissal of the SAC

To withstand a motion to dismiss under Rule 12(b)(6), Plaintiffs "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322 n.12 (2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570, (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The relevant determination is not whether the plaintiff will ultimately prevail, but whether it is entitled to offer evidence in support of its claims. *Lewy v. Skypeople Fruit Juice, Inc.*, No. 11 CIV. 2700 PKC, 2012 U.S. Dist. LEXIS 128416, at *20 (S.D.N.Y. Sep. 7, 2012). When faced with a "Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 322 (2007) (internal citations omitted).

If a complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, it should be sustained even if "actual proof of those facts is improbable." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010) (quoting *Twombly*, 550 U.S. at 556). A court's determination of whether alleged facts are plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The

6

standard does not require "the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120-21 (2d Cir. 2010).

To state a claim under Section 11, Plaintiff is only required to allege that Casper's Registration Statement "(1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading." *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 408 (S.D.N.Y. 2007). Defendants do not dispute that the heightened pleading standards of the Private Securities Litigation Act do not apply, and the SAC's sufficiency is governed by Rule 8(a)'s notice-pleading standard. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (citing Fed. R. Civ. P. 8(a)).

To state a claim under Section 10(b), and Rule 10b-5 promulgated thereunder, Plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the sale or purchase of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Although the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (which modifies the Exchange Act) and Federal Rule of Civil Procedure 9(b) require that the misrepresentations and omissions be identified with particularity, this burden is not onerous. To satisfy the particularity requirement, a complaint need only "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why statements were fraudulent." *Lewy*, 2012 U.S. Dist. LEXIS 128416, at *21 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

While a complaint needs to plead particularized facts giving rise to a strong inference of scienter, *see* 15 U.S.C. §78u-4(b)(2), the inference need not be irrefutable, *i.e.*, of the "smoking-

7

gun" genre, or even the "most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Rather, an inference of scienter is strong if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* The SAC meets this standard.

## II.    The SAC Adequately Alleges Material Misrepresentations By Defendants

### A.    Relevant Standard

Federal securities laws impose an obligation on speakers to be both accurate and complete. *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 282 (S.D.N.Y. 2011). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014); *see also Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008). Such a duty "arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993).

Here, Defendants' statements, absent further disclosure, served to mislead investors about the true status of Casper's operations and financial position at the time of the IPO. Those statements are therefore actionable under both the Securities Act and the Exchange Act.

### B.    The Alleged Misrepresentations and Omissions are Actionable

In particularized allegations, the SAC describes how Defendants misrepresented and/or omitted that:

- Casper was on the path to profitability. In particular, the Company stated that it had achieved 50.7% in gross margins for the three months ended September 30, 2019, up from 42.8% for the year ended December 31, 2016.

- Casper's core operations were profitable. For example, the Company represented that as of September 30, 2019, its existing stores that had been operating for one year or longer were

"all four-wall profitable," which it defined as gross profit, less operating expenses (excluding one-time costs and non-allocable expenses). The Company claimed that its growing e-commerce operations were likewise profitable, stating that from 2017 through September 30, 2019 it had maintained "'first purchase profitable'" ecommerce economics, defined as gross profit dollars, less marketing dollars over the time period.

- Casper continued to drive "operational efficiencies through a focus on reducing product return rates, price optimization, investing in our supply chain, improving the efficiency and enhancing performance of our marketing investments, and realizing economies of scale." [¶¶79-81].

Moreover, Defendants, in the IPO, emphasized Casper's "rapid growth" trajectory, claiming that the Company had achieved a 45.5% compound annual growth rate ("CAGR") between 2016 and 2018, increasing annual net revenues from $169.1 million for fiscal 2016 to $357.9 million by fiscal 2018. The Registration Statement also claimed that "the most exciting opportunities for Casper's growth story lie ahead" in the reporting periods following the IPO. ¶82. In addition, Defendants told investors that the Company's retail stores were "four-wall profitable," a bespoke profitability metric designed by Casper that purportedly showed its stores were profitable, excluding growth initiatives and non-allocable expenses. ¶87.

