**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ROBERT LEMATTA, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>CASPER SLEEP INC., PHILIP KRIM, GREGORY MACFARLANE, NEIL PARIKH, DIANE IRVINE, ANTHONY FLORENCE, JACK LAZAR, BENJAMIN LERER, KAREN KATZ, DANI REISS, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO., LLC, JEFFERIES LLC, BOFA SECURITIES, INC., UBS SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., PIPER SANDLER & CO. and GUGGENHEIM SECURITIES, LLC,<br><br>        Defendants. | Case No. 1:20-cv-02744-MKB-RML |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFF'S SECOND AMENDED COMPLAINT**

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

*Counsel for Casper Defendants*

WILLKIE FARR &
GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8677

*Counsel for Underwriter Defendants*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ........................................................................................................4

    A.    Factual Background ..................................................................................4

        1.    Casper's Initial Public Offering.......................................................4

        2.    The Unprecedented COVID-19 Pandemic .....................................7

        3.    Casper Announces First Quarter 2020 Results...............................8

    B.    Procedural Background ............................................................................9

ARGUMENT.............................................................................................................10

I.    The Complaint Fails to Plead Any Materially Misleading Statements or
Omissions, Requiring Dismissal of Both the '33 Act and '34 Act Claims. ..........11

    A.    No Material Misstatements About Profits and Profitability Trends..........11

    B.    No Material Misstatements About Distribution Network ........................15

    C.    No Material Misstatement About Pricing and Promotional
Strategies.................................................................................................18

    D.    No Material Misstatements About Growth..............................................20

    E.    No Duty to Disclose Under Items 303 and 105 ......................................23

    F.    No Additional Misstatements Are Pleaded Under Section 10(b).............24

II.    The Complaint Fails to Allege a Strong Inference of Scienter, Requiring
Dismissal of the '34 Act Claims..............................................................................25

    A.    Plaintiff Fails to Allege Motive and Opportunity....................................25

    B.    Plaintiff Fails to Allege Conscious Misbehavior or Recklessness ...........26

III.    The Complaint Fails to Allege Loss Causation, Requiring Dismissal Under
Both the '33 Act and '34 Act...................................................................................29

IV.    Plaintiff Fails to Allege Control Claims Against Defendants ...............................30

CONCLUSION.........................................................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Adair* v. *Kaye Kotts Assocs., Inc.*,
   1998 WL 142353 (S.D.N.Y. Mar. 27, 1998) (Sotomayor, J.) ....................13

*Amorosa* v. *AOL Time Warner Inc.*,
   409 F. App'x 412 (2d Cir. 2011) ....................29

*In re AOL Time Warner, Inc. Sec. Litig.*,
   503 F. Supp. 2d 666 (S.D.N.Y. 2007) ....................29

*Binn* v. *Bernstein*,
   2020 WL 4550312 (S.D.N.Y. July 13, 2020) ....................31

*Boluka Garment Co. Ltd.* v. *Canaan Inc.*,
   2021 WL 2853284 (S.D.N.Y. July 8, 2021) ....................10, 29, 30

*Campo* v. *Sears Holdings Corp.*,
   635 F. Supp. 2d 323 (S.D.N.Y. 2009) ....................27, 28

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ....................31

*Chambers* v. *Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ....................4

*In re China Life Sec. Litig.*,
   2008 WL 4066919 (S.D.N.Y. Sept. 3, 2008) ....................30

*City of Warren Police and Fire Retirement Sys.* v. *Foot Locker, Inc.*,
   412 F. Supp. 3d 206 (E.D.N.Y. 2019) ....................18

*DeMaria* v. *Andersen*,
   318 F.3d 170 (2d Cir. 2003) ....................13

*ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ....................25, 27, 30

*In re eSpeed, Sec. Litig*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006) ....................26

*In re Eventbrite, Inc. Sec. Litig.*,
   2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ....................24

*In re Focus Media*,
  701 F. Supp. 2d 534 (S.D.N.Y. 2010) ........................................................13

*In re Francesca's Hold. Corp. Sec. Litig.*,
  2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ............................................17

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..........................................26, 27, 31

*Goldman Sachs Grp. Inc.* v. *Arkansas Teacher Retirement Sys.*,
  141 S. Ct. 1951 (2021)................................................................................16

*Gregory* v. *ProNAi Therapeutics, Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018) ........................................................26

*In re Henry Schein Inc. Sec. Litig.*,
  2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) (Brodie, J.) ........................13

*Int'l Star Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*,
  146 F. 3d 66 (2d Cir. 1998) ........................................................................17

*In re ITT Educ. Servs. Inc. Sec. Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012) ........................................................16

*Jackson* v. *Abernathy*,
  960 F.3d 94 (2d Cir. 2020) ........................................................................28

*Kryz* v. *Pigott*,
  749 F.3d 117 (2d Cir. 2014) ......................................................................31

*Lachman* v. *Revlon, Inc.*,
  487 F. Supp. 3d 111 (E.D.N.Y. 2020) ........................................................22

*Ladmen Partners, Inc.* v. *Globalstar, Inc.*,
  2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) ............................................20

*Lau* v. *Opera Ltd.*,
  -- F. Supp. 3d --, 2021 WL 964642 (S.D.N.Y. Mar. 13, 2021) ............25, 29

*Lefkowitz* v. *Bank of N. Y.*,
  676 F. Supp. 2d 229 (S.D.N.Y. 2009) ........................................................17

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ........................................................10, 25, 29

*Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*,
  902 F. Supp. 2d 329 (S.D.N.Y. 2012) ........................................................14

*Meisel* v. *Westchester Cnty.*,
  2020 WL 3472500 (S.D.N.Y. June 25, 2020) .......................................................31

*In re Morgan Stanley Info. Fund. Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ....................................................................................10

*In re N2K, Inc. Sec. Litig.*,
  82 F. Supp. 2d 204 (S.D.N.Y. 2000) .......................................................................13

*Nadoff* v. *Duane Reade, Inc.*,
  107 F. App'x 250 (2d Cir. 2004) ..............................................................................13

*Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*,
  898 F.3d 243 (2d Cir. 2018) ....................................................................................31

*Nguyen* v. *MaxPoint Interactive, Inc.*,
  234 F. Supp. 3d 540 (S.D.N.Y. 2017) .....................................................................23

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006) .....................................................................22

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ....................................................................................25

*Okla. Police Pension Fund & Ret. Sys.* v. *Teligent, Inc.*,
  2020 WL 3268531 (S.D.N.Y. June 17, 2020) .........................................................22

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008) .....................................................................30

*Panther Partners, Inc.* v. *Ikanos Communications, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008) .....................................................................14

*Perry* v. *Mary Ann Liebert, Inc.*,
  2018 WL 2561029 (S.D.N.Y. June 4, 2018), *aff'd*, 765 F. App'x 470
  (2d Cir. 2019).........................................................................................................31

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  2020 WL 5632901 (S.D.N.Y. Sept. 21, 2020) ........................................................24

*In re ProShares Trust II Sec. Litig.*,
  2020 WL 71007 (S.D.N.Y. Jan. 3, 2020) ................................................................13

*Ramzan* v. *GDS Holdings Ltd.*,
  2020 WL 1689772 (S.D.N.Y. Apr. 7, 2020) ...........................................................26

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004) ....................................................................................10

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015) .........................................................15

*In re Sec. Capital Assur. Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010) .......................................................30

*Shemian* v. *Research in Motion Ltd.*,
    570 F. App'x 32 (2d Cir. 2014) ...............................................................27

*Singh* v. *Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) ......................................................................10

*St. Clair-Hibbard* v. *Am. Fin. Tr., Inc.*,
    2019 WL 4601720 (S.D.N.Y. Sept. 23, 2019), *aff'd*, 812 F. App'x 36
    (2d Cir. 2020).........................................................................................31

*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litig.*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011) .......................................................29

*Steamfitters' Indus. Pension Fund* v. *Endo Int'l PLC*,
    771 F. App'x 494 (2d Cir. 2019) ..............................................................23

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 147 (2d Cir. 2021) ....................................................................18

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................25

*Walsh* v. *Rigas*,
    2019 WL 294798 (S.D.N.Y. Jan. 23, 2019) .............................................25

*Wyche* v. *Advanced Drainage Sys., Inc.*,
    2017 WL 971805 (S.D.N.Y. Mar. 10, 2017), *aff'd*, 710 F. App'x 471
    (2d Cir. 2017).........................................................................................26

