UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------
ROBERT LEMATTA, *individually and on behalf of*
*all others similarly situated*,

                         Plaintiff,

        v.

CASPER SLEEP, INC., PHILIP KRIM, GREGORY
MACFARLANE, NEIL PARIKH, DIANE IRVINE,
ANTHONY FLORENCE, JACK LAZAR,
BENJAMIN LERER, KAREN KATZ, DANI REISS,
MORGAN STANLEY & CO. LLC, GOLDMAN
SACHS & CO. LLC, JEFFERIES LLC, BOFA
SECURITIES, INC., UBS SECURITIES LLC,
CITIGROUP GLOBAL MARKETS INC., PIPER
SANDLER & CO., and GUGGENHEIM
SECURITIES, LLC,

                     Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
20-CV-2744 (MKB)

MARGO K. BRODIE, United States District Judge:

       Robert Lematta commenced this securities class action on June 19, 2020, on behalf of

himself and other similarly situated investors who purchased or otherwise acquired Casper Sleep

("Casper") securities traceable to Casper's initial public offering conducted on or around

February 7, 2020 (the "IPO") against Casper Sleep, Inc.; Officer Defendants: Philip Krim,

Gregory Macfarlane, Neil Parikh; Individual Defendants: Diane Irvine, Anthony Florence, Jack

Lazar, Benjamin Lerer, Karen Katz, and Dani Reiss; and Underwriter Defendants: Morgan

Stanley & Co. LLC, Goldman Sachs & Co. LLC, Jefferies LLC, BofA Securities, Inc., UBS

Securities LLC, Citigroup Global Markets Inc., Piper Sandler & Co., and Guggenheim

Securities, LLC.  (Compl. ¶¶ 1, 6–26, Docket Entry No. 1.)  Lematta alleged that Defendants

violated the federal securities laws under the Securities Act of 1933 (the "Securities Act").

(Compl. ¶ 1.)  On October 27, 2020, Saleh Doron Gahtan ("Plaintiff"),[1] amended the Complaint

and added violations of the Securities Exchange Act of 1934 (the "Exchange Act").  (Am.

Compl. ¶ 1, Docket Entry No. 16.)  On June 30, 2021, Gahtan filed a Second Amended

Complaint (the "SAC") alleging that Defendants made several false and misleading statements

and omissions to investors, including by misrepresenting that Casper's business was

experiencing significant growth and would generate substantial profits, in violation of Sections

11 and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act.  (SAC ¶¶ 1–

10, Docket Entry No. 29.)

Defendants move to dismiss the SAC for failure to state a claim pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure and Plaintiff opposes the motion.[2]  For the reasons

explained below, the Court grants the motion in part and denies it in part.

## I.  Background

The Court assumes the truth of the factual allegations in the SAC for the purpose of

deciding Defendants' motion.

---

[1]  On August 18, 2020, Craig Albert and Saleh Doron Gahtan, other investors, moved for appointment as lead plaintiff.  (*See* Albert Mot. to Appoint Counsel and Lead Pl., Docket Entry No. 7.; Gahtan's Mot. to Appoint Counsel and Lead Pl., Docket Entry No. 10.)  On August 26, 2020, Albert withdrew his motion.  (Withdrawal of Albert Mot. to Appoint Counsel and Lead Pl., Docket Entry No. 13.)  On August 27, 2020, Magistrate Judge Robert M. Levy granted Gahtan's motion without objection and directed him to file an amended complaint.  (Order dated Aug. 27, 2020.)

[2]  (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 33; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 33-1; Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), Docket Entry No. 32; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 33-14.)

### a.  Casper's business model

Casper is a mattress and sleep aid company that has "brick-and-mortar" locations.  (SAC ¶ 35.)  Casper "purports to implement a 'cutting-edge' and data-driven omni-channel sales platform and marketing strategy in order to target and match potential customers with innovative sleep products tailored to their specific needs, optimize product price points, and maximize operating efficiencies." (*Id.*)  "Between its founding and 2019, Casper expanded from its first product — the Casper mattress — to offer soft goods, bedroom furniture and products that promote ambience for sleep such as lighting, sound, scents, temperature, and humidity; sleep technology, such as tracking devices, medical machines, bedside clocks, and connected devices; sleep supplements, such as sprays, pills and vitamins; and sleep services, such as digital apps, meditation, sleep programming, and counseling." (*Id.* ¶ 36.)  "Casper has also stated its intention to grow internationally and claimed to be building towards an international presence in more than twenty countries." (*Id.* ¶ 37.)  The mattress and sleep aid markets are highly saturated, and Casper's success depends heavily on customers' brand awareness.  (*Id.* ¶ 38.)  "In 2019, [Casper] spent approximately $155 million on sales and marketing activities, the most significant component of its operating expenses and an indication of the high cash flow needed for Casper to grow revenues and increase its market share." (*Id.* ¶ 39.)  As of September 30, 2019, Casper had only $54.6 million in cash and cash equivalents on hand, yet every quarter generated over $20 million in negative cash flows on average.  (*Id.* ¶ 42.)

Casper represented that its third-party manufacturing and distribution relationships conferred a competitive advantage by allowing the company to minimize overhead and control inventory flow.  (*Id.* ¶ 41.)  Casper highlighted these "significant long-term investments" in developing its distribution capabilities as a key component of its growth plan.  (*Id.*)

### b.  Casper's IPO

In January of 2020, Casper filed its Registration Statement with the Securities and Exchange Commission ("SEC").  (*Id*. ¶ 84.)  The Registration Statement was effective as of February 5, 2020.  (*Id*.)  The Registration Statement reassured investors that Casper's profitability metrics were improving.  (*Id*. ¶ 42.)  Plaintiff contends that "[t]he Registration Statement contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation."  (*Id.* ¶ 85.)  For example, it (1) highlighted Casper's purported core profitability, (*id.* ¶ 87); (2) stated that Casper's retail stores were generating . . . [sufficient revenue] to cover the costs of new store builds over an eighteen- to twenty-four-month period, (*id.* ¶ 88); (3) represented that Casper's e-commerce operations were profitable in the lead-up to the IPO, (*id.* ¶ 89); (4) "stated that [Casper's] multi-channel marketing and new retail store strategy had offered complementary revenue growth and "'first purchase profitable" e-commerce economics,'" (*id*. ¶ 90 (quoting the Registration Statement, annexed to Defs.' Mot. as Ex. 1, Docket Entry No. 33-3)); (5) represented that Casper had implemented several strategic initiatives designed to improve the company's profit margins, (*id*. ¶ 91); (6) "indicated that favorable year-over-year revenue and margin trends were sustainable and continuing," (*id*. ¶ 92); (7) emphasized Casper's global operations and intention to expand into several new international markets (*id*. ¶ 93); and (8) claimed that Casper's operations and growth were "supported by a highly qualified supply chain and distribution network," (*id*. ¶ 94).