The Registration Statement also stated that, among other things:

- Casper's retail stores were generating increasing amounts of cash and, based on observable trends, expected to cover the costs of new store builds over an 18- to 24-month period as the Company continued expanding retail locations.

- Casper's e-commerce operations were profitable and experiencing increased average order value (or "AOV").

9

- the Company's multi-channel marketing and new retail store strategy had offered complementary revenue growth and "'first purchase profitable' e-commerce economics."

- Casper had implemented a number of strategic initiatives, which *had already* significantly improved the Company's margins in the lead-up to the IPO and that the Company was taking advantage of an "opportunity for continued improvement in gross margins" *at the time of the IPO*.

- Casper purported to be growing internationally and claimed to be building towards an international presence in more than twenty countries.

- Casper's operations and growth strategy were supported by a highly qualified supply chain and distribution network.

[¶¶85-94.]

Defendants do not – indeed, cannot – dispute that once they broached the above topics, they were bound to be both accurate and complete in their representations. *See Lehman Bros.*, 799 F. Supp. 2d at 282; *Meyer*, 761 F.3d at 250; *Time Warner*, 9 F.3d at 268. Defendants were reckless to mislead and hide from investors the following adverse facts that existed at the time of the IPO:

**(a)** that Casper's profit margins were actually declining, rather than growing;

**(b)** that Casper was changing an important distribution partner, costing it 130 basis points of gross margin in the first quarter of 2020 alone;

**(c)** that Casper was holding a glut of old and outdated mattress inventory that it was selling at steeply discounted clearance prices, further impairing the Company's profitability;

**(d)** that Casper was suffering accelerating losses, further placing its ability to achieve positive cash flows and profitability out of reach;

10

**(e)** that Casper's core operations were not profitable, but were causing the Company to suffer over $40 million in negative cash flows during the first quarter of 2020 alone and doubling its quarterly net loss year over year;

**(f)** that, as a result of (a)-(e) above, Casper's ability to achieve profitability, implement its growth initiatives, and expand internationally had been misrepresented in the Registration Statement, as the Company needed to shutter its European operations, halt all international expansion, jettison over one fifth of its global corporate workforce, and significantly curtail new store openings in order to avoid an imminent cash and liquidity crisis, let alone achieve positive operating cash flows; and

**(g)** that Casper's revenue growth rate was not sustainable and had not positioned the Company to achieve profitability.

[¶95.]

Where Plaintiff establishes either "a material misrepresentation" or "a material omission of information that is necessary to prevent existing disclosures from being misleading—then, in a Section 11 case, 'the general rule is that an issuer's liability . . . is absolute." *Litwin*, 634 F.3d at 715-16 (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)). The SAC easily meets this threshold.

Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, also required disclosure of any known events or uncertainties that had caused, or were reasonably likely to cause, Casper's disclosed financial information not to be indicative of future results. ¶96. The risks posed by the Company's deteriorating margin rate, accelerating losses, loss of a key distribution partner, glut of outdated inventory and ongoing extraordinary promotional activity were known and were likely to (and in fact did) materially and adversely affect Casper's results and prospects. *Id.* The omitted material facts alleged herein were reasonably expected to (and did) have an unfavorable impact on

11

the Company's sales, revenues and income from continuing operations. *Id.*

In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, required, in the "Risk Factors" section of the Registration Statement, a discussion of the most significant factors that made the offering risky or speculative and that each risk factor adequately describe the risk. ¶97. Because the omitted material facts alleged herein were not disclosed, as well as the consequent material adverse effects on the Company's future results and prospects, Defendants violated Item 105. *Id.*