**Statutes**

15 U.S.C. § 78u-4 *et seq.* .................................................................................10

Securities Act of 1933 ..............................................................................*passim*

Securities Exchange Act of 1934.............................................................*passim*

**Regulations**

17 C.F.R. §229.105............................................................................................24

17 C.F.R. § 229.303 ..........................................................................................23

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................................10

**Other Authorities**

Derrick Bryson Taylor, *A Timeline of the Coronavirus Pandemic*, N.Y.
TIMES (Mar. 17, 2021), https://www.nytimes.com/article/coronavirus-
timeline.html ......................................................................................................14

DEUTSCHE WELLE (Apr. 14, 2020), https://www.dw.com/en/coronavirus-
what-are-the-lockdown-measures-across-europe/a-52905137; ...................7

Shayna Jacobs et al., *Coronavirus in New York: Cuomo Orders Shutdown
of All Nonessential Businesses*, WASH. POST (Mar. 20, 2020),
https://www.washingtonpost.com/national-security/coronavirus-new-
york-shutdown-cuomo/2020/03/20/ce124798-6aca-11ea-abef-
020f086a3fab_story.html ...............................................................................7

Defendants Casper Sleep Inc. ("Casper"), Philip Krim, Gregory Macfarlane, Neil Parikh (the "Officer Defendants"), Diane Irvine, Anthony Florence, Jack Lazar, Benjamin Lerer, Karen Katz, and Dani Reiss (the "Director Defendants," and with Casper and Officer Defendants the "Casper Defendants") and Morgan Stanley & Co. LLC, Goldman Sachs & Co., LLC, Jefferies LLC, BofA Securities, Inc., UBS Securities LLC, Citigroup Global Markets Inc., Piper Sandler & Co., and Guggenheim Securities, LLC (the "Underwriter Defendants" and with the Casper Defendants, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Complaint, dated June 30, 2021 (the "Complaint"), filed by Lead Plaintiff Saleh Doron Gahtan ("Plaintiff").[1]

## PRELIMINARY STATEMENT

This securities class action arises from the initial public offering ("IPO") of Casper in February 2020. Plaintiff, who purports to be a Casper shareholder, alleges that Casper made material misrepresentations in the Registration Statement issued to investors, in violation of Sections 11 and 15 of the Securities Act of 1933 (the "'33 Act"), as well as Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "'34 Act").

The Complaint falls woefully short of pleading any allegations supporting such claims. Plaintiff fails to plead anything more than that Casper's stock price declined in the quarter following the IPO as Casper—like many other companies—grappled with the COVID-19 pandemic (which the Complaint totally ignores) and addressed other post-IPO adverse

---

[1] The only claim brought against the Underwriter Defendants is for alleged violations of Section 11 of the Securities Act of 1933. As such, the Underwriter Defendants join in arguments related to that claim. Furthermore, as it relates to the Underwriter Defendants, the Complaint makes no detailed allegations that the Underwriter Defendants did anything wrong except serve as the underwriters for the Registration Statement in connection with the Casper initial public offering, and undertake duties consistent with that role.

developments that had been transparently disclosed as risks of conducting Casper's business. Plaintiff's opportunistic attempt to plead securities fraud should be flatly rejected.

Plaintiff's securities law claims are defective for a number of reasons:

*First*, Plaintiff has failed to plead a materially false statement, which is required under both the '33 Act and '34 Act. Plaintiff contends Casper made false and misleading statements about (1) profits and profitability trends, (2) Casper's distribution network, (3) pricing and promotional strategies, and (4) Casper's growth trends. But Plaintiff does not identify ***any*** material false statements on any of these subjects in the offering materials that were actually false *at the time of the IPO* in early February 2020:

- Casper transparently disclosed that it was not profitable, including by disclosing its losses for 2017 and 2018, and by estimating its losses for 2019. Plaintiff does not contend that any of Casper's historical financial information was incorrect. That Casper's losses accelerated in 1Q20 as the global pandemic took hold certainly does not render false its earlier financial results. As courts within this Circuit have repeatedly held, an accurate financial report does not become misleading simply because an issuer later experiences a downturn.

- Casper accurately disclosed that its distribution network relied on third-parties, and warned that disputes with these parties could have adverse consequences. That facts giving rise to a dispute with a logistics provider (FedEx), as well as the dispute itself, arose *after the IPO*, resulting in a temporary charge to earnings in 1Q20 (with expected improvement to margins in the next quarter). Moreover, Casper expressly warned that disputes with third-party distribution partners—the very risk that came to pass—could have a negative impact on its financial performance. Casper thus did not make any false statements about its reliance on a distribution network simply because it later had a dispute with a single logistics provider.

- Casper accurately disclosed that it may discount old inventory, particularly when (as here) Casper launched a new product intended to generate higher margins. That Casper engaged in such discounting during 1Q20, after the IPO, resulting temporarily in narrower margins that improved later in 2020, is entirely consistent with its earlier disclosures, and certainly does not render false Casper's general statements that it takes steps to optimize pricing.

- Casper spoke optimistically about its plans for future growth, while warning that its plans may not be realized. That, in March 2020, Casper was unexpectedly forced to curtail growth, close stores, and furlough employees in order to cut costs

and preserve cash as the unexpected and devastating COVID-19 pandemic spread to its sales territories does not render false Casper's earlier statements of optimism about growth and expansion prior to the onset of the pandemic.

For these reasons and others addressed below, the Complaint fails to allege any material false statement in the Registration Statement or otherwise, requiring dismissal of all '33 Act and '34 Act claims against all Defendants.  (*See infra* Part I.)

*Second*, the Complaint does not plead the required strong inference of fraudulent intent, or scienter, as required under Section 10(b).  In particular, the Complaint does not identify ***any*** motive for Casper or the Officer Defendants to defraud shareholders.  The desire to launch a successful IPO is a generic corporate motive, and does not plead scienter in this Circuit.  Nor does the Complaint plead conscious disregard or recklessness.  While Plaintiff purports to rely on a handful of confidential witnesses ("CWs"), none of the CWs allege that the Officer Defendants had private knowledge of facts that were inconsistent with their public statements.  Nor could they: of the seven CWs, three were no longer employed by Casper at the time of the IPO; five were store-level or regional level employees that did not report to the Officer Defendants; and the only CW who was employed at the time of the IPO and reported directly to an Officer Defendant (FE7) (i) does not claim to have been involved in the IPO and (ii) did not contradict any statement contained in the Registration Statement.  The failure to plead a strong inference of scienter is thus an additional basis to dismiss the '34 Act claims against Casper and the Officer Defendants.  (*See infra* Parts II and IV.)

*Finally*, the Complaint should be dismissed for failure to plead loss causation.  Plaintiff is required to allege that his purported stock drop losses were caused by a corrective disclosure of the alleged misstatements.  Because the alleged corrective disclosure on May 12, 2020 did not correct any prior statement—but rather provided new information for 1Q20 about events that

post-dated the IPO—Plaintiff cannot as a matter of law establish loss causation.  (*See infra* Part III.)

For these and other reasons addressed more fully below, the Complaint does not state a claim and should be dismissed in its entirety with prejudice.

## BACKGROUND

**A.      Factual Background**

1.      Casper's Initial Public Offering

Founded in 2014, Casper is a New York-based company that develops and sells mattresses and other sleep-related products and services.  (Compl. ¶¶ 15, 35; Ex. 1 ("RS")[2] at 1.) Casper had experienced large growth over the past six years prior to the IPO.  (Compl. ¶ 2; RS at 2, 4–7.)  To grow its business, Casper invested significantly in its expansion and marketing strategy, including by investing over $422 million in marketing between 2016 and 2019 (RS at 11–12.)  As a result, although Casper generated millions of dollars in revenue, which increased each year, it had yet to turn a profit.  (RS at 22.)

In connection with the IPO, Casper's lack of profitability was clearly disclosed in the Registration Statement.  For example, Casper reported that:

- In 2017, Casper's revenue was approximately $250 million, but its **total loss** was approximately **$73 million**.  (RS at 22.)

- In 2018, Casper's revenue was approximately $357 million, but its **total loss** was **$93 million**.  (RS at 22.)