Plaintiff alleges that these statements were inaccurate statements of material fact because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a) that Casper's profit margins were actually declining, rather than growing; (b) that Casper was changing an important distribution partner, costing it 130 basis points of gross margin in the first quarter of 2020 alone; (c) that Casper was holding a glut of old and outdated mattress inventory that it was selling at steeply discounted clearance prices, further impairing the Company's profitability; (d) that Casper was suffering accelerating losses, further placing its ability to achieve positive cash flows and profitability out of reach; (e) that Casper's core operations were not profitable, but were causing the Company to suffer over $40 million in negative cash flows during the first quarter of 2020 alone and doubling its quarterly net loss year over year; (f) that, as a result of (a)-(e) above, Casper's ability to achieve profitability, implement its growth initiatives, and expand internationally had been misrepresented in the Registration Statement, as the Company needed to shutter its European operations, halt all international expansion, jettison over one fifth of its global corporate workforce, and significantly curtail new store openings in order to avoid an imminent cash and liquidity crisis, let alone achieve positive operating cash flows; and (g) that, as a result of (a)-(f) above, Casper's revenue growth rate was not sustainable and had not positioned the Company to achieve profitability.

(*Id*. ¶ 95.)  In addition, Plaintiff contends that Items 303 and 105 of SEC Regulation S-K, 17 C.F.R. §§ 229.303 and 229.105 required Casper to disclose these adverse facts because they had caused, or were reasonably likely to cause, Casper's disclosed financial information not to be indicative of future results and made the IPO risky or speculative.[3]  (*Id*. ¶¶ 96–97.)  In addition, the purported risk factors that Defendants provided in the Registration Statement were themselves materially misleading.  (*Id*. ¶ 98.)  For example, the Registration Statement stated that a "'failure to increase [Casper's] revenue sufficiently to keep pace with [its] investments and other expenses could prevent [it] from achieving or maintaining profitability or positive cash

---

[3]  Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, required that Casper disclose any known events or uncertainties that had caused, or were reasonably likely to cause, Casper's disclosed financial information not to be indicative of future results.  (SAC ¶ 96.)  Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, required that Casper discuss and adequately describe, in the "Risk Factors" section of the Registration Statement the most significant factors that made the offering risky or speculative.  (*Id*. ¶ 97.)

flow on a consistent basis,' but failed to disclose that [Casper] was already suffering widening deficits and materially impaired margins at the time of the IPO, or the reasons for those impairments." (*Id*.)  "Similarly, while the Registration Statement stated that promotions were 'occasionally offered' by [Casper], it stated that these promotions were highly seasonal and occurred in connection with increased sales during Casper's second and third fiscal quarters and failed to mention the deep discounting that was then occurring in the midst of [Casper]'s first fiscal quarter and the IPO, as it had been forced to unload a glut of old and outdated inventory." (*Id*.)  Plaintiff contends that Defendants utilized "boilerplate, generic expressions of future contingent risk [that] failed to apprise investors of the specific and imminent threats facing [Casper] and the occurrence of adverse events that were already impacting [Casper's] business, operations, financial results and prospects at the time." (*Id*.)

In the IPO, Defendants sold 8.35 million shares of Casper common stock at $12 per share, generating over $100 million in gross proceeds.  (*Id*. ¶ 84.)  On March 19, 2020, Philip Krim, a member of Casper's senior leadership team, stated that the IPO raised approximately $88 million in net proceeds and Casper ended the first quarter of 2020 with a cash position of $116 million, which, according to Krim, "provid[ed Casper] with a strong balance sheet and cash to operate in this environment." (*Id*. ¶¶ 16, 99.)  Plaintiff contends that Krim's statements were inaccurate because they failed to disclose that Casper's worsening cash flow had compromised its ability to continue its purported growth rate and achieve its growth initiatives.  (*Id*. ¶ 100.) Casper did admit, however, that it expected adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") losses of between $27 and $30 million the first quarter of 2020, a 69% increase from the fourth quarter of 2019, and a 62% increase over Casper's average quarterly adjusted EBITDA losses for fiscal 2019.  (*Id*.)

### c.   Statements of former employees

Several former employees ("FE"s) discussed the profitability and growth of Casper based on personal knowledge and/or interactions with high-level Casper employees.  FE1 worked as head of enterprise partnerships and new ventures for Casper from August of 2017 to October of 2019 and carried the corporate rank of vice president at Casper.  (*Id.* ¶ 43.)   FE1 stated that at the time of FE1's departure from Casper, Casper was not profitable, due to tension between the goals of growing the company and becoming profitable.  (*Id.* ¶ 45.)  Casper's corporate officers, including Krim and Parikh, Casper's Chief Strategy Officer and a director at the time of the IPO, "were well-aware of everything that went on internally related to profitability."  (*Id.* ¶¶ 18, 46.)  In addition, FE1 described a "glut of older-model Casper mattresses that [Casper] was left to offload to retail chains such as TJ Maxx and Target while attempting to avoid oversaturating the market with Casper products.  These efforts involved aggressive discounts of 10 to 15%, which . . . cut into profitability in a big way."  (*Id.* ¶ 47.)  FE1 stated that discounted sales to retail stores included the predictable effect of cannibalizing direct, online sales to consumers.  (*Id.* 48.)  Also, contrary to Casper's positive forecasts regarding international expansion, FE1 revealed that Casper "struggled to gain a foothold in foreign markets between 2017 and 2019."  (*Id.* ¶ 49.)  Two specific obstacles recognized internally were preexisting global competition outside the U.S. and Casper's lack of any manufacturing facilities in Asia.  (*Id.* ¶ 49.)  By the end of 2019, Casper insiders had resigned themselves to doubling down on the U.S. market.  (*Id.* ¶ 51.)

FE2 worked as a store keyholder for Casper from September of 2019 to September of 2020 and reported to Store Manager Shaun Hayes, who in turn reported to Southeast Regional Manager Phil Amandola.  (*Id.* ¶ 52.)  FE2 corroborated FE1's statements that Casper was non-

profitable at the time of the IPO and that Casper's retail discounts ranging from 10 to 15% had a deleterious effect on Casper's ability to conduct direct sales.  (*Id*. ¶ 53.)