Defendants attempt to square the circle of what they said in the IPO documents versus what they revealed just a few months later by claiming that the coronavirus pandemic wreaked unforeseen havoc on Casper's business. *See* MTD at 7.  Defendants even go so far to attack the SAC for "totally ignore[ing]" the impact of COVID. *Id.* At 1. Leaving aside that the limited record by no means ascribes to COVID the overarching importance that Defendants ask the Court to accept – the IPO occurred in February 2020, while Defendants' disclosures began in April 2020 – their attempt to inject additional facts, including citations to news articles that have nothing to do with this case, see MTD at 7 n.3, and which Defendants admit are not part of the SAC, is entirely inappropriate at this stage of the litigation. *See Tellabs*, 551 U.S. at 324 (requiring that complaint allegations be accepted as true at the pleading stage). Defendants will have the opportunity to proffer their claims regarding COVID following discovery. At present, when Plaintiff is prevented by the PSLRA discovery stay from obtaining Defendants' internal documents, such arguments are premature.

Defendants also argue that because they because they made some disclosures referring to losses, though, notably, not the same losses disclosed in the Spring of 2020, their misrepresentations to investors are immunized. MTD at 11-12. The assertion is legally unsupported. In fact, whether a statement is literally true does not resolve the question of whether

it is actionable under the PSLRA.  *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("[S]o-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud."); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) ("The rule against half-truths, or statements that are misleading by omission, comports with the common-law tort of fraudulent misrepresentation, according to which 'a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue'"); *McMahan & Co. v. Wherehouse Entm't., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers"); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact.").[2]

---

[2] In *Gabelli*, a mutual fund executive had issued a Memorandum that stated that "for more than two years, [market timers] have been identified and restricted or banned from making further trades," but that efforts had not "completely eliminated all [market] timers." While the mutual fund had stopped most of its investors from engaging in market timing, the fund failed to disclose that it had made a secret exception for a single investor. The Second Circuit found that the complaint "plausibly alleged that a reasonable investor reading the Memorandum would conclude" — incorrectly — "that the [defendant] had attempted in good faith to reduce or eliminate . . . market timing across the board." 653 F.3d at 57; *see also Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012) (upholding alleged misrepresentations as "half-truths" where "the Complaint plausibly alleges facts indicating that a reasonable investor would assume that Transocean's safety and training measures were not only "large in extent and range or amount," but adequate, when, in fact, the measures were insufficient to address applicable legal requirements and created a high risk of legal exposure."); *SEC v. Saltsman*, No. 07-CV-4370 (NGG) (RML), 2016 U.S. Dist. LEXIS 101757, at *24 (E.D.N.Y. Aug. 2, 2016) ("the question is not whether some definition of 'institutional investor' would render Defendant's statements literally true. Instead, the question is, whether a reasonable investor would have been misled by Defendant's statements."). Similarly, investors here would have concluded, based on Defendants' statements in the IPO offering documents, that Casper's

13

Defendants' disclosures were also without merit because, as pled in the SAC:

> . . . . the purported risk factors that defendants did provide in the Registration Statement were themselves materially misleading. For example, the Registration Statement stated that a "failure to increase [Casper's] revenue sufficiently to keep pace with [its] investments and other expenses could prevent [it] from achieving or maintaining profitability or positive cash flow on a consistent basis," but failed to disclose that the Company was alreadysuffering widening deficits and materially impaired margins at the time of the IPO, or the reasons for those impairments. Similarly, while the Registration Statement stated that promotions were "occasionally offered" by the Company, it stated that these promotions were highly seasonal and occurred in connection with increased sales during Casper's second and third fiscal quarters and failed to mention the deep discounting that was then occurring in the midst of the Company's first fiscal quarter and the IPO, as it had been forced to unload a glut of old and outdated inventory. These boilerplate, generic expressions of future contingent risk failed to apprise investors of the specific and imminent threats facing the Company and the occurrence of adverse events that were already impacting the Company's business, operations, financial results and prospects at the time. [¶98]

## C.    Defendants' Materiality Arguments are Improper at the Pleading Stage

Defendants' arguments also present an improper foray into materiality, in particular where they suggests that the omitted information was simply unimportant. MTD at 12. The Supreme Court has explained that "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).  For a misstatement or omission to be material, there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231-32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see also ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). Because materiality is a mixed question of law and fact, and in the context of a Fed. R. Civ. P. 12(b)(6)

operations and finances were better positioned than they actually were at the time of the IPO.