Nevertheless, certain aspects of Casper's business were profitable based on certain disclosed metrics.  For example, retail stores that had been open for a year or more were "four-wall

---

[2]      The Court may consider in their entirety the documents cited in the Complaint, including the Registration Statement and other filings.  *See, e.g.*, *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (considering documents "in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing the suit.").

profitable," which represented "gross profit, less operating expenses . . . for each store."  (RS at 10; Compl. ¶ 80.)  Regarding the e-commerce channel, Casper disclosed "'first purchase profitable' e-commerce economics" from 2017 through September 30, 2019, which represents "gross profit dollars, less marketing dollars, over a specific time period."  (RS at 10; Compl. ¶ 80.)

In January 2020, Casper filed its Registration Statement with the Securities and Exchange Commission ("SEC").  (Compl. ¶ 84.)  The Registration Statement was effective as of February 5, 2020.  (*Id.*)  A Prospectus was then filed on February 7, 2020.  (*Id.*)  The Registration Statement disclosed that, while revenue was growing, Casper remained unprofitable.  (RS at 15.) In addition to its historical performance for the years 2017, 2018, and the first three quarters of 2019, Casper provided an estimate of its preliminary year-end 2019 results, estimating revenue of between $437.3 million and $441.3 million (RS at 14), and **net loss of between $96.4 million and $91.4 million**.  (RS at 15.)  No financial forecasts or guidance were provided for the year 2020 in the Registration Statement.

Casper also highlighted the risks associated with investing, providing over 40 pages of detailed risk disclosures.  (RS 26–68.)  Many of those disclosed risks relate to the alleged misstatements asserted by Plaintiff in this case:

**Risks of Operating Losses and Negative Cash Flow**.  Casper clearly cautioned investors about its history of operating losses and risks to future performance.  For example:

- "[W]e have a ***history of losses and expect to have operating losses and negative cash flow*** as we continue to expand our business."  (RS at 16 (emphasis added).)

- "[I]f we do not successfully implement our future retail store expansion, ***our growth and profitability could be harmed***."  (RS at 16 (emphasis added).)

- "***[I]f we are unable to successfully implement our growth strategies*** related to launching new products, it could have ***a material adverse effect on our business***, financial condition, and results of operations."  (RS at 16 (emphasis added).)

- "[W]e have a limited operating history and, as a result, ***our past results may not be indicative of future operating performance***." (RS at 16 (emphasis added).)

- "[O]ne of our ***key strategic initiatives is to expand our retail presence.*** If we are not able to effectively expand within this channel, ***this could adversely impact our ability to grow our market share and build our brand strength*** . . . ." (RS at 36 (emphasis added).)

- "***Our plans for international expansion may not be successful***." (RS at 47 (emphasis added).)

    **Risks of Reliance on Third-Party Manufacturers and Distributors**. Casper also

disclosed the risks that it relied upon third-party manufacturers and distributors to produce and

deliver its products, which could cause Casper to experience additional costs:

- "Our business depends on our ability to source and distribute products in a timely manner, and ***we rely on third-party manufacturers, distributors, and distribution centers*** to do so . . . *[D]isagreements with such distributors could require or result in costly and time-consuming litigation or arbitration*. Failure to timely and effectively obtain our products may result in increased shipping costs . . . which ***could negatively impact our results of operations or otherwise harm our business***." (RS at 40 (emphasis added).)

- "***[I]f we need to replace an existing manufacturer*** . . . we may be unable to supplement or replace our manufacturing capacity on a timely basis or on terms that are acceptable to us, which ***may increase our costs, reduce our margins, and harm our ability to deliver our products on time.***" (RS at 35 (emphasis added).)

    **Risk of Discounting Inventory**. Casper disclosed that "[l]aunching new products or

updating existing products may also leave us with obsolete inventory that we may not be able to

sell or ***we may sell at significantly discounted prices***." (RS at 29 (emphasis added).)

    **Risk of Pandemic Outbreak**. Finally, Casper disclosed that the outbreak of an epidemic

could adversely affect its business, disclosing: "The occurrence of . . . ***epidemic outbreaks*** . . .

in certain regions where our retail stores, distribution centers and other facilities are located, or

where our manufacturers', suppliers' and retail partners' facilities are located, ***could adversely

affect our business and result in lower sales***." (RS at 58 (emphasis added).)

2. <u>The Unprecedented COVID-19 Pandemic</u>

On March 11, 2020, more than a month after Casper's IPO, the unprecedented outbreak of the novel coronavirus (COVID-19) was declared a global pandemic and lockdowns were imposed worldwide, including the closures of non-essential businesses. (Ex. 2 at 20.)[3] Casper responded swiftly to the COVID-19 pandemic, including by taking steps to protect its employees and preserve its cash position—all while keeping investors informed.

On March 19, Casper reported its fourth quarter and full-year 2019 results. (Ex. 3.) For full-year 2019, Casper disclosed total revenue of $439.3 million and net loss of $92.5 million, squarely within the estimates provided in the Registration Statement. (Ex. 3 at 71.) Casper also cautioned investors about negative COVID-related changes, including "changing consumer behavior" and "a slowdown in e-commerce and retail foot traffic, which will have a negative impact on our revenues." (Ex. 3 at 57–58.) Casper further noted that it had temporarily closed certain retail stores "in North America for an eleven-day period" due to COVID-19, and warned that a prolonged closure could materially, adversely impact Casper's revenue. (*Id.* at 58.)

On March 30, Casper announced additional measures to respond to the COVID-19 pandemic, including that it was extending the closure of all its retail stores in North America and was furloughing employees "until operations can safely and responsibly resume." (Ex. 4.)

On April 21, Casper announced that it would reduce its global workforce by 21% and close its European operations, which would result in more than $10 million in annualized savings. (Ex. 5.)

---

[3]   *See, e.g.*, *Coronavirus: What Are the Lockdown Measures Across Europe?*, DEUTSCHE WELLE (Apr. 14, 2020), https://www.dw.com/en/coronavirus-what-are-the-lockdown-measures-across-europe/a-52905137; Shayna Jacobs et al., *Coronavirus in New York: Cuomo Orders Shutdown of All Nonessential Businesses*, WASH. POST (Mar. 20, 2020), https://www.washingtonpost.com/national-security/coronavirus-new-york-shutdown-cuomo/2020/03/20/ce124798-6aca-11ea-abef-020f086a3fab_story.html.

3.    Casper Announces First Quarter 2020 Results

On May 12, 2020, Casper released its 1Q20 financial results—which Plaintiff contends

served as a correction of alleged misstatements in the Registration Statement from the IPO, even

though the Registration Statement contained no guidance regarding 1Q20 financial results.

Casper announced revenue of $113 million and net loss of $34.5 million, respectively

representing a decline of almost 11% in revenue and an increase in loss of 36% as compared to

the prior quarter.  (Ex. 3 at 30, 34; Ex. 2 at F-34.)  Casper disclosed that, due to COVID-19, the

temporary store closures in North America "impacted [Casper's] retail results in the first

quarter," particularly due to the "cessation in retail foot traffic."  (Ex. 2 at 30, 38.)  In addition to

noting the possibility of "constrained supply or slowed customer demand" attributable to

COVID-19, Casper warned that "the COVID-19 pandemic has impacted, and we expect will

continue to impact, our revenues, results of operations and financial condition."  (Ex. 2 at 20,

27–28.)  Further, in response to the pandemic, Casper was "reducing the number of planned

openings of new retail stores in 2020," and expected the "majority" of capital expenditures "to

occur in the first half of 2020" due to the pandemic.  (*Id.* at 27.)

Additionally, gross margins were negatively impacted by a temporary charge associated

with Casper's change in logistics provider (FedEx), as well as discounts offered to reduce

existing inventory in advance of its new mattress launch at the end of 1Q20.  (Ex. 2 at 31; Ex. 6

at 34.)  Both the change in logistics provider and new product launch were predicted to improve

margins beginning in the second quarter.  (*Id.*)

Following release of its Q1 2020 earnings, Casper's share price declined $1.53 on

May 12, 2020—or about 20% from the previous day's close.  (Compl. ¶¶ 8, 105.)

### B. Procedural Background

Shortly after Casper announced its first quarter results, on June 5, 2020, a putative class action was filed in New York State Court, *In re Casper Sleep Inc. Sec. Litig.*, No. 652284/20 (the "State Action"), alleging violations of the '33 Act in connection with Casper's IPO. On June 19, 2020, the first putative class action was filed in this Court. (ECF No. 1.) On August 27 2020, Saleh Doron Gahtan was appointed lead plaintiff. Plaintiff filed the First Amended Complaint on October 27, 2020 (ECF No. 16), which asserted claims under both the '33 Act and the '34 Act.