FE3 worked for Casper as an area manager in charge of retail stores from November of 2019 to August of 2020 and reported to Jeff Liu, vice president of global retail, who reported to Krim.  (*Id*. ¶ 54.)  FE3 corroborated FE1 and FE2 regarding Casper's lack of profitability in advance of the IPO and stated that the profit and loss of Casper's stores was trending downwards as early as 2019, in part due to overspending on marketing.  (*Id*. ¶¶ 55–56.)  FE3 "elaborated that it was common knowledge internally that the stores were actively losing money month over month, but that [Casper] rationalized this by saying it was focused on brand awareness, and that, in essence, it takes money to make money."  (*Id*. ¶ 56.)  According to FE3, "beginning in November [of] 2019, Casper mounted a concerted effort to make the books look good for the close of the quarter before the IPO" by making major cuts in employee payroll and hours and slashing the eighteen- to twenty-four-month time period new retail stores had to repay the costs of getting set up — a figure cited in Casper's offering documents — to eight-to-ten months.  (*Id*. ¶¶ 57–58.)

FE4 worked for Casper as a supply chain business analyst from 2017 to January of 2019 and reported to Sri Gade, Casper's director of business sales.  (*Id*. ¶ 60.)  FE4 echoed that Casper was not making a profit at the time of the IPO and "knew that, in reality, Casper was never actually profitable — even if its internal custom metrics suggested otherwise — as demonstrated by the fact that employees never got a profitability-pegged 401(k) match."  (*Id*. ¶¶ 62–63.)

FE5 worked for Casper as an operations coordinator in New York from October of 2017 to June of 2019 and reported to Liu, who reported to Krim.  (*Id*. ¶ 65.)  Like FEs 1–4, while working at Casper, FE5 was aware that the company was not profitable. (*Id*. ¶ 66.)  FE5 learned

of Casper's unprofitability directly from Krim, who said in a meeting attended by FE5 regarding quarterly results that the company was not yet profitable.  (*Id*. ¶67.)

FE6 worked for Casper as an operations manager from June or July of 2019 to March of 2020 and reported to Store Manager Kyle Rod, who reported to Stephen Jaurequi, the west region multi-unit manager.  (*Id*. ¶ 70.)  FE6 confirmed that Casper discounted mattresses made in 2018 by as much as 50 to 60% off the original price in a bid to get through as much inventory as possible.  (*Id*. ¶ 71.)  FE6 overheard calls between headquarters and Rod during which headquarters ordered Rod to move product quickly to allow for the store's inventory to be replenished.  (*Id*.)  FE6 also reported that Casper's discounted sales to outlets caused a predictable blow to sales.  (*Id*. ¶ 72.)  In addition, like FE3, FE6 discussed Casper's attempts to simulate profitability through cuts, specifically by terminating its policy of providing medical, dental, and vision plan coverage in October of 2019 to employees like FE6, who were left to pay for their own healthcare.  (*Id*. ¶ 74.)

FE7 worked for Casper Sleep as vice president of digital product from December of 2018 to April of 2020.  (*Id*. ¶ 75.)  He initially reported to Eleanor Morgan, then the chief experience officer, and after Morgan's departure reported to Emilie Arel, Casper's president and chief commercial officer.  (*Id*.)  FE7 also reported Casper's use of cuts, including actions to remove high-salary employees, to increase profitability prior to the IPO.  (*Id*. ¶ 78.)

### d.  Post-IPO

On April 21, 2020, Casper announced significant actions it was taking to improve its cash position and business model.  (*Id*. ¶ 101.)  Casper stated that "it was reducing the size of its global operations and sales team and completely winding down its European operations, leading

to the loss of 21% of its entire corporate workforce globally." (*Id.*)  Casper also announced that Gregory Macfarlane, Casper's CFO and COO, was resigning.  (*Id.*)

On May 12, 2020, Casper announced is financial results for the quarter that ended on March 31, 2020, which was the same quarter as the IPO.  (*Id.* ¶ 102.)  It stated that it had suffered a net loss of $34.5 million, a 98% increase in comparison to the previous year, and an adjusted EBITDA loss of $22.9 million, a 60% increase in comparison to the previous year.  (*Id.* ¶ 102.)  In addition, Casper reported that its gross margin had fallen during the quarter by 190 basis points.  (*Id.*)  Krim stated on an earnings call that the decrease in net margin was due to a change in one of Casper's logistics providers and an unusually high number of clearance sales needed to get rid of old mattress inventory that had built up prior to the IPO.  (*Id.* ¶ 103.)  Krim also announced that the company was substantially reducing the number of planned retail openings.  (*Id.*)

Casper's quarterly report on Form 10-Q stated that its cash and cash equivalents had only increased $48.5 million during the entire quarter, even though the company received over $88 million in net cash proceeds from the IPO.  (*Id.* ¶ 104.)  According to the Form 10-Q, Casper had suffered over $40 million in negative cash flows from operating and investing activities during the quarter.  (*Id.*)  Given that the Company had only $116 million in cash on hand as of March 31, 2020, Casper was on track to run out of cash within a year.  (*Id.*)

In response to these announcements on May 12, 2020, Casper shares fell by $1.53 per share from the previous day's close, or 20% on heavy trading volume. (*Id.* ¶ 105.)  On May 13, 2020, analysts at Wedbush, a wealth management firm, published a report concluding that Casper was "leaving sales on the table" and noting that Casper's gross margins of 46.9% in the first quarter of 2020 missed forecasts "as extended clearance period discounting on the

company's old product line weighed on performance and it incurred a charge associated with a change in logistics provider." (*Id.*)  At market close on June 4, 2020, Casper's stock was trading 32% below the IPO price, at just $8.18 per share.  (*Id.* ¶ 106.)

Plaintiff alleges that in and around Casper's IPO, Defendants made misleading statements, failed to disclose material facts, and misjudged consumer demand, which caused the stock price to close 32% below the IPO price and damaging investors.  (*Id.* ¶¶ 2–9.)

## II.   Discussion

### a.   Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (same).

> **b.   Plaintiff has pleaded materially misleading statements or omissions as to Casper's path to profitability and distribution and supply networks**

Defendants argue that Plaintiff's claims under the Securities Act and Exchange Act must be dismissed because he failed to plead any materially misleading statements or omissions. (Defs.' Mem. 11.)  First, Defendants assert that they did not make material misstatements about profits and profitability trends.  (*Id*.)  In support, Defendants claim that (1) Plaintiff does not allege that any of Casper's statements about its historical financial performance were false; (2) Casper fully and transparently disclosed the risk of future unprofitability, namely that it was unprofitable to date, and disclosed the risks to its profit margins; and (3) Plaintiff improperly relies upon events that occurred after the IPO.  (*Id*. at 11–15.)  Second, Defendants argue that they did not make any material misstatements about Casper's distribution.  (*Id*. at 15.)  Defendants assert that: "(1) none of Casper's statements about its distribution network are alleged to be false; (2) Casper expressly warned of the potential negative impact of changing a logistics partner; (3) the logistics partner dispute (with FedEx), and facts giving rise to it, occurred after the IPO; and (4) the alleged misstatements are immaterial as a matter of law."  (*Id*. at 15–18.)  Third, Defendants argue that Casper did not make material misstatements about pricing and promotional strategies.  (*Id*. at 18.)  In support, Defendants assert that: (1) Plaintiff does not allege that Casper's statements about pricing strategy were actually false; (2) Casper expressly warned investors in the Registration Statement that it would offer discounts to clear out old inventory; (3) the discounting occurred after the IPO; and (4) the challenged statements are immaterial.  (*Id*. at 18–20.)  Fourth, Defendants argue that Casper did not make material misstatements about growth.  (*Id*. at 20.)  Defendants assert that (1) Plaintiff does not allege that any of the historic information about Casper's growth was inaccurate; (2) the Registration Statement expressly acknowledged the risk that the expansion plans would not be realized; (3)