14

motion, dismissal on materiality grounds is only appropriate when the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).   Here, the withheld information regarding the SEC investigation, and Defendants' knowledge of same was clearly important to investors, as evidenced by the substantial stock drops that occurred upon disclosure of the truth.  *See also In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 465-66 (S.D.N.Y. 2017) (significant volatility of the company's securities "preclude[d] the conclusion that the alleged misstatements and omissions . . . were so obviously unimportant to a reasonable investor to be immaterial.") (citations, internal quotations marks, and footnote omitted)); *Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) (significant stock drop supports inference of materiality).

## III.    The Inference Of Scienter Is Cogent And Compelling

### A.    Relevant Standard

A plaintiff may satisfy the PSLRA's scienter requirement "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).   In the Order, this Court held that to state a recklessness-based claim "plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information that they had a duty to monitor." Order at 18 (citing (*In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 574 (S.D.N.Y. 2012)).   Moreover, "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* (citing *Teamsters Local 445 Freight Div. PensionFund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008)).

15

**B.    The SAC's Scienter Allegations Favor Denying Defendants' Motion**

Here, the SAC allegations – in public statements which Plaintiff specifically identifies – support a strong inference that the Individual Defendants knew about (or recklessly disregarded) the undisclosed conditions at Casper, which Defendants omitted from investors, and which rendered their public statements materially misleading. The multiple former employees, or "FEs" cited in the SAC confirmed, based on personal knowledge and/or interaction with high-level Casper employees, that:

- Casper's corporate officers, including Defendants Krim and Parikh, were well-aware of everything that went on internally related to profitability.

- Casper had a glut of older-model Casper mattresses that the Company was left to offload to retail chains such as TJ Maxx and Target while attempting to avoid oversaturating the market with Casper products. These efforts involved aggressive discounts of 10 to 15%, which cut into profitability in a big way.

- discounted sales to retail stores included the predictable effect of cannibalizing direct, online sales to consumers.

- in direct contrast to Casper's sunny forecasts regarding international expansion, the Company struggled to gain a foothold in foreign markets between 2017 and 2019. Two specific obstacles known internally were preexisting global competition outside the U.S. and Casper's lack of any Asian manufacturing facilities, owing to the fact that it would not be profitable for Casper to ship U.S.-made mattresses to Asia. By the end of 2019, Company insiders had resigned themselves to doubling down on the U.S. market.

16

- Casper was non-profitable at the time of the IPO and that the Company's retail discounts ranging from 10 to 15% had a deleterious effect on Casper's ability to conduct direct sales.

- the profit and loss of Casper's stores was trending downwards as early as 2019, in part due to overspending on marketing.

- it was common knowledge internally that the stores were actively losing money month over month, but that the Company rationalized this by saying it was focused on brand awareness, and that, in essence, it takes money to make money.

- beginning in November 2019, Casper mounted a concerted effort to make the books look good for the close of the quarter before the IPO. Casper did this by engaging in major cuts to employee payroll and hours, as well as slashing the 18-to-24 months new retail stores had for repaying the costs of getting set up – a figure cited in the Company's offering documents – to a mere 8-to-10 months.

- Casper implemented job losses targeted to remove high-salary employees just before the IPO to make itself look better financially.

The facts alleged in the SAC leave no doubt that Defendants were well-aware of the true state of affairs at Casper – a reality that was only disclosed to the investing public well after the IPO. Defendants seek to disqualify the FEs while ignoring the factual grounding of their statements. In the Second Circuit, confidential witnesses may be relied upon "if they are described in the complaint with sufficient particularly to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300,

17

308 (2d Cir. 2000).[3]  Defendants have made no arguments to the contrary as to CW1. Indeed, the the erroneous proposition that confidential witness statements are limited to first-person perception is only relevant to the inquiry of whether the confidential informant was able to support the allegations in question. *See Glaser v. The9 Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) (confidential witness statements regarding defendant were gleaned from intermediaries); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 340 (S.D.N.Y. 2011) (confidential witness statement was "unsupported").