The federal and state court cases were predicated on the same alleged misstatements from the Registration Statement and asserted claims against the same Defendants by an identical putative class. (ECF Nos. 21, 22.) (The alleged misstatements in the Registration Statement are listed by category in Exhibit 7.)

On December 28, 2020, Defendants moved to dismiss the first-filed State Action. (No. 652284/20; NYSCEF 27, 28.) Instead of opposing the motion to dismiss, the state plaintiffs tacitly conceded the insufficiency of the claims, and agreed voluntarily to dismiss. (NYSCEF 41.) The dismissal of the State Action was effective on May 3, 2021. (NYSCEF 49.) Defendants requested that the Plaintiff here dismiss as well, but Plaintiff declined.

On June 16, 2021, a court conference was held before Magistrate Judge Levy. At the court conference, Defendants pressed Plaintiff for its best and final complaint because Plaintiff had the benefit of reviewing Defendants' motion to dismiss in the State Action. Plaintiff requested to amend its complaint, and filed the Second Amended Complaint ("Compl.") on June 30, 2021. (ECF No. 29.) The Second Amended Complaint, however, relies on the same purported misstatements (Compl. ¶¶ 79–98) as its predecessor. Indeed, the Second Amended Complaint is essentially identical to the First Amended Complaint, and again brings the following claims: a Section 11 claim against all Defendants; a Section 15 claim against the

Individual Defendants; a Section 10(b) claim against Casper and the Officer Defendants; and a Section 20(a) claim against the Officer Defendants.

**ARGUMENT**

To state a claim under Section 10(b), the plaintiff must allege not only a materially false or misleading statement, but also scienter, reliance, and loss causation. *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005); *see also Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019); *Rombach* v. *Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004). Likewise, to state a claim under Section 11, a plaintiff must plead that the offering documents contained a materially misleading statement. *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010). A court may also dismiss a Section 11 claim where it is clear on the face of the pleading that causation cannot be established. *See, e.g.*, *Boluka Garment Co. Ltd.* v. *Canaan Inc.*, 2021 WL 2853284, *3–5 (S.D.N.Y. July 8, 2021).

Plaintiff must meet the heightened standard of Rule 9(b) for both the Section 10(b) claims and the Section 11 claims where, as here, the Section 11 claims are "premised on allegations of fraud." *Rombach*, 355 F.3d at 171. In order to satisfy Rule 9(b), Plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 170 (internal citation omitted). The Court must look at the offering document holistically and assess whether the document was misleading in its entirety. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 365–66. To plead a claim under Section 10(b), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 *et seq.*, also requires the Complaint to identify "each statement alleged to have been misleading," and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

## I. The Complaint Fails to Plead Any Materially Misleading Statements or Omissions, Requiring Dismissal of Both the '33 Act and '34 Act Claims.

### A. No Material Misstatements About Profits and Profitability Trends

Plaintiff cites various statements that Casper made regarding its profits and profitability trends that Plaintiff now contends are misleading. These statements include, for example, Casper's disclosures that certain existing stores are "four-wall profitable" (Compl. ¶ 87), that Casper "target[s] . . . a cash-on-cash payback period ranging from 18 to 24 months" for new retail stores, and that certain e-commerce sales are profitable, excluding certain marketing expenses. (Compl. ¶ 88.) Plaintiff also cites the Registration Statement's disclosures of historical profit margins over the prior eight quarters, which fluctuated between 42 and 51 percent. (Compl. ¶¶ 91, 92.) Plaintiff contends that these statements were false because—during the first quarter of 2020, after the onset of the COVID-19 pandemic, and nearly two months after the IPO closed—losses accelerated to $34.5 million. (Compl. ¶¶ 95(a), (c), (e), 102.)

There is a mismatch between the statements cited in the Complaint and the allegations pleaded by Plaintiff for why those statements were misleading because (1) the Complaint does not plead that any of Casper's statements about its historical financial performance were false; (2) Casper fully and transparently disclosed the risk of future unprofitability, that it was unprofitable to date, and risks to its profit margins; and (3) Plaintiff improperly relies upon events that post-dated the IPO in an effort to falsify statements about profitability prior to the IPO.

*First*, Plaintiff does not allege that any of Casper's statements were actually false. Casper disclosed its "history of losses," as well as Casper's "expect[ation] to have operating losses and negative cash flow as we continue to expand the business." (RS at 16.) Indeed, Casper explicitly advised investors in the Registration Statement that it experienced net losses of over

$73 million and $93 million in 2017 and 2018, respectively, and anticipated net loss in 2019 of $91.4 to 96.4 million, which estimate proved correct. *Supra* 4–7. Likewise, Casper disclosed the range of its historical profit margins, *supra* 11, and that certain segments of its business were profitable only excluding significant expenses. *Supra* 4–5. ***Plaintiff does not allege that any of this historical information was misstated, much less how it was misstated or whether any such misstatement was material.***

The CWs add nothing beyond what Casper already disclosed in the Registration Statement—namely, that "Casper was not a profitable company." (Compl. ¶ 45; *see also* Compl. ¶¶ 53, 55–56, 62, 66, 74 ("corroborat[ing]" the lack of profitability).) For example, FE3 stated that Casper was trying to improve its payback period for new stores to 8-to-10 months, but FE3 confirms stores had previously paid back their costs in 18-to-24 months, which is exactly what the Registration Statement said. (Compl. ¶¶ 58, 88.) Likewise, CWs FE3, FE6, and FE7 observe only that Casper worked to improve its financial position in advance of its IPO—certainly an ubiquitous goal among private companies planning an IPO. (Compl. ¶¶ 58, 74, 78.) No CW contends that Casper's effort to improve its financial position resulted in any inaccuracies in its public filings.

Plaintiff appears to advance the theory that Casper's concededly ***accurate*** financial information is somehow rendered misleading by virtue of Casper's later 1Q20 performance. But the Registration Statement did not include any financial guidance for 1Q20. To the contrary, Casper expressly warned that, given its limited operating history, its past results may not be indicative of future performance. Moreover, accurate financial information does not become false simply because the company later experiences a decline. This theory has been repeatedly rejected by courts in this Circuit considering similar arguments. "Accurate statements about past

performance are self evidently not actionable." *Nadoff* v. *Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004); *see also In re Henry Schein Inc. Sec. Litig.*, 2019 WL 8638851, at *16 (E.D.N.Y. Sept. 27, 2019) (Brodie, J.) ("Because . . . the gross margin percentage reported in Schein's SEC filings was accurate historical data, Plaintiff has failed to state a claim.") (internal citations omitted); *DeMaria* v. *Andersen*, 318 F.3d 170, 181 (2d Cir. 2003) (rejecting argument that historic loss results were misstated because the prospectus "plainly stated . . . [the] history of net losses"); *Adair* v. *Kaye Kotts Assocs., Inc.*, 1998 WL 142353, at *5 (S.D.N.Y. Mar. 27, 1998) (Sotomayor, J.) ("An accurate report simply does not become misleading because an issuer suffers a material loss subsequent to the period covered by the report."). For these reasons, none of the statements made about Casper's historical profitability or profit margins are materially misleading simply because Casper purportedly underperformed in 1Q20.

*Second*, because Casper warned of the very risk that came to pass, no misstatement claim is pleaded. Casper expressly warned that it could experience declining profitability in the future, and Casper made no promises about future profitability. (*See* RS at 31 (warning of expected operating losses and negative cash flow as business expanded), 32 (warning Casper could remain unprofitable in the future).) Because Casper "disclose[d] the primary omission alleged by [Plaintiff]," Plaintiff cannot state a claim. *In re ProShares Trust II Sec. Litig.*, 2020 WL 71007, at *7 (S.D.N.Y. Jan. 3, 2020); *see also In re Focus Media*, 701 F. Supp. 2d 534, 541 (S.D.N.Y. 2010) (finding that the warning "our gross margin may fluctuate" adequately conveyed the risk that "the gross margin could be lower than that suggested by the guidance"); *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y. 2000) (finding when investors were told company "has incurred significant losses and expects to continue to incur significant losses" no investor could be misled about risk of losses).