Plaintiff relies on post-IPO events, particularly the onset of COVID-19, to allege that the Registration Statement is false; and (4) the alleged misstatements are statements of optimism and puffery and are immaterial.  (*Id.* at 20–23.)  Fifth, Defendants argue that they had no duty to disclose under items 303 and 105 of Regulations S-K.  (*Id.* at 24.)  Sixth, Defendants argue that the section 10(b) claim against them is premised on the very same alleged misstatements as the section 11 claim and is therefore subject to dismissal for the same reasons.  (*Id.* at 24.)

Plaintiff responds that he adequately alleges material misrepresentations by Defendants that misled investors about the true status of Casper's operations and financial position at the time of the IPO.  (Pl.'s Opp'n 8.)  In support, Plaintiff asserts that the SAC describes how Defendants misrepresented and/or omitted several material facts, including that: (a) Casper was on the path to profitability, (b) Casper's core operations were profitable, and (c) that Casper continued to drive "operational efficiencies."  (*Id.* at 8–9.)  In addition, Plaintiff argues that in the IPO, Defendants "emphasized Casper's 'rapid growth' trajectory, claiming that the [c]ompany had achieved a 45.5% compound annual growth rate ('CAGR') between 2016 and 2018, increasing annual net revenues from $169.1 million for fiscal 2016 to $357.9 million by fiscal 2018."  (*Id.* at 9.)  Plaintiff also argues that "Defendants told investors that [Casper]'s retail stores were 'four-wall profitable,' a bespoke profitability metric designed by Casper that purportedly showed its stores were profitable, excluding growth initiatives and non-allocable expenses."  (*Id.*)  Plaintiff contends that these representations were inaccurate and incomplete, (*id.* at 10), and further claims that Defendants were reckless to mislead and hide from investors:

> (a) that Casper's profit margins were actually declining, rather than growing; (b) that Casper was changing an important distribution partner, costing it 130 basis points of gross margin in the first quarter of 2020 alone; (c) that Casper was holding a glut of old and outdated mattress inventory that it was selling at steeply discounted clearance prices, further impairing [Casper]'s profitability; (d) that Casper was

13

suffering accelerating losses . . . ; (e) that Casper's core operations were not profitable, but were causing [Casper] to suffer over $40 million in negative cash flows during the first quarter of 2020 alone and doubling its quarterly net loss year over year; (f) that, as a result of (a)-(e) above, Casper's ability to achieve profitability, implement its growth initiatives, and expand internationally had been misrepresented in the Registration Statement, as the [c]ompany needed to shutter its European operations, halt all international expansion, jettison over one fifth of its global corporate workforce, and significantly curtail new store openings in order to avoid an imminent cash and liquidity crisis, let alone achieve positive operating cash flows; and (g) that Casper's revenue growth rate was not sustainable and had not positioned the Company to achieve profitability.

(*Id.* at 10–11.) In addition, Plaintiff contends that Defendants' materiality arguments are improper at the pleading stage because materiality is a mixed question of law and fact. (*Id.* at 14.)

### i.    The Securities Act and the Securities Exchange Act

### 1.    The Securities Act

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)). "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Id.* at 358–59 (quoting 15 U.S.C. § 77k(a)). Claims under Sections 11 require a plaintiff to plead facts showing that the defendant made a material misstatement or omission. *Id.*; *see N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013) ("So long as a

plaintiff establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading — then, in a Section 11 case, the general rule is that an issuer's liability . . . is absolute." (alteration in original) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011))).

Plaintiffs alleging actionable misstatements and omissions under Section 11 must "at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." *Scott v. Gen. Motors Co*., 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014); *see also Ladmen Partners, Inc. v. Globalstar, Inc*., No. 07-CV-0976, 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008) ("The veracity of a registration statement which may give rise to liability under [Section 11] is determined by assessing the facts as they existed when the statement became effective.").

"Section 15, in turn, creates liability for individuals or entities that 'control[] any person liable' under section 11." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 358 (quoting 15 U.S.C. § 77o). "Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under section[] 11." *Id*.

## 2.   Securities Exchange Act

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b); *see also In re Synchrony Fin. Sec. Litig*., 988 F.3d 157, 167 (2d Cir. 2021) (same); *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018) (same). To state a claim for securities fraud under

section 10(b) or Rule 10b–5 of the Exchange Act, "a plaintiff must allege that [the] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."[4] *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 167 (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015)); *see also Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (same); *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (same). A plaintiff must make a threshold showing that the material misrepresentation was made by the defendant. *See* 17 C.F.R. § 240.10b–5 ("It shall be unlawful for any person, directly or indirectly . . . [t]o *make any untrue statement* of a material fact or to omit to state a material fact necessary." (emphasis added)); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit *making any material misstatement or omission* in connection with the purchase or sale of any security." (emphasis added)). In addition, a claim of securities fraud under section 10(b) of the Exchange Act is "subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *Wyche v. Adv. Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (same).

Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its regulations] shall also be liable jointly

---

[4] Defendants do not argue that Plaintiff failed to allege that he relied on Defendants' misstatements or omissions of material fact. (*See generally* Defs.' Mem.)

and severally with and to the same extent as such controlled person to any person to whom such

controlled person is liable."  15 U.S.C. § 78t(a); *see also City of Omaha Police & Fire Ret. Sys.*

*v. Evoqua Water Techs. Corp*., 450 F. Supp. 3d 379, 429 (S.D.N.Y. 2020) ("In order to establish

a prima facie case of liability under § 20(a), a plaintiff must show a primary violation of the

Exchange Act.").

### 3.    Material misstatements and omissions

Defendants argue that Plaintiff has failed to adequately plead a material misstatement or

omission about (1) profit and profitability trends, (2) distribution network, (3) pricing and

promotional strategies, and (4) growth.  (Defs. Mem. 11–20.)