## C.      Defendants Offer No Competing Inference

*Tellabs* only permits courts to weigh competing inferences on a motion to dismiss in one limited circumstance: where a defendant, accepting complaint allegations as true, has proffered a nonculpable explanation for the supposed wrongdoing.   Here, Defendants offer no innocent explanation for why their "private information differed from public disclosures," MTD at 27, other than COVID, which, as noted above, fails to explain the gaping chasm between the pre-COVID information Defendants disclosed around and after the IPO. While Plaintiff is not required to plead a motive (including via Defendants' stock sales), the SAC states one: that Defendants were required to misrepresent the underlying facts in order to sell the IPO to investors.  *Darquea v. Jarden Corp.*, No. 06 CV 0722 (CLB), 2007 U.S. Dist. LEXIS 40247, at *27 (S.D.N.Y. May 31, 2007) ("Plaintiffs adequately alleged scienter in that Defendants could have been motivated to artificially inflate the stock price in order to convert a class of preferred stock to common stock ….").

---

[3] In particular, FE statements regarding company-wide internal knowledge have been upheld. *See Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (crediting allegations of confidential witness/"senior derivatives analyst" that "everyone knew" about problems with unconfirmed trades); *see also In re GE Sec. Litig.*, 857 F. Supp. 2d 367, 389 (S.D.N.Y. 2012) (FEs "worked as managers within the real estate group, so it is probable that a person in such a position would have information regarding GE's practices with regards to troubled loans.").

**IV.      The SAC Adequately Alleges Control Person Claims**

Defendants do not contest that the SAC adequately alleges that the Individual Defendants were control persons with respect to their public statements. In addition, because the SAC alleges a viable claim under Section 10(b), Defendants' bid to dismiss the control person claim based on any purported lack of an underlying Section 10(b) violation should be denied. *See* MTD at 30-31. Moreover, although culpable participation is not required in this Circuit, *see In re Barrick Gold Sec. Litig.*, No. 13–cv–3851, 2015 U.S. Dist. LEXIS 43053, at *3 (S.D.N.Y. Apr. 1, 2015), the SAC expressly alleges that the Individual Defendants participated in the misstatements by signing the Company's newly-alleged Class Period filings with the SEC.  Thus, the Individual Defendants is liable under Section 20(a) of the Exchange Act for the Company's Section 10(b) violations.  15 U.S.C. § 78t(a).[4]

**CONCLUSION**

Based on the foregoing, Defendants' motion to dismiss the SAC should be denied in its entirety.

Dated:  August 30, 2021

                                                   Respectfully submitted,

                                                   **POMERANTZ LLP**

                                                   */s/ Louis C. Ludwig*

---

[4] Defendants' argument that the SAC does not properly plead loss causation is without merit because it asserts, contrary to established precedent, that Plaintiff must plead a corrective disclosure in order to demonstrate a connection between Defendants' misconduct and the Class's losses. See MTD at 29-30. Defendants are wrong because the SAC adequately pleads a materialization of the risks that Defendants failed to disclose, *i.e.*, the "loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (citation omitted). Here, the allegations show investors suffered recoverable losses when the truth about Casper came to light following the IPO. Because Defendants fail to even mention, much less distinguish, materialization of the risk – which is unquestionably a viable means of pleading loss causation in this Circuit – in their motion, their arguments regarding loss causation should be similarly disregarded.

19

Patrick V. Dahlstrom
Louis C. Ludwig
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Email:  pdahlstrom@pomlaw.com
          lcludwig@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 30th day of August, 2021, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Louis C. Ludwig