13

*Third*, the Complaint fails to plead any claim based on statements about profitability because it contains no well-pleaded allegation that the 1Q20 results were known at the time of the IPO.  The IPO took place on February 6, 2020—approximately one month after the start of the first quarter.  The quarter closed in March 31, 2020, so nearly two months of financial performance **had not even yet happened** at the time of the IPO.  Further, when the IPO occurred, the virus had not even been named "COVID-19," no COVID-19 deaths had been reported in the United States, COVID-19 had not been declared a pandemic, and cities in the United States had not begun implementing stay-at-home orders.[4]  The COVID-19 implications were simply not known at the time of the IPO.  Nor does Plaintiff plead any factual basis, through any of the CWs or otherwise, to contend that Casper knew at the time of the IPO how it would perform in 1Q20.

Plaintiff cannot invoke hindsight or rely on subsequent events to contend that Casper should have made different disclosures at the time of its February IPO.  *Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 345 (S.D.N.Y. 2012) ("With the benefit of hindsight, Plaintiffs cannot establish falsity by simply pointing to . . . [certain facts] and making "conclusory allegations that . . . [the company's] earlier statements were . . . necessarily false."); *Panther Partners, Inc.* v. *Ikanos Communications, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) ("[C]ourts may not employ 20/20 hindsight") (internal citation omitted).

But hindsight is precisely what Plaintiff attempts to invoke here.  In paragraph 95, for example, Plaintiff conclusorily alleges that Casper's ability to achieve profitability, among other things, was misrepresented in the Registration Statement by virtue of Casper failing to disclose certain "adverse facts that existed at the time of the IPO[.]"  (These alleged adverse facts purportedly include that Casper's profit margins were declining, it was changing an important

---

[4]     Derrick Bryson Taylor, *A Timeline of the Coronavirus Pandemic*, N.Y. TIMES (Mar. 17, 2021), https://www.nytimes.com/article/coronavirus-timeline.html.

distribution partner, it was selling outdated inventory at a discount, it was suffering accelerating losses, and its core operations were not profitable.)  But Plaintiff does not offer factual allegations showing that such information was known at the time of the IPO, and the Court need not credit this allegation as true upon a motion to dismiss, as it is conclusory and unsupported by factual assertions.  *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 526 (S.D.N.Y. 2015).

For these three independent reasons,[5] the Complaint fails to plead any materially false statements about Casper's profitability and profit trends.

## B.     No Material Misstatements About Distribution Network

Plaintiff next alleges that Casper made material misstatements about its distribution network, including statements like "[o]ur supply chain is instrumental to both supporting growth and improving business performance" (Compl. ¶ 91), the supply chain is comprised of "highly qualified" partners (Compl. ¶ 94), and "[w]e believe our domestic and international providers have sufficient capacity to meet our future needs." (Compl. ¶ 94.)  Plaintiff claims that these statements are false because "Casper was changing an important distribution partner," which caused it to have an additional expense during 1Q20.  (Compl. ¶ 95(b).)

Plaintiff's claim fails because (1) none of Casper's statements about its distribution network are alleged to be false; (2) Casper expressly warned of the potential negative impact of changing a logistics partner; (3) the logistics partner dispute (with FedEx), and facts giving rise to it, occurred after the IPO; and (4) the alleged misstatements are immaterial as a matter of law.

*First*, none of the statements identified by the Plaintiff are rendered misleading by the change in a single logistics partner.  The alleged misstatements merely disclosed to investors that Casper relied upon a network of third-parties to help produce, distribute, and store its products.

---

[5] Certain of the alleged misstatements about profitability are also inactionable puffery, as shown on Exhibit 7, and thus also fail for the reasons described *infra* 17, 20, 22.

(Compl. ¶¶ 91, 94.) Those statements are not false: Casper did, in fact, rely upon third-parties to distribute its products. The fact that Casper took a temporary charge during the first quarter to change a logistics partner, which was expected "to reduce transportation costs beginning in the second quarter," does not render false any of the earlier statements about Casper's overall network. (Ex. 8 at 7.) Casper's supply chain is still "instrumental to both supporting growth and improving business performance" (Compl. ¶ 91); Casper still manages a global supply of "highly qualified" partners (Compl. ¶ 94); and Casper is still "work[ing] with multiple third-party logistics providers" (Compl. ¶ 94), after changing one partner. These general statements do not become misleading simply because a specific event occurred relating to one logistics partner. *In re ITT Educ. Servs. Inc. Sec. Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) ("[T]he alleged omissions must be sufficiently connected to Defendants' existing disclosures to make those public statements misleading.") (internal quotations omitted); *see generally Goldman Sachs Grp. Inc.* v. *Arkansas Teacher Retirement Sys.*, 141 S. Ct. 1951, 1961 (2021) ("[I]t is less likely that [a] specific disclosure actually corrected [a] generic misrepresentation.").

*Second*, the risk of a change of a distribution partner was expressly disclosed in the risk section of the Registration Statement, which stated:

> Our business depends on our ability to source and distribute products in a timely manner, and ***we rely on third-party manufacturers, distributors, and distribution centers*** to do so . . . ***[D]isagreements with such distributors could require or result in costly and time-consuming litigation or arbitration.*** Failure to timely and effectively obtain our products may result in increased shipping costs . . . which ***could negatively impact our results of operations or otherwise harm our business***."

(RS at 40 (emphasis added); *see also supra* 6; RS at 35, 36, 38 (additional risk disclosures).) Casper clearly warned that it may have disputes with its distributors, which could harm its business. (*Id.*) Simply put, the very risk that materialized was expressly disclosed. (RS at 35,

36, 38, 40.)  *See In re Francesca's Hold. Corp. Sec. Litig.*, 2015 WL 1600464, at \*12 (S.D.N.Y.

Mar. 31, 2015) (holding that when investors were warned of the serious risk of "deterioration or

change . . . in vendor relationships" investors could not be "misled into believing the terms . . .

would continue indefinitely").

*Third*, the Complaint again relies improperly on events that post-dated the IPO.

Specifically, Plaintiff does not offer any well-pleaded factual allegations that Casper changed its

logistics provider or incurred that charge **before the IPO**.  To the contrary, the Complaint lacks

any facts showing why negotiations began, when negotiations began, when the negotiations

allegedly broke down, or when a new provider was selected.  (Compl. ¶ 95(b).)  Specifically,

none of the CWs, even the "supply chain business analyst," (Compl. ¶ 60), provides the required

well-pleaded facts in support of this claim.

Plaintiff does not plead these facts because they cannot:  based on the complaint in the

lawsuit that FedEx filed publicly against Casper, these developments post-date the IPO by nearly

two months.  (Ex. 10 at ¶¶ 6, 10, 11.)[6]  Thus, the change in logistics provider occurred *after* the

IPO and could not render any statements misleading as of the IPO.

*Fourth*, the statements regarding Casper's logistics partners were immaterial as a matter

of law.  For example, Casper stated that its "supply chain is instrumental to . . . supporting

growth and improving business performance," "Casper has invested ahead of our growth in . . .

international distribution," and that Casper "intend[s] to continue to drive continued operational

improvement."  (RS at 14, 85.)  These types of vague statements about Casper's distribution

---

[6]  As a publicly filed court document, the Court can take judicial notice of the Complaint.  *See e.g.*, *Int'l Star
Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*, 146 F. 3d 66, 70 (2d Cir. 1998) ("A court may take
judicial notice of a document filed in another court not for the truth of the matters asserted in the other
litigation, but rather to establish the fact of such litigation and related filings."); *see also Lefkowitz* v. *Bank of N.
Y.*, 676 F. Supp. 2d 229, 249 (S.D.N.Y. 2009) ("Judicial notice may encompass the status of other lawsuits,
including [those] in other courts, and the substance of papers filed in those actions.").

network are classic puffery, and are immaterial as a matter of law. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 147, 173 (2d Cir. 2021) ("[A] generally optimistic view of the state of business partnerships and the synergies of [a company's] business model cannot support claims of securities fraud"); *City of Warren Police and Fire Retirement Sys.* v. *Foot Locker, Inc.*, 412 F. Supp. 3d 206, 223–24 (E.D.N.Y. 2019) (finding defendant's "broad characterizations" of its "vendor relationships as 'strong,' 'positive,' and 'great'" were puffery).

For each of these reasons, the Complaint does not state a cause of action as a matter of law with respect to Casper's statements about its distribution partners.