Plaintiff responds that he has adequately pleaded material misstatements and omissions

regarding Casper's profitability, (Pl's Opp'n 8–9), growth, (*id.* at 9–10), distribution networks,

(*id.* at 10), and pricing and promotional strategies, (*id.* at 9).  In addition, Plaintiff argues he

pleaded that Defendants failed to make necessary disclosures required under the rules and

regulations governing preparation of the Registration Statement, which served to mislead

investors.  (*Id.* at 11–12; *see also* SAC ¶ 85.)

Claims under section 11 of the Securities Act and section 10(b) of the Exchange Act

require "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality."

*In re Morgan Stanley Info. Fund Sec. Litig*., 592 F.3d at 360.  "The definition of materiality is

the same for these provisions as it is under section 10(b) of the Exchange Act: '[W]hether the

defendants' representations, taken together and in context, would have misled a reasonable

investor.'"  *Id.* (alteration in original) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d

Cir. 2004)).  "However, because the materiality element presents 'a mixed question of law and

fact,' it will rarely be dispositive in a motion to dismiss."  *Id*. (citation omitted); *see In re*

*Synchrony Fin. Sec. Litig.*, 988 F.3d at 170 ("The materiality of an item of information is a mixed question of law and fact.").

"A statement is materially misleading when 'the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 151 (2d Cir. 2021) (quoting *Rombach*, 355 F.3d at 172 n.7); *see also Singh*, 918 F.3d at 63 (explaining that allegedly misleading statements are "evaluated not only by literal truth, but by context and manner of presentation"). "A statement or omission is material if a reasonable investor would have considered it significant in making investment decisions." *Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 37 (2d Cir. 2018) (alteration omitted) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir. 2000)); *see also Singh*, 918 F.3d at 63 ("An alleged misrepresentation is material if 'there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.'" (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010))); *see also United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) ("A misstatement in a securities transaction is material so long as there is a substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision." (alteration omitted)).

When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366 (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate"). "[L]iterally true statements" are actionable if they "create a materially misleading impression." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir.

2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013).  "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366.  Thus, plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud."  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 171.

### A.    Statements about profits and profitability trends

The Registration Statement highlighted Casper's purported core profitability and sustained profitability, including that (1) Casper disclosed that certain existing stores are "four-wall profitable," (SAC ¶ 87); (2) Casper "target[ed] . . . a cash-on-cash payback period ranging from [eighteen] to [twenty-four] months" for new retail stores (*id.* ¶ 88); and (3) certain e-commerce sales were profitable, excluding certain marketing expenses, (*id.* ¶ 89.)

Defendants argue that Casper disclosed its "history of losses," as well as Casper's "expect[ation] to have operating losses and negative cash flow as we continue to expand the business."  (Defs.' Mem. 11–12 (citing Registration Statement at 16.))

Plaintiff argues that Casper's core operations were not profitable and actually caused $40 million in negative cash flows during the first quarter of 2020 alone, and that Casper doubled its quarterly net loss year over year.  (Pl.'s Opp'n 11.)

Plaintiff has sufficiently alleged that Defendants' misstatements and omissions about its ability to gain and sustain profitability were materially misleading.  FE3 revealed that beginning in November of 2019, Casper "mounted a concerted effort to make the books look good for the close of the quarter before the IPO."  (*Id.* ¶ 57.)  These actions included making major cuts to employee payroll and hours, as well as slashing the eighteen- to twenty-four-month time period

new retail stores had to repay the costs of getting set up — a figure cited in the company's offering documents — to eight to ten months.  (*Id*. ¶ 58.)  Casper also made attempts to simulate profitability by ending its policy of providing medical, dental, and vision plan coverage for employees like FE6, who were left to pay for their own healthcare.  (*Id*. ¶ 74.)  Furthermore, FE7 stated that Casper implemented job losses targeted to remove high-salary employees just before the IPO.  (*Id*. ¶ 78.)  In addition, in direct contrast to Casper's positive forecasts regarding international expansion, FE1 reported that Casper struggled to gain a foothold in foreign markets between 2017 and 2019 and that Casper's officers and employees were aware that preexisting global competition outside the U.S. and Casper's lack of any Asian manufacturing facilities posed hurdles to international expansion.  (*Id.* ¶ 49.)  Indeed, by the end of 2019, Casper insiders had resigned themselves to refocusing on the U.S. market.  (*Id.* ¶ 51.)

Construing the allegations in Plaintiff's favor, Plaintiff has plausibly alleged that Defendants omitted information in order to mislead investors on the prospects of Casper's capacity for growth and profitability.  Based on the information Casper provided, a reasonable investor may have believed that Casper was on a path to achieve profitability and implement its growth initiatives, when according to Plaintiff's factual allegations, Casper was actually suffering accelerating losses, its core operations were not profitable, its revenue growth rate was not sustainable, and it had not positioned itself to achieve profitability.  Casper did provide a warning that its plans may not be realized, but because Casper chose to speak about the potential path to growth and profitability, Casper had an obligation to ensure its statements were "both accurate and complete," including the fact that major cuts to employee payroll and benefits influenced its profit prospects.  *See Meyer v. Jinkosolar Holdings Co*., 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a

20

company speaks on an issue or topic, there is a duty to tell the whole truth." (citing *Caiola*, 295

F.3d at 331 (2d Cir. 2002))).  Plaintiff adequately alleges that, having chosen to speak on

initiatives designed to improve the company's profit margins, sustainability, and international

growth, Defendants failed to do so in an "accurate and complete" manner.  *See Caiola*, 295 F.3d

at 331; *see also Operating Local 649 Annuity Trust Fund*, 595 F.3d at 92 (recognizing that the

"veracity of a statement or omission is measured not by its literal truth, but by its ability to

accurately inform rather than mislead prospective buyers"); *see, e.g.*, *In re Global Crossing, Ltd.*

*Sec. Litig.*, 322 F. Supp. 2d 319, 343 (S.D.N.Y. 2004) (denying motion to dismiss a complaint

that alleged that the defendants knew that "there would be no increase in demand for [their]

products and services").

## B.   Statements about distribution network

The Registration Statement made several statements about Casper's distribution network,

including that (1) "[Casper's] supply chain is instrumental to both supporting growth and

improving business performance," (SAC ¶ 91); (2) the supply chain is comprised of "highly

qualified" partners, (*id*. ¶ 94), and (3) "[Casper] believe[s] [its] domestic and international

providers have sufficient expansion capacity to meet our future needs," (*id*. ¶ 94).

Defendants argue that these statements are not materially misleading because "(1) none

of Casper's statements about its distribution network are alleged to be false; (2) Casper expressly

warned of the potential negative impact of changing a logistics partner; (3) the logistics partner

dispute (with FedEx), and facts giving rise to it, occurred after the IPO; and (4) the alleged

misstatements are immaterial as a matter of law."  (Defs.' Mem. 15.)