## C. No Material Misstatement About Pricing and Promotional Strategies

Plaintiff also contends that Casper made misstatements about its pricing and promotional strategies. The challenged statements themselves simply state that Casper "intend[s] to continue building a data-based understanding of price elasticity, dynamics, promotional strategies and other price management tools to drive optimized pricing" (Compl. ¶ 91), that Casper has "identified several opportunities . . . to reduce return rates and increase customer satisfaction" (Compl. ¶ 91), and that Casper "believe[s] that with larger budgets and deeper experience, we will benefit from lower media rates and increased data that will improve our proprietary models, multi-channel synergies . . . purchase occasions . . . , and purchases from previous repeat consumers." (Compl. ¶ 91.) Plaintiff alleges that these statements were false because Casper engaged in discounting of old inventory in 1Q20, in anticipation of a new higher margin mattress launch at the end of that quarter. (Compl. ¶ 95(c).)

Plaintiff's claim fails because (1) the Complaint does not plead that Casper's statements about pricing strategy were actually false; (2) Casper expressly warned investors in the Registration Statement that it would offer discounts to clear out old inventory; (3) the discounting occurred post-IPO; and (4) the challenged statements are immaterial.

18

*First*, Casper's statements are not alleged to be false. Casper's decision to discount inventory is entirely consistent with its disclosures that it had ongoing efforts to understand and optimize prices. Nowhere in the Complaint does Plaintiff plead facts suggesting that Casper did not, for example, "continue building a data-based understanding of price elasticity, dynamics, promotion strategies and other price management tools to drive optimized pricing." (Compl. ¶ 91.) Discounting old inventory in favor of a "new lineup" with "meaningfully higher projected gross margins" does not falsify Casper's assertion that it performed analysis of its customers and promotions. (Ex. 8 at 7.) To the contrary, discounting itself is a way of optimizing pricing based on current demand.

*Second*, Casper's statements about optimizing pricing are not false because Casper explicitly warned investors that "[l]aunching new products or updating existing products may also leave us with obsolete inventory that we may not be able to sell or we may sell it at *significantly discounted prices*." (RS at 29 (emphasis added).) After explicitly being warned that Casper may "significantly" discount old inventory, there is no supportable claim that investors were misled about the potential for discounting in 1Q20—particularly where, as here, the discounts coincided with the launch of new higher margin products. The allegations by the CWs simply report that Casper discounted mattresses, consistent with Casper's own disclosures. (Compl. ¶¶ 47–48, 53, 59, 66, 71–73.)

*Third*, Plaintiff again conflates events that occurred after the IPO with those that were known at the time of the IPO. Casper launched its new mattress collection "at the end of the first quarter of 2020." (Ex. 8 at 7.) As a result of the launch, Casper offered "discounts associated with clearance sales of prior models." (*Id.*) The Complaint does not plead that Casper knew, as

of early February, how much it would need to discount over the next two months, much less how margins would ultimately be impacted for the first quarter (which had just begun).

*Fourth*, the statements about pricing optimization are general statements of corporate optimism, which are not actionable as a matter of law. *See Ladmen Partners, Inc.* v. *Globalstar, Inc.*, 2008 WL 4449280, at *13 (S.D.N.Y. Sept. 30, 2008) (finding statements about a company's belief it will gain new customers, will be commercially viable, and will provide an acceptable service were "expressions of corporate optimism couched in subjective terms").

For each of these reasons, the Complaint fails to identify any materially false statements about pricing optimization or the risk of discounting.

### D.  No Material Misstatements About Growth

Finally, Plaintiff contends that Casper made misleading statements in the Registration Statement about its growth plans.  With respect to growth plans, Plaintiff alleges Casper made misstatements by saying things like "[w]e complement our strong online presence by expanding our physical retail footprint" (Compl. ¶ 90), "[w]e plan to continue the rollout of new Casper retail stores to strengthen our footprint in existing cities" (Compl. ¶ 90), "[w]e have achieved rapid growth" (Compl. ¶ 92), and "[w]e envision expanding our total international footprint to more than 20 countries."  (Compl. ¶ 93.)  Plaintiff contends that all of these statements are shown to be false by virtue of Casper's first quarter cost-reduction measures and acceleration of cash outflows.  (Compl. ¶¶ 95, 101.)

These claims are untenable because (1) the Complaint does not plead that any of the historic information about Casper's growth was inaccurate; (2) the Registration Statement expressly warned of the risk that the expansion plans would not be realized; (3) the Complaint relies on post-IPO events, particularly the onset of COVID-19, to plead that the Registration

Statement is false; and (4) the alleged misstatements are statements of optimism and puffery and are immaterial.

*First*, Plaintiff does not contend that Casper made any false statement about the experienced rapid growth from 2017 to 2019. While the growth plans and financial position shrank in 1Q20 following the onset of the COVID-19 pandemic, that does not make any of the historical information inaccurate. *See supra* 7–8. Similarly, while the CWs claim that the United States was the key market (not international), that is consistent with the disclosures in the Registration Statement. For example, while FE1 noted potential obstacles to expansion in Asia (Compl. ¶ 49), the Registration Statement only identified business "in seven countries," all in North America and Europe (RS at 2, 14), with the bulk of the stores depicted in North America. (RS at 144.) Similarly, FE4 and FE5's view that the U.S. market was the most important for Casper (Compl. ¶¶ 64, 69), is consistent with the reported revenue for North America that was over *ten* times larger than the revenue for Europe. (RS at F-19.) While Casper was in an earlier stage of growth with its less profitable international operations, and hoped and planned to expand internationally, the depiction of its existing international operations is not alleged to be inaccurate.

*Second*, in the Registration Statement, Casper highlighted the risks that could prevent it from achieving its growth plans. Casper warned it may not be able to implement its strategic initiatives; the initiatives may not lead to growth (RS at 36); "may not achieve the growth potential" it expected (RS at 32); its plans for international expansion may not succeed, (RS at 47); and its growth strategy was premised on expanding retail "which presents risks and challenges." (RS at 37.) Casper repeatedly warned that it may not achieve its planned growth,

and there cannot be any false or misleading statements based on Casper's failure to meet all of its aspirations in the single quarter following the IPO.

*Third*, while the Complaint cites Casper's announcement on April 21, 2020 that "it was taking significant actions to improve its cash position and business model" as evidence of the Company's "ballooning losses and deteriorating cash position" shortly after the IPO, it simply glosses over the fact—as the very announcement cited by Plaintiff makes clear—that the changes in the growth plan and cash conservation were directly attributable to COVID-19. (Compl. ¶ 101.) As discussed above, *supra* 7–8, Casper implemented aggressive cost-cutting measures, including store closures and a pullback in expansion, to conserve cash in the face of COVID-19. At the time of the IPO, Casper certainly could not have known how it would need to adjust its strategy to respond to the unprecedented and not yet declared pandemic. This is yet another example of Plaintiff assuming (impossibly) that post-IPO developments relating to COVID-19 were known at the time of the IPO.

*Fourth*, the challenged statements are pure puffery. Indeed, it is difficult to conceive of a more classic example of puffery than "the most exciting opportunities for Casper's growth story lie ahead." (Compl. ¶ 82.) Courts routinely find similar statements to be immaterial as a matter of law. *See Lachman* v. *Revlon, Inc.*, 487 F. Supp. 3d 111,130–31 (E.D.N.Y. 2020) (statement that company had "significant opportunities for improvements in operational excellence" was non-actionable puffery); *Okla. Police Pension Fund & Ret. Sys.* v. *Teligent, Inc.*, 2020 WL 3268531, at *13 (S.D.N.Y. June 17, 2020) (rejecting claim based on statement that company was "continuing to grow its business"); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 398 (S.D.N.Y. 2006) (holding that alleged misstatements that company "expect[ed] to see continued momentum in [its business] going into the fourth quarter" were puffery).

For each of these reasons, the Complaint fails to state a claim for the alleged misstatements about growth plans.