Plaintiff argues that these statements are materially misleading because Plaintiff alleges

that Casper "highlighted these supposed 'significant long-term investments' in developing its

distribution capabilities as a key component of its growth plan[,]" when in fact it was changing an important distribution partner, costing it 130 basis points of gross margin in the first quarter of 2020. (Pl.'s Opp'n 4, 10.)

Plaintiffs have alleged sufficient facts to support a claim that Defendants' misstatements and omissions about the distribution network were likely to mislead a reasonable investor.  As discussed in the prior section, FE1 stated that Casper struggled to gain a foothold in foreign markets between 2017 and 2019 due to internally known obstacles, including that Casper lacked any Asian manufacturing facilities and that it would not be profitable for Casper to ship U.S.-made mattresses to Asia.  (SAC ¶ 49.)  In addition, Casper represented that its third-party manufacturing and distribution relationships conferred a competitive advantage, when in fact it was changing an important distribution partner, costing it 130 basis points of gross margin in the first quarter of 2020.  (SAC ¶¶ 41, 95.)  A reasonable investor may have been led to believe that Casper's purported secure distribution and manufacturing network would significantly contribute to its growth, and thus the sustainability and profitability of Casper.  However, Defendants statements served to mislead investors about the true status of Casper's operations.  *See Operating Local 649 Annuity Trust Fund*, 595 F.3d at 92  (recognizing that the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers"); *see, e.g.*, *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d at 343 (denying motion to dismiss a complaint that alleged that the defendants knew that "there would be no increase in demand for [their] products and services").

### C.   Statements about pricing and promotional strategies

The Registration Statement contained several statements about growth, including that Casper (1) "intend[s] to continue building a data-based understanding of price elasticity,

dynamics, promotional strategies and other price management tools to drive optimized pricing";
(2) has "identified several opportunities . . . to reduce return rates and increase customer
satisfaction"; and (3) "believe[s] that with larger budgets and deeper experience, [it] will benefit
from lower media rates and increased data that will improve our proprietary models, multi-
channel synergies . . . , purchase occasions . . . , and purchases from previous repeat consumers."
(SAC ¶ 91.)

Defendants argue that these claims are not materially misleading because (1) Plaintiff
does not allege that Casper's statements about pricing strategy were actually false; (2) Casper
expressly warned investors in the Registration Statement that it would offer discounts to get rid
of old inventory; (3) the discounting occurred after the IPO; and (4) the challenged statements
are immaterial.  (Defs.' Mem. 18.)

Plaintiff argues that Casper did not inform investors of the hypercompetitive nature of the
mattress market and the resulting need to maximize sales prices, but instead publicly emphasized
the importance of omni-channel sales and marketing platform to gain "a databased understanding
of price elasticity dynamics, promotional strategies and other price management tools to drive
optimized pricing."  (Pl.'s Opp'n 4 (quoting SAC ¶ 40).)  In addition, Plaintiff argues that while
Casper represented that it minimized its overhead and controlled inventory flow, in reality, it
"was holding a glut of old and outdated mattress inventory that it was selling at steeply
discounted clearance prices, further impairing the [c]ompany's profitability."  (*Id*. at 4, 10.)

Casper's statements about optimizing pricing are not materially misleading because the
Registration Statement explicitly warned investors that "[l]aunching new products or updating
existing products may also leave [Casper] with obsolete inventory that we may not be able to sell
or we may sell at significantly discounted prices." (Registration Statement 29.)  As a general

matter, "[w]hen a registration statement warns of the exact risk that later materialized, a [securities fraud] claim will not lie as a matter of law." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (alteration in original); *see also Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) ("An accurate statement coupled with the precise disclosure of a risk later realized cannot adequately form the basis for a securities claim."), *aff'd*, 347 F. App'x 617 (2d Cir. 2009); *Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37, 38 (2d Cir. 2014) (affirming dismissal where the offering materials "clearly disclosed in numerous, repeated, sometimes boldfaced warnings," the risks that ultimately materialized). The "glut" that Plaintiff references materialized only after Casper explicitly warned that it may "significantly" discount old inventory and is consistent with Casper's disclosures.  Thus, the Registration Statement's references about pricing and promotional strategies were not likely to mislead a reasonable investor.

### D.  Statements about growth

The Registration Statement contained several statements about growth, including that (1) "[Casper] complement[s] [its] strong online presence by expanding [its] physical retail footprint," (SAC ¶ 90); (2) "[Casper] plan[s] to continue the rollout of new Casper retail stores to strengthen [its] footprint in existing cities," (*id.*); (3) "[Casper] ha[s] achieved rapid growth," (*id.* ¶ 92); and (4) "[Casper] envision[s] expanding [its] total international footprint to more than [twenty] countries," (*id.* ¶ 93).

Defendants argue that these claims fail because (1) the SAC does not allege that any of the historic information about Casper's growth was false; (2) the Registration Statement recognized that the expansion plans may not be realized; (3) the Complaint relies on post-IPO events, particularly the COVID-19 pandemic, to plead that the Registration Statement is false;

and (4) the purported misstatements are immaterial statements of optimism and puffery.  (Defs.'
Mem. 20–21.)

Plaintiff contends that all these statements are false because Casper was suffering
accelerating losses, further placing its ability to achieve positive cash flows and profitability out
of reach.  (Pl.'s Opp'n 10; SAC ¶¶ 95, 101.)

These forward-looking statements about Casper's growth are not actionable under the
bespeaks-caution doctrine.[5]  "A forward-looking statement accompanied by sufficient cautionary
language is not actionable because no reasonable investor could have found the statement
materially misleading . . . . In such circumstances, it cannot be supposed by a reasonable investor
that the future is settled, or unattended by contingency."  *MF Glob., Ltd.*, 620 F.3d at 141;
*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("[A]lleged
misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that
any reasonable investor could consider them important in light of adequate cautionary language
set out in the same offering."); *see also Rombach*, 355 F.3d at 173 ("The touchstone of the
inquiry is not whether isolated statements within a document were true, but whether defendants'
representations or omissions, considered together and in context, would affect the total mix of
information and thereby mislead a reasonable investor regarding the nature of the securities
offered.").  The protection of the bespeaks-caution doctrine extends to both claims under the
Securities Act and the Exchange Act. *See MF Glob., Ltd.*, 620 F.3d at 141 n.8 ("Though we
originally applied bespeaks caution to an action under § 10(b) of the 1934 Securities Exchange

---

[5]  "It is settled that the bespeaks-caution doctrine applies only to statements that are
forward-looking."  *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir.
2010).