### E. No Duty to Disclose Under Items 303 and 105

Lacking any alleged misstatements in the offering materials to support a claim for securities fraud, Plaintiff attempts to manufacture an affirmative duty to disclose under Items 303 and 105 of Regulation S-K. These allegations also fail. Item 303 requires companies to disclose any "known trends or uncertainties" that are "reasonably expect[ed]" to have a material impact on the business. 17 C.F.R. § 229.303. Plaintiff's reliance on Item 303 fails for three reasons: *First*, Defendants did not violate Item 303 because the events that impacted the business in the first quarter—i.e., the COVID-19 pandemic and the resulting decline in performance, the dispute with a logistics partner, and the discounting of existing inventory—did not exist at the time of the IPO. Therefore, these events did not need to, and could not, be disclosed. *Second*, Item 303 does not require a company to disclose internal and propriety business decisions or strategies, like changing a partner or discounting inventory. *See Steamfitters' Indus. Pension Fund* v. *Endo Int'l PLC*, 771 F. App'x 494, 498 (2d Cir. 2019) (stating that "business strategy decisions" to change a business upon an acquisition was "not the type of disclosure Item 303 requires"). *Third*, even if the events were trends, not business decisions, or occurred prior to the IPO, events occurring "within a two month period of time do not establish a 'trend' for purposes of the disclos[ures] required by Item 303"—which means that Item 303 cannot, as a matter of law, be the basis for any claim here. *Nguyen* v. *MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017).

In any event, the Item 303 claim also fails because Casper **did** disclose known uncertainties—providing extensive risk disclosures about the potential implications of further losses and lack of profitability, failures of Casper's growth strategy, disputes with distributors,

and an epidemic. *See In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *15–16 (N.D. Cal. Apr. 28, 2020) (dismissing claims based on Item 303 violations when the company "did disclose the exact risks that Plaintiffs argue were not disclosed").

Plaintiff also cites Item 105, which requires companies to disclose "the material factors that make an investment . . . speculative or risky." 17 C.F.R. §229.105. As discussed above, in Casper's 40 pages of risk factors, the risks were extensively discussed (RS at 26–69)—including the risks that ultimately materialized in 1Q20. Plaintiff thus cannot credibly allege that Casper did not comply with Item 105. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 2020 WL 5632901, at *5 (S.D.N.Y. Sept. 21, 2020) (denying reconsideration on an alleged Item 105 violation where disclosure "addresses the very issue" allegedly not disclosed).

### F.     No Additional Misstatements Are Pleaded Under Section 10(b)

The Section 10(b) claim against Casper and the Officer Defendants is premised on the very same alleged misstatements as the Section 11 claim, and thus is subject to dismissal for the reasons articulated *supra* Part I.A–D. Plaintiff cites only one additional misstatement as the basis for its Section 10(b) claim other than those in the Registration Statement: the statement by Defendant Krim in paragraph 99 to the effect that there was an IPO in the first quarter raising $88 million and that Casper ended 1Q20 with $116 million in cash. (Compl. ¶¶ 99–100.) This statement, however, is not alleged to be false (Casper did, as Plaintiff concedes, conduct an IPO and raise cash), and thus cannot, as a matter of law, serve as the basis for any claim.

In addition, Plaintiff incorrectly claims the statement was made during the class period in March 19, 2020, when actually the statement was made on May 12, 2020. (*Compare* Ex. 9 *with* Ex. 8.) May 12 is the date at the conclusion of the putative class period when the truth purportedly was revealed and the stock price dropped. (Compl. ¶ 105.) A statement made on May 12 thus cannot adequately allege loss causation because statements made on May 12

allegedly caused the stock to drop (not artificially increase).  *Lentell*, 396 F.3d at 173.  Further,

Plaintiff did not purchase any shares after May 12, so he could not possibly have purchased at

artificially inflated prices, much less have relied on the alleged misstatement that day.  *See, e.g.*,

*Walsh* v. *Rigas*, 2019 WL 294798, at *7 (S.D.N.Y. Jan. 23, 2019) (plaintiff has a "manifest

inability to plead reliance" on misstatements and omissions made ***after*** investment).

## II.     The Complaint Fails to Allege a Strong Inference of Scienter, Requiring Dismissal of the '34 Act Claims

The Section 10(b) claim must also be dismissed for failure to plead a strong inference of

scienter as to any Defendant.  In order to plead a strong inference of scienter, Plaintiff needs to

allege facts that lead to an inference that is "cogent and at least as compelling" as any non-

fraudulent intent.  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

The strong inference of scienter must be alleged for *each* Defendant, including the individual

officers.  *See, e.g.*, *Lau* v. *Opera Ltd.*, -- F. Supp. 3d --, 2021 WL 964642, at *10 (S.D.N.Y. Mar. 13,

2021).  Scienter can be pleaded either through allegations showing "motive and opportunity to

commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness."

*ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187,

198 (2d Cir. 2009).

### A.     Plaintiff Fails to Allege Motive and Opportunity

In order to allege motive to commit fraud, the Plaintiff needs to allege that the defendants

"benefitted in a concrete and personal way from the purported fraud."  *Novak* v. *Kasaks*,

216 F.3d 300, 309–311 (2d Cir. 2000).  Generic motives, "such as the desire for the corporation

to appear profitable and the desire to keep stock prices high to increase officer compensation,"

that are common to most corporate officers are insufficient to allege motive as a matter of law.

*ECA*, 553 F.3d at 198 (citations omitted).

In this case, the Complaint identifies no motive to defraud.  While there are allegations that Casper aspired to launch a successful IPO, that is a desire that is common to any business and insufficient for motive.  *See, e.g.*, *Ramzan* v. *GDS Holdings Ltd.*, 2020 WL 1689772, at *4 (S.D.N.Y. Apr. 7, 2020) ("[A]ctively raising capital is a goal shared by all issuers and, without more, is insufficient to support an inference of *scienter*."); *Gregory* v. *ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d 372, 414 (S.D.N.Y. 2018) (holding defendants' desires to have a successful IPO and raise capital were "exactly the sort of generalized 'motives' that the courts in this District regularly reject as bases for inferring scienter"); *Wyche* v. *Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *12 (S.D.N.Y. Mar. 10, 2017) (rejecting alleged motive of "raising as much money as possible in connection with the IPO"), *aff'd*, 710 F. App'x 471 (2d Cir. 2017). The purported motive is further weakened by the lack of allegations that Officer Defendants profited personally, such as through stock sales that are suspicious in timing or amount.  *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 382 (E.D.N.Y. 2013) (finding no scienter where plaintiff failed to allege defendant sold shares during the class period); *In re eSpeed, Sec. Litig*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) ("[T]he dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period.").

The far more compelling inference from the pleaded facts is that the unanticipated and devastating COVID-19 pandemic caused Casper to alter its business plans shortly after its IPO, and that Casper addressed other developments in 1Q20 as they arose. (*See* Ex. 2 at 20; Ex. 3; Ex. 5.)  Plaintiff has failed to allege any motive for Defendants to lie to shareholders in the IPO, let alone a cogent or compelling inference.

### B.  Plaintiff Fails to Allege Conscious Misbehavior or Recklessness

The second avenue to allege scienter is through identifying conscious misbehavior or recklessness, but when there is no motive, the strength of the allegations must be

"correspondingly greater." *ECA*, 553 F.3d at 198–99. The Complaint must plead conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Shemian* v. *Research in Motion Ltd.*, 570 F. App'x 32, 35 (2d Cir. 2014).

The Complaint fails to satisfy this standard. While it relies on the CWs ostensibly to show that private information differed from public disclosures, the CW allegations do not support that proposition. To the contrary, the Complaint barely mentions the Officer Defendants who purportedly carried out the fraud (or any other employee), and certainly does not offer well-pleaded facts demonstrating Defendants' intent to deceive. Specifically:

**Krim**. There are seven references to CEO Krim by the CWs (Compl. ¶¶ 44, 45, 54, 65, 67, 75, 77), but only two CWs allegedly reported directly to Krim. (Compl. ¶¶ 44, 75.) The CWs who did not have personal contact with Krim do not—and cannot—establish that Krim was privately aware of any fact that was inconsistent with his public statements. *See Campo* v. *Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (rejecting confidential witnesses that did not have contact with the defendants); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 378 (rejecting confidential witnesses who did not have contact with executives). As to the other two CWs, FE1, who left the company before the IPO, claims only that Defendant Krim was "well-aware of everything that went on internally related to profitability." (Compl. ¶ 46.) Not only is that statement too generalized to establish any scienter, but the public was equally aware of Casper's lack of profitability. *Supra* 5–6; 11–13 (discussing disclosures regarding lack of profitability). Plaintiff is left with the assertion that by FE7 that Krim was a "micromanager." (Compl. ¶¶ 75, 77.) This pejorative description of Krim's managerial style is not a substitute for alleging "what specific contradictory information the [Defendant Krim] received or when he received it," *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 379; *see also Shemian*, 570 F. App'x at

35 ("The complaint does not allege any specific facts giving rise to the inference that the Individual Defendants knew, when speaking, that their statements . . . were false.").