Act, 15 U.S.C. § 78j(b), we have since applied the doctrine to actions under § 11 and § 12(a)(2) of the 1933 Securities Act." (internal citations omitted)).

In the Registration Statement, Casper highlighted the risks that could prevent it from achieving its forward-looking growth plans.  Casper warned that (1) it may not be able to implement its strategic initiatives and that the initiatives may not lead to growth, (Registration Statement 36); (2) it "may not achieve the growth potential" it expected, (*id*. at 32); (3) its "plans for international expansion may not be successful," (*id.* at 47); and (4) its growth strategy was premised on expanding retail "which presents risks and challenges," (*id*. at 37.)  Because Casper repeatedly warned that it may not achieve its planned growth and outlined the risks associated with its forward-looking statements, the statements would not be misleading to a reasonable investor.  Thus, Plaintiff cannot rely on these statements about growth to support his claims for securities fraud under either the Exchange Act or the Securities Act.

Moreover, to the extent that the Plaintiff challenges statements concerning Casper's "envision" to expand to other markets, the Court finds that those statements are no more than corporate puffery.  (*See* SAC ¶ 93 ("[Casper] envision[s] expanding [its] total international footprint to more than [twenty] countries."))  Such statements "[do] not give rise to securities violations," because they are "too general to cause a reasonable investor to rely upon them." *ECA & Loc. 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 205–06 (2d Cir. 2009).  Statements are general puffery when they are "merely generalizations regarding [a company]'s business practices." *Id*. at 206. The statements about Casper's growth and desire to expand into international markets are corporate optimism more appropriately described as puffery.  *See, e.g.*, *In re Nokia Oyj (Nokia Corp.) Sec. Litig*., 423 F. Supp. 2d 364, 397–98 (S.D.N.Y. 2006) (holding that optimistic statements about growth were puffery).

ii. **Duty to disclose**

In addition, Defendants had a duty to disclose Casper's plans for sustaining profitability and the loss of distribution networks. Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 requires that Casper's SEC Form 10–K "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016) (alteration in original) (quoting 17 C.F.R. § 229.303(a)(3)(ii)). According to the SEC's interpretive release regarding Item 303, "disclosure [under Item 303] is necessary 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'" *Id.* (alteration in original) (quoting *Stratte–McClure*, 776 F.3d at 101).

Likewise, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, requires a disclosure of the "most significant risk factors" associated with the security. *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020) (quoting 17 C.F.R. § 229.105). To state a claim under Item 105, an issuer must know, at the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business. *See id.*

Casper's limited ability to implement sustainable profitability protocols and its change of an important distributor are facts that have a materially unfavorable impact on sales, revenue, and income from continuing operations, and thus should have been disclosed. Further, Casper's former employees provide factual support of Plaintiff's claim that Defendants knew about these materially adverse trends and risks, and therefore should have disclosed them. *See Stratte-McClure*, 776 F.3d at 105 ("Item 303 'requires not only a "discussion" but also an "analysis" of

27

known material trends,' and that disclosure is 'necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results." (quoting Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Release Nos. 33–8350, 34–48960, 68 Fed. Reg. 75056, 75061 (Dec. 29, 2003))).

### c.   Plaintiff sufficiently alleged scienter under section 10(b) of the Exchange Act

Defendants argue that Plaintiff fails to allege a strong inference of scienter, as required by Section 10(b) of the Securities Act, because Plaintiff fails to allege Defendants' motive and opportunity to commit fraud or conscious misbehavior or recklessness.  (Defs.' Mem. 25–28.)

Plaintiff argues that the allegations in the SAC support a strong inference that Defendants knew about (or recklessly disregarded) the undisclosed conditions at Casper, which Defendants hid from investors, and which rendered public statements about Casper's profitability misleading.  (Pl.'s Opp'n 16.)  In support, Plaintiff asserts that multiple former employees confirmed that Defendants were well-aware of the state of affairs at Casper, but only disclosed this information to the investing public well after the IPO.  (*Id*. at 16–17.)  Plaintiff argues that it can rely on these confidential witnesses because they are described in the SAC "with sufficient [particularity] to support the probability that a person in the position occupied by the source would possess the information alleged."  (*Id*. at 17 (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).)

When bringing a claim under Section 10(b), a plaintiff must plead facts to support a finding of scienter.  *See* 15 U.S.C. § 78u-4(b)(2)(A); *Singh*, 918 F.3d at 62.  To survive a Rule 12(b)(6) motion under the PSLRA, a plaintiff must plead "with particularity facts that give rise to a strong inference that the defendant acted with the requisite state of mind."  *ECA & Loc. 134*

*IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 198.  When the defendant is a corporate entity, the pleaded facts must create "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc*., 531 F.3d 190, 195 (2d Cir. 2008)).

"To establish scienter, 'a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud.'"  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021) (quoting *Rombach*, 355 F.3d at 176).  When a plaintiff seeks to establish scienter through evidence of recklessness, she may do so "through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  *SEC. v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)); *see also City of Pontiac*, 752 F.3d at 184 (noting that, in this context, recklessness is defined as "a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." (quoting *Novak*, 216 F.3d at 308, 312)).  Circumstances comprising evidence of recklessness include allegations that a defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."  *Emps.' Ret. Sys. of Gov. of the V.I. v. Bankford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ECA & Loc. 134 IBEW Joint Pension Tr.*

*of Chicago*, 553 F.3d at 199).  When assessing whether scienter has been adequately pled, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  *Tellabs, Inc.*, 551 U.S. at 322. Thus, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id*. at 323.

Plaintiff's allegations in the SAC support an inference that the Individual Defendants knew about (or recklessly disregarded) the undisclosed conditions at Casper.  Multiple former employees cited in the SAC confirmed, based on personal knowledge and/or interaction with high-level Casper employees, that Casper's corporate officers, including Krim and Parikh, were well-aware of Casper's unprofitability and undesirable prospects, yet made public statements contradicting that very knowledge.  (SAC ¶¶ 43–78); *see In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 76 (2d Cir. 2001) ("Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business.").

### d. Plaintiff sufficiently alleges loss causation under the Securities Act and Exchange Act

Defendants argue that the SAC must be dismissed because Plaintiff fails to allege loss causation as required by Section 11 and Section 10(b).  (Defs.' Mem. 29.)  In support, Defendants assert that Plaintiff cites only to the stock drop on May 12, 2020, when Casper announced the financial results for the first quarter of 2020, the change in one of Casper's logistics providers, discounts to inventory, and a reduction in planned retail openings.  (*Id.*) However, none of this information revealed to the market that any prior statement by Defendants

were false.  (*Id*.)  In addition, Defendants claim that the impact of the COVID-19 pandemic was unprecedented and caused some of Casper's negative outcomes.  (*Id*. at 29–30.)