**Parikh**.  The only allegation regarding Parikh comes from FE1, who was not employed by Casper at the time of IPO.  (Compl. ¶ 43.)  FE1 alleges that, similar to Krim, Parikh was "well-aware of everything that went on internally related to profitability," (Compl. ¶ 46), which is insufficient to plead fraud with particularity, or to plead Parikh's scienter.  *See supra* 27.

**Macfarlane**.  The only allegation about Macfarlane derives from FE7,[7] who "at times reported to Greg Macfarlane, the CFO."  (Compl. ¶ 75.)  But there are absolutely zero allegations of any facts known by Macfarlane that contradict his public statements, much less when he learned them and how.

Having failed to identify any person with scienter (whether an officer or otherwise), the Plaintiff also fails to allege scienter for Casper.  The "most straightforward" way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement to the company.  *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).  Here, there are no allegations of motive and opportunity or conscious misbehavior or recklessness for the Officer Defendants—or any other Casper employee.  As a result, the Section 10(b) claims against Casper and the Officer Defendants must be dismissed for failure to plead a strong inference of scienter.

---

[7]    The other CWs have numerous other flaws that undermine any showing of scienter by the Officer Defendants.  *First*, none of the CWs claim to have been involved in the IPO.  *Second*, FE1, FE4, and FE5 were no longer employed at Casper by the time of the class period.  *Third*, FE2, FE3, FE4, FE5, and FE6 did not report to the Officer Defendants.  *Campo*, 635 F. Supp. 2d at 335 (rejecting confidential witnesses who were not employed at the time of the class period or did not report to the defendants).

**III. The Complaint Fails to Allege Loss Causation, Requiring Dismissal Under Both the '33 Act and '34 Act**

Both the Section 10(b) and Section 11 claims also should be dismissed for failure to allege loss causation. It is well-established that in order to adequately allege a Section 10(b) violation, the Plaintiff needs to allege loss causation, the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell*, 396 F.3d at 172. Loss causation can be sufficiently alleged by stating that "the market reacted negatively to a corrective disclosure, which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (internal quotations omitted). Similarly, "[t]he absence of loss causation is an affirmative defense to a [S]ection 11 claim." *Amorosa* v. *AOL Time Warner Inc.*, 409 F. App'x 412, 416–17 (2d Cir. 2011) (summary order); *In re State Street Bank & Trust Co. Fixed Income Funds Investment Litig.*, 774 F. Supp. 2d 584, 590 n.4 (S.D.N.Y. 2011) (noting the reasoning of *Lentell* has been employed "to analyze loss causation in Section 11 claims."). Dismissal of both the Section 11 and Section 10(b) claims is permissible at the motion to dismiss stage. *See, e.g.*, *Boluka Garment Co. Ltd.*, 2021 WL 2853284, at *3–5; *Lau*, 2021 WL 964642, at *12–13 (dismissing claims under Sections 10(b) and 11 for failure to allege loss causation).

In support of its loss causation requirement, Plaintiff cites only the stock drop on May 12, 2020, when Casper announced the financial results for 1Q20, the change in one of Casper's logistics providers, discounts to inventory, and a reduction in planned retail openings. (Compl. ¶¶ 102–03.) None of this information, however, revealed to the market that any prior statement was false. Rather, the change in the logistics partner and the discounts of mattresses were events that occurred *after* the IPO. *Supra* 17, 19–20. Similarly, Casper had not made any projections about 1Q20 performance, and the impact of the COVID-19 pandemic on Casper's business in 1Q20 (such as reductions in store openings) was released for the first time on May 12, so it did not correct any

prior purported misstatement.  *Supra* 14–15.  Further, the "decision to reverse course, particularly in a dynamic business environment," such as an unprecedented global pandemic "does not imply that the earlier business strategy was a subterfuge."  *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552–53 (S.D.N.Y. 2008).

In addition, certain information relevant to Plaintiff's claims was disclosed on April 21, 2020, when Casper announced a reduction of its global operations.  But Plaintiff does not allege any stock drop on April 21; to the contrary, the stock price increased on that day.  (*See* Ex. 11 (showing Casper's stock price on Apr. 21, 2020).)  To the extent that new information was disclosed on April 21 without any corresponding drop, alleged misstatements on those subjects (if any) cannot possibly have caused any losses.  *See Boluka Garment Co., Ltd.,* 2021 WL 2853284, at *3–5; *see also, e.g.*, *In re Sec. Capital Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 601–02 (S.D.N.Y. 2010) (no loss causation where company's stock rose after alleged corrective disclosures, because "[i]n the absence of any sharp drop, Plaintiffs have not demonstrated that Defendants' disclosures, and not the market failures, caused these final declines in [the company]'s stock"); *In re China Life Sec. Litig.*, 2008 WL 4066919, at *7–8 (S.D.N.Y. Sept. 3, 2008) (theories of loss causation were without merit where company's stock rose after alleged corrective disclosure and company's IPO documents and subsequent statements contained no misstatements).

For these reasons, failure to allege loss causation is an additional basis to dismiss both the Section 10(b) and Section 11 claims.

## IV.    Plaintiff Fails to Allege Control Claims Against Defendants

As Plaintiff has failed to plead any primary violation of Section 11 and Section 10(b), the control claim under Section 15 against the Individual Defendants and Section 20(a) against the Officer Defendants must be dismissed.  *See ECA*, 553 F.3d at 206–07.

The Section 20(a) claims should be dismissed for the independent reason that Plaintiff did not allege facts showing that any of the Officer Defendants culpably participated in the alleged fraud. *See Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). As discussed *supra* 25–28, Plaintiff failed to allege that the Officer Defendants acted with scienter and, therefore, Plaintiff fails to allege culpable participation. *See, e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 390 (absent allegations that "Individual Defendants acted with the requisite scienter" no control person liability under Section 20(a)).

## **CONCLUSION**

Defendants respectfully request that the Court dismiss the Complaint in its entirety with prejudice.[8]

---

[8] Because Plaintiff filed the Second Amended Complaint only after Defendants moved to dismiss the State Action advancing substantially the same arguments for dismissal, and, accordingly, Plaintiff was given ample opportunity to cure the pleading deficiencies identified in this motion to dismiss, a dismissal with prejudice is warranted, as a third bite at the apple would be fruitless. *See Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257–58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.") (internal quotations omitted); *see also Kryz* v. *Pigott*, 749 F.3d 117, 134 (2d Cir. 2014) (affirming dismissal of fraud claim with prejudice, even where plaintiffs proposed new pleadings, where amendment would be futile); *Binn* v. *Bernstein*, 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) (noting "courts in this district routinely deny" leave to amend when doing otherwise "would be allowing them a 'third bite at the apple'") (collecting cases), *report and recommendation adopted*, 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020); *Meisel* v. *Westchester Cnty.*, 2020 WL 3472500, at *9 (S.D.N.Y. June 25, 2020) (denying leave where plaintiff had "already amended once, after having the opportunity to review a pre-motion letter from Defendants stating the grounds on which they would move to dismiss"); *St. Clair-Hibbard* v. *Am. Fin. Tr., Inc.*, 2019 WL 4601720, at *9 n.10 (S.D.N.Y. Sept. 23, 2019) (denying leave where plaintiff had "already filed three successive complaints in this action, one of which was in response to Defendants' motion to dismiss"), *aff'd*, 812 F. App'x 36 (2d Cir. 2020); *Perry* v. *Mary Ann Liebert, Inc.*, 2018 WL 2561029, at *10 (S.D.N.Y. June 4, 2018) (same), *aff'd*, 765 F. App'x 470 (2d Cir. 2019).

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

BY:  /s/ *Audra J. Soloway*
Audra J. Soloway
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
Email: asoloway@paulweiss.com

*Attorney for Casper Defendants*


WILLKIE FARR & GALLAGHER LLP

BY: /s/ *Todd G. Cosenza*
Todd G. Cosenza
Charles Dean Cording
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8677
Fax: (212) 728-9677
Email: tcosenza@willkie.com
        ccording@willkie.com

*Attorneys for Underwriter Defendants*