Plaintiff argues that Defendants offer no innocent explanation for why their "private information differed from public disclosures," other than COVID-19, which fails to explain the discrepancy between the pre-COVID-19 information Defendants disclosed around and after the IPO.  (Pl.'s Opp'n 18.)  In addition, Plaintiff argues that while he is not required to plead a motive, the SAC states one: Defendants misrepresented the underlying facts in order to sell the IPO to investors.  (*Id*.)

"Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'"  *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, No. 20-CV-2805, 2022 WL 151302, at *2 (2d Cir. Jan. 18, 2022) (*quoting Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 172 (2d Cir. 2005)); *see also Charney v. Wilkov*, 734 F. App'x 6, 10 (2d Cir. 2018) (same).  "To plead loss causation, [a plaintiff] must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'"  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).  "Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed."  *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, No. 20-CV-10041, 2022 WL 596679, at *28 (S.D.N.Y. Feb. 28, 2022) (quoting *Abramson v. Newlink Genetics Corp*., 965 F.3d 165, 179 (2d Cir. 2020)).

Plaintiff adequately pleads a materialization of some of the risks that Defendants failed to disclose.  For example, Plaintiff alleges that Casper struggled to gain a foothold in foreign markets, (SAC ¶ 49), and later Casper "stated that it was reducing the size of its global operations and sales team and completely winding down its European operations, leading to the loss of 21% of its entire corporate workforce globally," (*id*. ¶ 101).  In addition, Plaintiff alleges that Casper's revenue was trending downwards, and the company took several unsustainable and troublesome actions to inflate its projected growth and profitability, (*id*. ¶¶ 55–58, 74). Later during the same quarter when Defendants conducted the IPO, Casper stated that it had suffered a net loss of $34.5 million, a 98% increase year over year, and an adjusted EBITDA loss of $22.9 million, a 60% increase year over year; and its gross margin had dropped 190 basis points over the quarters, (*id*. ¶ 102).  Plaintiff also described mattress inventory as a "glut" that further impaired Casper's profitability, (*id*. ¶¶ 47, 96), and later Krim stated that the decrease in net margin was the result of a change in one of Casper's logistics providers and an unusually high number of clearance sales necessary to get rid of old mattress inventory that had amassed prior to the IPO, (*id*. ¶ 103).  Furthermore, Krim also stated that Casper was significantly reducing the number of planned retail openings, further diminishing its growth prospects.  (*Id*.)  After these problems materialized, Casper shares fell.  (*Id*. ¶ 105.)  Based on these factual allegations, Plaintiff has sufficiently alleged loss causation.[6]  *In re Omega Healthcare Invs., Inc. Sec. Litig*.,

---

[6]  Defendants argue that the changes in Casper's performance, growth plan, and cash conservation were directly attributable to COVID-19.  (Defs.' Mem 22–23.)  However, at the motion to dismiss stage, the Court declines to consider competing theories about what may have caused adverse outcomes to materialize that were not referenced in the SAC.  *See, e.g.*, *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc*., 545 F. Supp. 3d 120, 147-50 (S.D.N.Y. 2021) (recognizing that "years of news reports" about potential investigations, prosecutions and fines, all of which later materialized, did not defeat plaintiffs' allegations of loss causation at the Rule 12(b)(6) stage); *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) (recognizing

563 F. Supp. 3d 259, 271 (S.D.N.Y. 2021) (finding that plaintiffs adequately pled loss causation as to the omission where they alleged stock prices dropped after the information omitted materialized); *see also In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 380 (S.D.N.Y. 2018) (describing the burden of pleading loss causation as "a low one at the pleading stage").

### e.   Plaintiff sufficiently alleges control-person claims

Defendants argue that because Plaintiff has failed to plead any primary violations of Section 11 and Section 10(b), the control claim under Section 15 against the Individual Defendants and Section 20(a) against the Officer Defendants must be dismissed.  (Defs.' Mem. 30.)   Defendants also argue that the Section 20(a) claims should be dismissed for the independent reason that Plaintiff did not allege facts showing that any of the Officer Defendants culpably participated in the alleged fraud.  (*Id.* at 31.)

Plaintiff argues that he expressly alleges in the SAC that the Individual Defendants participated in the misstatements by signing the Company's newly alleged Class Period filings with the SEC.  (Pl.'s Opp'n 19.)  Therefore, the Individual Defendants are liable under Section 20(a) of the Exchange Act for Casper's Section 10(b) violations.  (*Id.*)

To state a claim under Sections 15 or 20(a), a plaintiff must show: (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the defendant"; and

---

that the "burden to plead loss causation is 'not a heavy one,' and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, 'the chain of causation is . . . not to be decided on a Rule 12(b)(6) motion to dismiss'" (quoting *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 187 (2d Cir. 2015))); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011) (holding that at the motion to dismiss stage, the complaint "need not rule out all competing theories for the drop in . . . stock price; that is an issue to be determined by the trier of fact on a fully developed record"); *In re Pronetlink Sec. Litig.*, 403 F. Supp. 2d 330, 336 (S.D.N.Y. 2005) ("Defendants' contentions that intervening causes . . . were to blame for the collapse of [the company's] share price must await the trial.").

(3) "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *In re Bernard L. Madoff Inv. Sec. LLC*, 818 F. App'x 48, 55 (2d Cir. 2020) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007); *see also ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 207 ("In order to establish a prima facie case of controlling-person liability [under sections 15 or 20(a)], a plaintiff must show a primary violation by the controlled person." (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996))); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740, 746 (S.D.N.Y. 2015) (recognizing parallel control person liability under Section 15 of the Securities Act and 20(a) of the Exchange Act).

As described above, Plaintiff has pled primary violations of Section 11 and Section 10(b) and also alleged facts showing that the "Officer Defendants participated directly or indirectly in the [alleged fraud via the] preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements . . . designed to influence the market for Casper securities."  (SAC ¶ 133.)

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's control claims.

**III.  Conclusion**

For the foregoing reasons, the Court grants Defendants' motion in part and denies it in part.  The Court denies Defendants' motion as to (1) Plaintiff's claims regarding Defendants' statements or omissions about Casper's profits and profitability and distribution network; (2) the sufficiency of Plaintiff's scienter allegations; (3) the sufficiency of Plaintiff's loss allocation

allegations; and (4) the sufficiency of Plaintiff's control-person claims.  The Court grants

Defendants' motion as to Plaintiff's claims regarding Defendants' statements about Casper's

pricing and promotions and growth.

Dated: September 30, 2022
       Brooklyn, New York

                              SO ORDERED:


                              ____/s/ MKB_____
                              MARGO K. BRODIE
                              United States District Judge