**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT LEMATTA, Individually and on behalf of all others similarly situated, | Case No: 1:20-cv-02744 |
| Plaintiff, | **CLASS ACTION** |
| v. | Honorable Margo K. Brodie |
| CASPER SLEEP INC., et al., | Honorable Robert M. Levy |
| Defendants. | |

**DECLARATION OF JOSHUA B. SILVERMAN IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, FINAL CERTIFICATION OF SETTLEMENT CLASS, AN AWARD OF ATTORNEYS' FEES AND EXPENSES, AND PLAINTIFF'S COMPENSATORY AWARD**

I, JOSHUA B. SILVERMAN, hereby declare as follows:

1.      I am a partner at Pomerantz LLP ("Pomerantz"), Lead Counsel for Court-appointed Lead Plaintiff Saleh Doron Gahtan ("Lead Plaintiff" or "Plaintiff") and the Class in this action (the "Action"), and am an attorney admitted to practice in this Court *pro hac vice*. I have led the prosecution of this Action since August 2020, as well as the negotiations resulting in the resolution of this Action, and I have personal knowledge of the matters set forth herein. I have also been kept informed of developments in the Action by attorneys working with me or under my direction. The statements in this declaration are made based upon my personal knowledge unless otherwise indicated.

2.      I am proud of the benefits achieved for the Class Members in the $3,000,000 Settlement proposed herein and I respectfully submit this Declaration in support of Lead Plaintiff's Motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (1) the $3,000,000 Settlement; (2) the proposed plan for allocating the Settlement proceeds to eligible members of the Class (the "Plan of Allocation"); (3) final certification of the Settlement Class; (4) Lead Counsel's application for an award of attorneys' fees of 33 1/3% of the Settlement Fund (supported by Lead Plaintiff), and reimbursement of reasonable litigation expenses of $233,242.40; and (5) a modest $15,000 compensatory award to Lead Plaintiff pursuant to 15 U.S.C. § 78u- 4(a)(4). The Settlement Amount was deposited into an Escrow Account maintained by the Escrow Agent, The Huntington National Bank, via payments on October 16, 2024, October 31, 2024, and November 4, 2024, and has been earning interest for the benefit of the Class since those dates. The Settlement resolves all claims that were or could have been asserted by Lead Plaintiff in the Second Amended Consolidated Class Action Complaint (ECF 29) (the "Second

2

Amended Complaint"). *See* Stipulation, ECF 80 at 12-13 against all remaining Defendants and their affiliates.

3.      This Declaration sets forth the nature of the claims asserted in the Action, which involve alleged misrepresentations and omissions made by Defendants Casper Sleep, Inc. ("Casper"), Philip Krim, Gregory MacFarlane, Neil Parikh, Diane Irvine, Anthony Florence, Jack Lazar, Benjamin Lerer, Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Jefferies LLC, BofA Securities, Inc., UBS Securities LLC, Citigroup Global Markets Inc., Piper Sandler & Co., and Guggenheim Securities, LLC (collectively, "Defendants") misrepresenting Casper's financial health because Casper's profit margins were actually declining, not growing, as well as concealing that Casper had dismissed its most important distribution partner and was experiencing problems transitioning to a new distribution partner; that Casper had a glut of old inventory that impaired profitability; that Casper was accelerating losses; and that Casper's core operations were burning cash. It also details the proceedings to date, including the extensive efforts undertaken by Lead Plaintiff and Lead Counsel in prosecuting the Action. In the face of increasing risks, Lead Plaintiff commenced hard-fought negotiations that ultimately resulted in the Settlement. Lastly, this Declaration provides background facts supporting Lead Counsel's request for an award of attorneys' fees and reimbursement of litigation expenses and modest, proposed awards of $15,000 to Lead Plaintiff Saleh Doron Gahtan for reasonable costs and expenses relating to his time and effort representing  the Class, pursuant to 15 U.S.C. § 78u-4(a)(4).

I.      **PRELIMINARY STATEMENT**

4.      This Action has been intensively litigated since its commencement on June 19, 2020, through the time the Parties reached an agreement in principle to settle in June 2024. The Settlement was achieved only after Lead Plaintiff, through the efforts of Lead Counsel, expended

3

significant time, effort, and expense. Lead Plaintiff believes the $3,000,000 Settlement represents an excellent result for the Class.

5.     The Second Amended Complaint alleges violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Lead Plaintiff alleged that, in the Company's February 7, 2020 initial public offering and/or during the period between March 19, 2020 and May 12, 2020 (the "Class Period"), Defendants misrepresented Casper's financial health because Casper's profit margins were actually declining, not growing, and concealed that Casper had dismissed its most important distribution partner and was experiencing problems transitioning to a new distribution partner; that Casper had a glut of old inventory that impaired profitability; that Casper was accelerating losses; and that Casper's core operations were burning cash..

6.     This action was first filed on June 19, 2020.

7.     Lead Counsel has litigated this action on a wholly contingent basis and has advanced substantial litigation expenses in connection with its efforts. The Court-approved plan of notice fully disclosed to potential Class Members that Lead Counsel would seek attorneys' fees of up to 33 1/3% and reimbursement of up to $280,000 in litigation expenses. To date, no objections have been made against the Settlement. *See infra* at ¶¶73, 88. Lead Counsel's request for attorneys' fees in the amount of 33 1/3% of the Settlement Fund (supported by Lead Plaintiff) is well justified given the facts of this case, the benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed. Lead Counsel also requests reimbursement of the reasonable expenses incurred in connection with

its prosecution of the Action in the amount of $233,242.40, which is substantially below the noticed expense cap.

8.      The reasonableness of the requested fee is further supported by the fact that the requested fee equates to a multiplier of negative 0.54 on Lead Counsel's lodestar, as explained *infra* at ¶¶69-71, is well below the range that courts in this Circuit accept as reasonable and supports a fee at the higher end of the range. *See In re PPDAI Grp. Inc. Sec. Litig.*, No. 18-CV-6716 (TAM), 2022 WL 198491, at *16 (E.D.N.Y. Jan. 21, 2022) (collecting cases) (a negative lodestar multiplier of 0.755 "is well below the parameters used throughout district courts in the Second Circuit, [and] affords additional evidence that the requested fee is reasonable."); *Guevoura Fund Ltd. v. Sillerman*, No. 1:15-CV-07192-CM, 2019 WL 6889901, at *18 (S.D.N.Y. Dec. 18, 2019) (collecting cases) ("Courts have repeatedly recognized that the reasonableness of the fee request under the percentage method is reinforced where, as here, the percentage fee would represent a negative multiplier of the lodestar."); *In re Sterling & Foster, Inc. Sec. Litig.*, 238 F. Supp. 2d 480, 490 (E.D.N.Y. 2002) ("the fact that any reasonable fee would necessarily represent a negative multiplier of the lodestar supports an award at the higher end of the spectrum." ); *see also Rosi v. Aclaris Therapeutics, Inc.*, No. 19-CV-7118 (LJL), 2021 WL 5847420, at *8–9 (S.D.N.Y. Dec. 9, 2021) (finding that "a lodestar multiplier of approximately 3.3 … is reasonable" for a $2.65 million settlement); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts[.]"). Thus, Lead Counsel's request for attorneys' fees is eminently reasonable in light of the risk of non-payment undertaken by Lead Counsel, the fact that Lead Counsel has a negative lodestar multiplier, and precedent within this Circuit approving lodestar multipliers up to 5.5. *See, e.g.,* *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5). Moreover,

Lead Counsel's fee request is supported by Lead Plaintiff and is consistent with the retainer agreements entered into at the beginning of this litigation. *See* Declaration of Saleh Doron Gahtan, attached hereto as **Exhibit 1**, ¶¶5-6.

9. I respectfully submit that the Settlement, for the reasons discussed herein and in the accompanying memoranda, is fair, reasonable, and adequate in all respects; that the Plan of Allocation is fair, reasonable, and has a rational basis; and that the Court should therefore approve them and grant final certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure. Likewise, I respectfully submit that Lead Counsel's request for attorneys' fees and reimbursement of litigation expenses, including Lead Plaintiff's request for costs and expenses incurred in connection with his representation of the Class (collectively, the "Fee and Expense Application"), is fair and reasonable and should be approved.

## II.   FACTUAL SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS

10. Defendant Casper Sleep Inc. ("Casper") is a mattress company founded in 2014 as an online retailer. ¶35.[1] In the run-up to its Initial Public Offering ("IPO"), Casper expanded into partnerships with retailers, while also opening its own brick-and-mortar locations. *Id*.

11. At the time of its February 7, 2020 IPO, Casper distributed products directly to customers through its e-commerce platform, sixty Casper retail stores, and eighteen retail partners. ¶37. Casper also claimed that third-party distribution relationships conferred a competitive advantage. ¶41.

12. The Company filed its IPO Registration Statement with the U.S. Securities and Exchange Commission (the "SEC") on Form S-1 on January 10, 2020, and filed its IPO Prospectus

---

[1] Citations to "¶__" or "¶¶__" are references to the numbered paragraphs of the Consolidated Second Amended Complaint (the "SAC"). (ECF 29).

on Form 424B4 with the SEC on February 7, 2020.  The Registration Statement highlighted the Company's purported core profitability, including that its retail stores were "four-wall profitable" and were generating increasing amounts of cash, as well as how its e-commerce operations were profitable.  ¶¶85-91.  The Registration Statement also touted Casper's distribution network and its integral place in the Company's pathway to profitability.  ¶94.

13.    Lead Plaintiff alleges that these statements created a false and misleading impression about Casper's financial health because Casper's profit margins were actually declining, not growing.  ¶95.  Lead Plaintiff also alleges that the Registration Statement concealed that Casper had dismissed its most important distribution partner and was experiencing problems transitioning to a new distribution partner; that Casper had a glut of old inventory that impaired profitability; that Casper was accelerating losses; and that Casper's core operations were burning cash.  *Id*.  Based on the Registration Statement, Defendants conducted the IPO and Defendants sold 8.35 million shares of Casper common stock at $12 per share, generating over $100 million in gross proceeds.  ¶84.

14.    Lead Plaintiff alleges that, in reality, internal reports cast Casper's operation far more bleakly than the Registration Statement.  Internally, Casper acknowledged "early signs of a 30% drop in same-store performance," that the direct-to-consumer eCommerce market was "slowing," that 2109 eCommerce revenue net of promotions had missed budget by 20%, that eCommerce conversions were 13% less than expected in 2019, that the Company had observed "significant diminishing marginal returns on media spend," and that "omni-channel cannibalization" was something the Company was "already seeing signs of … in 2019," with "risks are increasing as we grow our store footprint," all negative trends impacting profitability.

15.     On March 19, 2020, Casper held an earnings call on which Defendant Philip Krim announced the IPO results and affirmed that Casper had "a strong balance sheet and cash to operate[.]" ¶99.  On April 21, 2020, the Company announced that, despite just raising more than $100 million in gross offering proceeds from the IPO, it needed to take significant actions to improve its cash position.  ¶101.  Further, Casper announced that Defendant Gregory Macfarlane, the Company's CFO and COO, was resigning.  *Id*.

16.     On May 12, 2020, Casper announced to investors that it had suffered a net loss of $34.5 million – a 98% increase year over year – and an adjusted EBITDA loss of $22.9 million – a 60% increase year over year.  ¶102.  Moreover, the Company announced that its gross margin had fallen by 190 basis points during the quarter.  *Id*.  On an earnings call that same day, Defendant Philip Krim attributed Casper's problems to a change in logistics providers and an abnormally high number of clearance sales needed to dispose of old mattress inventory that built up before the IPO.  ¶103.  On May 12, 2020, Casper also filed its Form 10-Q quarterly report with the SEC stating that Casper suffered over $40 million in negative cash flows during the quarter.  ¶104.  At that burn rate, Casper was on track to run out of cash entirely within the year.  *Id*.

17.     In response to this news, Casper shares fell on May 12, 2020 by $1.53 per share from the previous day's close, or 20%, on heaving trading volume.  ¶105.  The following day, Wedbush published a report concluding that Casper's 1Q20 gross margins of 46.9% missed forecasts "as extended clearance period discounting on the company's old product line weighed on performance and it incurred a charge associated with a change in logistics provider."  *Id*.

### III.    PROCEDURAL HISTORY

18.    This Action was filed on June 19, 2020. *See* ECF 1. Following the filing of the initial complaint, multiple parties filed motions to be appointed lead counsel and lead plaintiff, including Lead Plaintiff Saleh Doron Gahtan. ECF 7-13.

19.    On August 27, 2020, the Court appointed Saleh Doron Gahtan to be Lead Plaintiff, and approved his selection of counsel, Pomerantz LLP as Lead Counsel (*see* text order dated August 27, 2020).

20.    On October 27, 2020, after interviewing multiple former Casper employees as part of a thorough investigation and engaging a damages expert, Plaintiff filed his Amended Complaint (ECF 16) that added claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

21.    Thereafter, on December 1, 2020, Defendants moved to stay the Action in favor of a state court action asserting violations of the Securities Act of 1933 (ECF 21), but ultimately withdrew the motion to stay on May 12, 2021 (ECF 27).

22.    The Parties consented to allow Plaintiff to file a Second Amended Complaint, which Plaintiff did on June 30, 2021 (ECF 29).

23.    As a result of Plaintiff's extensive investigation, the Amended and Second Amended Complaint contained much stronger and more detailed allegations than the initial complaint, and supported additional claims. *Id.*

24.    On July 31, 2021, Defendants moved to dismiss Plaintiff's Second Amended Complaint, which the Parties subsequently fully briefed. ECF 31-34.

25.    On September 20, 2022, the Court issued its order on Defendants' motion to dismiss and sustained Plaintiff's core claims. ECF 35.

26.     After the Court's September 20, 2022 order, the Parties proceeded to discovery, where Plaintiff received and reviewed over 30,000 documents comprising approximately 258,000 pages, and took or participated in 11 depositions, informing him of the strengths and weaknesses of his case.

27.     On January 18, 2023, in the midst of discovery, the Parties participated in a mediation before Jed Melnick, an experienced mediator familiar with securities class actions. This mediation did not resolve the Action, and the Parties returned to litigation.

28.     On November 3, 2023, Plaintiff served Defendants with his motion for class certification, and accompanying documents.

29.     On April 4, 2024, while the Parties were briefing Plaintiff's motion for class certification, the Parties participated in another mediation session before Mr. Melnick. At the end of the session, the mediator proposed that the Parties resolve the Action for the Settlement Amount. All Parties later accepted the proposal.

30.     On April 25, 2024, Plaintiff informed the Court by letter motion that the Parties had reached an agreement to settle the Action in its entirety and requested that the Court stay the proceedings so that Plaintiff could prepare and file a motion for preliminary approval by June 3, 2024 (ECF 75).

31.     On May 1, 2024, the Court granted the letter motion and stayed all deadlines and proceedings in the Action.  On June 7, 2024, Plaintiff filed his motion for preliminary approval of the Settlement, which the Court subsequently granted on July 18, 2024.  ECF 78-82.

32.     On August 20, 2024, after Defendants missed multiple payments to the Settlement Fund, Plaintiff filed his motion to enforce the Stipulation of Settlement, which the Parties subsequently briefed.  ECF 83-92.

33.     The Parties participated in multiple conferences to attempt to resolve this funding deficiency, after which, on October 8, 2024, the Court entered an order amending its preliminary approval order and another order amending the payment schedule for Defendants to fund the Settlement. ECF 87-96.  Casper satisfied the amended funding schedule.

34.     Plaintiff now moves for final approval of the Settlement.

## IV.     THE STRENGTHS AND WEAKNESSES OF THE CASE

35.     Based on its experience and knowledge of the facts and applicable law,  Lead Counsel – a law firm specializing in the prosecution of complex securities litigation – believes that the Settlement is in the best interest of the Class. Lead Plaintiff also believe the Settlement is fair, reasonable and adequate to Class Members.  *See* Declaration of Saleh Doron Gahtan, ¶6.  Lead Counsel and Lead Plaintiff have also evaluated the various risks to class certification and to proving support for their claims at summary judgment.  Each of these issues presented a substantial risk to recovery that Lead Plaintiff and Lead Counsel considered in reaching the proposed Settlement.

### A.     Certification of the Class

36.     While Lead Plaintiff believes that securities fraud actions such as this Action are appropriate for class action treatment, Lead Plaintiff is also aware that Defendants would have opposed class certification outside the context of the Settlement.  Lead Plaintiff believes that the Class satisfies the requirements of Fed. R. Civ. P. 23, and that he would prevail in establishing numerosity, commonality, typicality, and predominance. Further, Lead Plaintiff believes that he has, and would continue to, adequately and fairly protect the interests of the Class. Lead Plaintiff acknowledges, however, that Defendants would likely oppose class certification and their arguments might have merit. If the Court found these arguments persuasive, it could deny

certification, which would prevent recovery for absent Class Members. While Lead Counsel believes its arguments would have prevailed, class certification would not have been certain.

37. Even if the Class was certified, Defendants could petition the Second Circuit for leave to appeal that decision immediately pursuant to Rule 23(f), which could result in substantial delays in the resolution of the litigation. The recent case of *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 CIV. 3461 (PAC), 2021 WL 5826285 (S.D.N.Y. Dec. 8, 2021), is instructive on this point. There, the district court originally granted plaintiffs' motion for class certification on September 24, 2015. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 CIV. 3461 PAC, 2015 WL 5613150, at *8 (S.D.N.Y. Sept. 24, 2015), *vacated and remanded sub nom. Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474 (2d Cir. 2018). Thereafter, defendants appealed the district court's order to the Second Circuit *twice*, then to the Supreme Court, and then *again* to the Second Circuit. In other words, over seven years after the *Goldman* plaintiffs first moved to certify the class, its fate remained undetermined. *See also In re Vivendi Universal, S.A. Sec. Litig.*, No. 11-908 (2d Cir. July 20, 2011) (denying second Rule 23(f) petition over four years after district court originally granted class certification). Thus, the danger of a protracted delay over class certification is very real.

**B.      Risk of Establishing Liability and Damages at Summary Judgment and Trial**

38. If the Court granted Lead Plaintiff's motion for class certification, Defendants would have then presented additional arguments at summary judgment and trial to oppose Lead Plaintiff's claims. Most notably, Defendants would likely challenge evidence regarding falsity, materiality, scienter, damages, and loss causation, the outcome of which is difficult to predict. For the Class to recover damages at the level estimated by Lead Plaintiff's expert, Lead Plaintiff would need to prevail on each and every one of the remaining allegations, for the entire Class.

12

Notwithstanding this fact, the jury would also have to adopt Lead Plaintiff's expert's damages analysis over Defendants' expert's analysis, and such expert battles are never predictable. *See In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *9 (S.D.N.Y. Nov. 7, 2007).

39.    Defendants' arguments at summary judgment and trial would be informed by extensive fact discovery, which was ongoing at the time of the Settlement.  While some of the evidence uncovered supported Plaintiff's claims, other evidence did not and could potentially undermine Lead Plaintiff's allegations regarding the falsity of Defendants statements relating to Casper's financial health and Defendants' alleged concealment of the fact that Casper had dismissed its most important distribution partner and was experiencing problems transitioning to a new distribution partner; that Casper had a glut of old inventory that impaired profitability; that Casper was accelerating losses; and that Casper's core operations were burning cash.

40.    The  risks inherent in proving scienter for purposes of the Section 10(b) claim were also significant due to, *inter alia*, the nature of Defendants' alleged misrepresentations and omissions, which  center  on  Defendants'  representations regarding Casper's financial health. There is no guarantee that a jury, upon assessing the totality of the evidence and the credibility of witnesses, would find the Defendants to have a culpable state of mind. Indeed, securities cases that have survived a motion to dismiss have later been defeated on scienter and/or loss causation grounds at summary judgment. *See, e.g.*, *In re Symbol Techs. Class Action Litig.*, 950 F. Supp. 1237, 1246 (E.D.N.Y. 1997) (granting summary judgment because the plaintiffs failed to adequately support their allegations of scienter).

41.    Further, there would be significant risk to proving causation (both as an affirmative element and to defeat negative causation defenses), given the industry turmoil during the onset of

Covid. *See Vaccaro v. New Source Energy Partners L.P.*, 2017 WL 6398636, at *5 (S.D.N.Y. Dec. 14, 2017) (noting that "Plaintiffs may have been unable to prove that Defendants' misleading statements were the cause of Plaintiffs' losses"); *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 118 (S.D.N.Y. 2009) (same).

## V.    SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT

### A.    The Parties' Settlement Negotiations and Resulting Settlement

42.    The Parties began discussing settlement at the end of 2022, and on January 18, 2023, they participated in a full-day mediation before an experienced mediator, Jed Melnick. This mediation did not resolve the Action, and the Parties returned to litigation.  A second mediation was held before Mr. Melnick on April 4, 2024.  That too did not immediately resolve the Action, but subsequent negotiations led to a mediator's proposal to settle the Action for the Settlement Amount, which both sides accepted.  On June 6, 2024, Lead Counsel for Lead Plaintiff and counsel for Defendants executed the Stipulation and Agreement of Settlement.  *See* ECF 80.

43.    On June 7, 2024 Lead Plaintiff filed a Motion for Preliminary Approval of the Settlement, along with the Stipulation of Settlement, which the Court subsequently granted and entered an Order preliminarily approving the Settlement.  *See* ECF 78-82.

44.    On August 20, 2024, after Defendants missed multiple payments to the Settlement Fund, Plaintiff filed his motion to enforce the Stipulation of Settlement, which the Parties subsequently briefed.  ECF 83-92.  The Parties participated in many conferences before the Court to attempt to resolve this funding breach, and to get the Settlement back on track.  On October 8, 2024, the Court entered an order amending its preliminary approval order (the "Preliminary Approval Order") and another order amending the payment schedule for Defendants to fund the Settlement. ECF 87-96.

**B.      Notice to the Class Meets the Requirements of Due Process and Rule 23 of the Federal Rules of Civil Procedure**

45.    Pursuant to its initial preliminary approval order, the Court set: (i) October 18, 2024 as the deadline for filing papers in support of the Final Settlement, the Plan of Allocation, and the application by Lead Counsel for attorneys' fees or reimbursement of expenses; (ii) October 25, 2024 as the deadline for submitting any written objections to the Settlement; (iii) October 25, 2024 as the deadline for submitting requests to be excluded from the Class or filing any opposition to any of the applications; (iv) November 8, 2024 as the deadline for all replies to responses to any opposition to the Applications; and (v) a Final Approval Hearing to be held on November 15, 2024 at 10:00 a.m. *Id.* at 3-15. These dates were later amended pursuant to the Court's October 8, 2024's Preliminary Approval Order, and set as: (i) November 18, 2024 as the deadline for filing papers in support of the Final Settlement, the Plan of Allocation,  and  the application by Lead Counsel for attorneys' fees or reimbursement of expenses (collectively, the "Applications"); (ii) November 30, 2024 as the deadline for submitting any written objections to the Settlement; (iii) November 30, 2024 as the deadline for submitting requests to be excluded from the Class or filing any opposition to any of the applications; (iv) December 13, 2024 as the deadline for all replies to responses to any opposition to the Applications; and (v) a Final Approval Hearing to be held on February 6, 2025 at 2:00 P.M. in Courtroom 6F North, 225 Cadman Plaza East, Brooklyn, New York 11201. ECF 95 at 2-8.

46.    In accordance with the Preliminary Approval Order, Lead Counsel instructed Strategic Claims Services ("SCS"), the Court-approved Claims Administrator for the Settlement, to: (1) e-mail and mail copies of the Court-approved Postcard Notice by first-class mail,  postage prepaid to potential members of the Class and nominees; (2) e-mail potential class members a link to both the Notice and the Claim on the settlement website; and (3) publish the Summary Notice

in accordance with the Preliminary Approval Order (*i.e.*, over the *Globe Newswire*). The Postcard Notice and Summary Notice direct recipients to the full Notice on the Settlement website, www.strategicclaims.net/Casper/.  All Notices described the Settlement and information regarding the lawsuit and the right of Class Members to: (a) participate in the Settlement; (b) object to any aspect of the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; or (c) exclude themselves from the Class.

47.     As set forth in the Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; (C) Report on Requests for Exclusion and Objections; and (D) Claims Received to Date ("Bravata Decl.", attached as **Exhibit 2**) regarding mailing of the notice of pendency and proposed settlement of class action and proof of claim, SCS initially disseminated 5,320 copies of the Postcard Notice to potential Class Members and nominees in accordance with the Preliminary Approval Order, and e-mailed an additional 9,913 potential Class Members to provide them with the Court-approved Notice (the "Notice") and Claim link, including to brokers and nominees contained in SCS' master mailing list. *See* Bravata Decl. at ¶¶2-8. In accordance with the Preliminary Approval Order, on August 13, 2024, SCS caused the Summary Notice to be published over the *Globe Newswire*. *Id.* at ¶9.

48.     Lead Counsel also caused SCS to establish a website dedicated to the Settlement (www.strategicclaims.net/casper/). The website provides members of the Class with information concerning the Settlement and access to downloadable copies of the Claim Form, Notice, Stipulation, and the Preliminary Approval Order, as well as copies of other filings in this Action. Additionally, SCS established and maintains a toll-free telephone number, 1-866-274-4004, to respond to inquiries from Class Members regarding the Settlement.

16

49.     To date, through direct mailings, mailings to brokers and nominees, and e-mails, SCS has sent over 15,235 claim forms to potential Class Members, and received 5,634 Proofs of Claim submitted by potential Class Members indicating their support of and desire to participate in the Settlement. *See* Bravata Decl. at ¶¶7, 14.

50.     As set forth above, the deadline for members of the Class to request exclusion from the Class or file an opposition to the Settlement, Plan of Allocation, and/or Fee and Expense Application is November 30, 2024. Thus, while the deadline for submitting requests to be excluded from the Class has not yet passed, as of the date of this filing, November 18, 2024, SCS has received no exclusions or objections to the Settlement. *Id*. ¶¶12-13.

**C.     Participation in the Settlement and Submission of Claims**

51.     Class Members who wish to be potentially eligible to receive a distribution from the Settlement Fund are required to submit a completed Proof of Claim to the Court-authorized Claims Administrator, SCS, postmarked or submitted no later than November 8, 2024.

52.     The Claims Administrator, supervised by Lead Counsel, will make reasonable efforts to resolve any curable defects in Proof of Claim Forms to ensure that all Class Members with otherwise valid Claims are not rejected and obtain their rightful compensation from the Settlement Fund. Lead Counsel has been, and will continue to be, involved in the claims administration process. It will continue to communicate with Class Members, answer their questions, and ensure the process runs smoothly and efficiently.

**VI.     PLAN OF ALLOCATION**

53.     As mentioned above, pursuant to the Court's Preliminary Approval Order and as set forth in the Notice, Class Members who wish to participate in the Settlement and be eligible to

17

receive a distribution from the Settlement Fund must provide a valid Proof of Claim to the Claims Administrator postmarked or submitted on or before November 8, 2024. *See* ECF. No. 95 at 3-5.

54.     The proposed Plan of Allocation equitably distributes the net proceeds of the Settlement  to Class Members who submit timely and valid Proofs of Claim based  on  their respective  alleged  economic  losses  as  a result of the alleged violations of federal securities laws asserted in the Action, as opposed  to  market-wide or industry-wide factors, or company-specific factors unrelated to the alleged fraud.  Calculations under  the Plan of Allocation  are consistent with Sections 11 and 15 of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

55.     The Plan of Allocation was prepared in consultation with an econometric expert firm that Lead Counsel retained as consultants. Although the Plan of Allocation is not a formal damages analysis, it reflects the informed views of Lead Plaintiff's consultants, including their review of publicly available information regarding Casper and statistical analysis of the price movements of Casper securities during the Class Period. Lead Counsel believes that the Plan of Allocation is reasonable, well-supported, and should be approved.

56.     Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each share of Casper common stock purchased  or  otherwise acquired that is traceable to the Company's February 7, 2020 initial public offering and/or during  the  Class  Period  from March 19, 2020 through May 12, 2020, both dates inclusive. The calculation of the Claimant's Recognized Loss Amounts will depend upon several facts, including when the shares of Casper common stock were purchased or otherwise acquired during the Class Period, and in what amounts, and whether those shares were sold, and if sold, when they were sold, and for what amounts. *See* Notice, ECF 80-2 at 5-9.

57.     The Plan of Allocation reflects the estimated alleged artificial inflation in the price of Casper common stock during the Class Period. Artificial inflation is estimated from the changes to the price of Casper's common stock during the Class Period resulting from alleged misrepresentation and disclosure events, net of market-wide and industry-wide factors.

58.     Under the Plan of Allocation, Recognized Loss Amounts also take into account the PSLRA's statutory limitation on recoverable damages, whereby losses on eligible shares of Casper common stock cannot exceed the difference between the purchase price paid for the stock and the average price of the stock during the 90-day period subsequent to the Class Period if the share was held through August 10, 2020 (*i.e.*, the end of the 90-day period) and losses on eligible shares of Casper common stock purchased or otherwise acquired *during* the Class Period and sold during the 90-day period subsequent to the Class Period cannot exceed the difference between the purchase price paid for the stock and the average price of the stock during the portion of the 90-day period elapsed as of the date of sale. A table showing the average 90-day lookback price for each day of the 90-day period is attached as Table 2 to the Notice. *See* Notice, ECF 80-2 at 5-8.

59.     To avoid wasteful *de minimus* distributions that would erode the Net Settlement Fund without providing any meaningful benefit to Class Members, the Plan of Allocation provides that no distributions will be made to Claimant's with a *pro rata* share of less than $20.00.

60.     Pursuant to the Plan of Allocation, any remaining funds in the Net Settlement Fund, after six (6) months from the date of distribution of such Net Settlement Fund, shall be used: (i) first, to pay any amounts mistakenly omitted from the initial distribution to Authorized Claimants; (ii) second, to pay any additional Notice and Administration Costs incurred in administering the Settlement; and (iii) finally, to make a second distribution to Authorized Claimants who cashed their checks from the initial distribution and who would receive at least $20.00 from such second

19

distribution, after payment of the estimated costs or fees to be incurred in administering the Net Settlement Fund and in making this second distribution, if such second distribution is economically feasible.

61. The structure of the Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund among Authorized Claimants. Lead Counsel submits that the Plan of Allocation is fair and reasonable and should be finally approved together with the Settlement.

62. Despite broad dissemination of the Plan of Allocation to potential Class Members in the Notice, no objections to the Settlement have been filed.

## VII. THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS FINAL APPROVAL

63. Lead Plaintiff believes that he would have prevailed on his motion for class certification. Defendants are similarly convinced that they would have successfully opposed at certification. Likewise, Lead Plaintiff believes that he would have prevailed on the merits at trial. Defendants are equally adamant that they would prevail. Lead Plaintiff faced a significant risk that he would not have convinced a jury that Defendants made false and misleading statements with the requisite state of mind and that these statements caused Lead Plaintiff's losses. Moreover, the Court could have denied Lead Plaintiff's motion for class certification or entered summary judgment for Defendants, the jury could have found in Defendants' favor, or Lead Plaintiff could have lost on appeal.

64. Having considered the foregoing risks and evaluated Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and its extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement before this Court is fair, reasonable, and adequate, and in the best interests of the Class.

## VIII.  LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

65.    The Notice provides that Lead Counsel will apply to the Court for attorneys' fees not to exceed 33 1/3% of the Settlement Amount and reimbursement of expenses not to exceed $280,000, plus interest earned on these amounts at the same rate as the Settlement Fund. As set forth in the accompanying memorandum of points and authorities in support of its Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Compensatory Award for Plaintiff (the "Fee Memorandum"), Lead Counsel is requesting attorneys' fees in the amount of 33 1/3% of the Settlement Fund and reimbursement of expenses in the amount of $233,242.40. As discussed in the accompanying Fee Memorandum, the requested fee is within the range of what is customarily awarded in similar complex actions. The recovery of $3,000,000 represents a meaningful percentage of total maximum damages and is an excellent result for the Class.

66.    The expenses incurred by Lead Counsel in connection with this litigation are set forth below. Lead Counsel, in seeking reimbursement of $233,242.40 in reasonable expenses, has averred that the expenses incurred in this Action are reflected on the books and records maintained by the firm and are an accurate recording of the expenses incurred. Those expenses consist of the reasonable fees paid to Lead Plaintiff's experts who provided Lead Plaintiff with extensive assistance during this litigation, and other expenses like filing fees and database charges. Such expenses were reasonably necessary for the prosecution of this Action and of the type normally chargeable to a client in non-contingency litigation.

### A.    Lead Counsel's Application for Attorneys' Fees

67.    For its efforts on behalf of the Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage-of-recovery basis. The percentage-of-recovery method is appropriate because it aligns the lawyers' interest in being paid a fair fee with the interest

21

of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances.[2]

68.    Lead Counsel requests a fee of 33 1/3% of the Settlement Fund. As set forth in the accompanying Fee Memorandum, numerous district courts within the Second Circuit have applied the percentage-of-recovery method in awarding fees. The percentage sought is merited in this case in light of the effort required and the result obtained and is in line with percentages awarded by many courts in this Circuit in common fund cases. Lead Plaintiff endorses Lead Counsel's fee request.

### 1.    The Requested Fee is Reasonable

69.    Lead Counsel undertook time-consuming, challenging, and risky work to prosecute the claims against Defendants and to achieve this Settlement. As detailed above, this Action was settled only after Lead Counsel had conducted an extensive and ongoing investigation into the Class's claims, thoroughly researched the facts and law applicable to the Class's claims and Defendants' defenses thereto, prepared and filed an amended and second amended complaint detailing each Defendant's alleged violations of the federal securities laws, opposed Defendants' motion to dismiss the Second Amended Complaint, considered the risks of continued litigation, and engaged in vigorous settlement negotiations with defense counsel, which resulted in a favorable recovery for the Class.

---

[2] Districts in the Second Circuit also consider the factors enumerated in *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) when assessing a request for attorneys' fees from a common fund. The *Goldberger* factors include: (1) the time and labor expended by counsel; (2) the risks of the litigation; (3) the magnitude and complexity of the litigation; (4) the requested fee in relation to the settlement; (5) the quality of representation; and (6) public policy considerations. *Id*. at 50. As discussed in the Fee Memorandum, each of these factors favors the requested fee award.

70.    Since the inception of the Action, Lead Counsel has dedicated over 2,631 hours to the investigation, prosecution, and resolution of the claims against Defendants, resulting in a lodestar of $1,864,972.00. The requested fee of 33 1/3% of the Settlement Fund, yields a multiplier of approximately negative 0.54. In other words, the attorneys' fees requested here represent near what counsel would have earned had counsel been compensated if billed hourly using counsel's hourly billable rates, even before accounting for the considerable risk of nonpayment undertaken by Lead Counsel.

71.    The lodestar enumerated below includes a schedule that indicates the amount of time spent by each attorney at Pomerantz who worked on this Action and the lodestar calculations based on their current billing rates. The hourly rates for the attorneys included in the schedule are commensurate with the hourly rates charged by lawyers of reasonably comparable skill, experience, and reputation which have been accepted in other securities or shareholder litigation. For personnel who are no longer employed by Lead Counsel, the lodestar is based upon the billing rates for such personnel in their final year of employment.

| ATTORNEY | STATUS | CURRENT RATE | HOURS | CURRENT TOTAL |
|---|---|---|---|---|
| Silverman, Joshua B. | Partner | $1,100.00 | 306.10 | $336,710.00 |
| Szydlo, Brenda | Partner | $1,000.00 | 116.50 | $116,500.00 |
| Hood, Alex | Partner | $975.00 | 1.10 | $1,072.50 |
| Ludwig, Louis C. | Of Counsel | $825.00 | 886.10 | $731,032.50 |
| Tourek, Christopher | Of Counsel | $700.00 | 261.70 | $183,190.00 |
| O'Connell, Brian | Of Counsel | $700.00 | 0.90 | $630.00 |
| Martinez, Diego | Associate | $600.00 | 29.70 | $17,820.00 |
| Arifi, Genc | Associate | $600.00 | 5.00 | $3,000.00 |
| LoPiano, James | Associate | $550.00 | 4.19 | $2,304.50 |
| Shteyn, Villi | Associate | $550.00 | 0.60 | $330.00 |
| Celik, Morgan | Project Associate | $465.00 | 1,009.50 | $469,417.50 |
| | ATTORNEY TOTAL | | 2,621.39 | $1,862,007.00 |

23

| PARALEGAL AND LEGAL ASSISTANTS | STATUS | CURRENT RATE | HOURS | CURRENT TOTAL |
|---|---|---|---|---|
| Lo, Jack | Paralegal | $365.00 | 3.50 | $1,277.50 |
| Welsh, Morgan | Other Timekeeper | $195.00 | 5.00 | $975.00 |
| Hall, Simon | Paralegal | $375.00 | 1.90 | $712.50 |
| | | GRAND TOTAL | 2,631.79 | $1,864,972.00 |

### 2.    The Support of Lead Plaintiff and Reaction of the Class

72.    Lead Plaintiff was consulted about, and approved, Lead Counsel's Fee and Expense Application. *See* Declaration of Saleh Doron Gahtan. The request is also consistent with the retainer agreements that Lead Plaintiff entered into with Lead Counsel. Lead Plaintiff's support of the requested attorneys' fees should be given considerable weight.

73.    To date, following the dissemination of approximately 15,235 copies of the Notice, each of which informed potential Class Members of Lead Counsel's intent to seek a fee of up to 33 1/3% of the Settlement Fund and reimbursement of litigation expenses up to $280,000, there has been no objections to the Settlement or the amount of attorneys' fees and expenses set forth in the Notice.

### 3.    Standing and Experience of Lead Counsel

74.    The expertise and experience of counsel is an important factor in setting a fair fee. As Lead Counsel's firm resume demonstrates, the attorneys at Pomerantz are experienced and skilled securities class action litigators and have successful track records in securities cases throughout the country. *See* Pomerantz LLP Firm Resume, attached as **Exhibit 3**.

### 4.    Standing and Caliber of Opposing Counsel

75.    The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants are represented by Kirkland

& Ellis LLP and Wilkie Farr & Gallagher. These well-regarded firms spared no effort in the vigorous defense of its clients. In the face of this formidable opposition, Lead Plaintiff and Lead Counsel developed, litigated, and successfully negotiated an excellent recovery in this Action for the Class.

     5.     The Monetary Settlement Achieved

76.     The $3,000,000 Settlement was achieved as a result of extensive negotiations, as detailed herein. The Settlement is a favorable recovery to the Class representing ***more than 40%*** of the maximum amount that would likely be awarded if Plaintiff prevailed, and the majority of the amount that Lead Counsel believes could actually be collected if this litigation proceeded to trial. The percentage is based upon consultation with Plaintiff's damages expert, which assessed that the maximum aggregate Section 10(b) damages are $1.26 million, and maximum aggregate Section 11 damages after accounting for negative causation are $6.2 million. These amounts are overlapping, not cumulative. Plaintiff and Lead Counsel believe it is almost certain that *some* negative causation would be established because Casper's peers also declined in the period in question, and industry declines were largely attributed to Covid. However, in the highly unlikely event that Defendants failed to establish *any* negative causation, Plaintiff estimates that Section 11 damages could reach $50.2 million. Even then, the proposed recovery would represent 5.98% of those damages, still a favorable recovery. Thus, the Settlement recovers a far greater proportion of damages than the median recovery in securities class actions of this size, and an overwhelming portion of the amounts that could practically be collected. Therefore, the Settlement is not only fair, reasonable and adequate, but an excellent result for Class Members.

6.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High Risk, Contingent Securities Cases

77.     This litigation was undertaken by Lead Counsel on a wholly contingent basis, with no guarantee of ever being compensated for the enormous investment of time and money the case required. In undertaking that responsibility, Lead Counsel dedicated significant resources to the prosecution of this Action and advanced considerable expenses without any assurance of reimbursement. Thus, it incurred a financial burden and risk far greater than a firm paid on an ongoing basis.

78.     Lead Counsel took on these risks despite the possibility of no recovery. There have been many hard-fought lawsuits where, because of discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee to counsel.

79.     Many post-PSLRA cases in this Circuit have been dismissed at summary judgment after thousands of hours have been invested in successfully opposing motions to dismiss and pursuing discovery. *See, e.g.*, *In re All. Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 189-90 (S.D.N.Y. 2003) (dismissing Section 11 claims on summary judgment).

80.     The risks of contingent litigation are also highlighted by the fact that a change in the law can result in dismissal even after a great deal of time and effort has been expended on the case. This is especially true of securities class actions, where intervening shifts in legal standards have undermined trial victories. *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 533 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (in a case brought in 2005, a Supreme Court decision after entry of a verdict in Lead Plaintiff's favor reduced the billion-dollar award to approximately $78 million); *Glickenhaus &*

26

*Co. v. Household Int'l, Inc.*, 787 F.3d 408, 414, 433 (7th Cir. 2015) (reversing and remanding securities class action jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction in light of intervening Supreme Court case); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1231-32 (10th Cir. 1996) (1973 case tried to a verdict for plaintiffs in 1988 vacated in 1996 as a result of an intervening Supreme Court decision).

81.     Public interest also supports the fee request.  Courts have repeatedly held that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations. The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). "'[P]rivate securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses' - a matter crucial to the integrity of the domestic capital markets." *Id.* at 320 n.4. The SEC, a vital but understaffed government agency, does not have the budget or the resources to ensure complete enforcement of the securities laws. If this important policy is to be carried out, the courts should award fees which will adequately compensate plaintiffs' counsel, considering the enormous risks undertaken with a clear view of the economics of the situation.

## IX.     REIMBURSEMENT OF THE REQUESTED EXPENSES IS FAIR AND REASONABLE

82.     Lead Counsel also seeks reimbursement from the Settlement Fund of $233,242.40 for expenses reasonably and actually incurred in connection with its commencement prosecution and mediation of the claims asserted in the Action, below the $280,000 maximum set forth in the Notice. These expenses are detailed in ¶85 below for Pomerantz.

83.     From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and at the very least, would not recover anything until the Action was successfully resolved. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement would not compensate for the lost use of the funds advanced to prosecute this Action. Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

84.     As attested to, Lead Counsel's expenses are reflected on the books and records maintained by Lead Counsel, which are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred. These expense items are not included in its hourly billing rates.

85.     The expense schedule below identifies the specific categories of expenses, *e.g.*, court fees, fees for experts and consultants, online legal and factual research, travel costs, reproduction costs, messenger and courier costs, and overnight mail costs incurred by Pomerantz. These expenses were reasonable and necessary to the prosecution and resolution of this Action and are the type of expenses that counsel typically incur in complex litigation, and for which counsel are typically reimbursed when the litigation gives rise to a common fund. The travel costs also include anticipated travel costs for Lead Counsel to attend the final approval hearing on February 6, 2025.

| Pomerantz LLP | |
|---|---|
| Category: | Total: |
| Filing and Process Server Fees | $922.00 |
| Computerized Legal Research | $4,617.73 |

| | |
|---|---|
| e-Discovery Hosting Charges | $24,003.12 |
| Deposition and Court Reporting | $29,263.90 |
| Experts | $132,210.50 |
| Private Investigator Fees | $11,323.15 |
| Mediator Fees | $21,322.07 |
| Clerical overtime, photocopy and postage | $1,532.56 |
| Press Releases | $2,769.37 |
| Travel, Lodging, and Meals | $5,277.99 |
| **Total Expenses Incurred:** | **$233,242.40** |

86.    Of the total amount of expenses, $132,210.50, or approximately 56.68%, was expended on experts. Lead Counsel worked extensively with experts at Stanford Consulting Group Inc. and Fideres Partners LLP in the complex and specialized areas of loss causation and damages. These experts were utilized to assist in: (i) determining the likely recoverable damages; (ii) preparing a methodology for assessing classwide damages; (iii) assessing market efficiency; (iv) preparing for settlement negotiations; and (v) developing the Plan of Allocation.

87.    The expenses detailed above and the other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are customarily incurred in litigation and routinely charged to clients billed by the hour. Moreover, all of the expenses incurred by Lead Counsel were necessary to the successful prosecution and resolution of the claims against Defendants. These expenses have been approved by Lead Plaintiff.

88.    Both the Notice and Summary Notice apprise potential Class Members that counsel will be seeking reimbursement of expenses in an amount not to exceed $280,000. As noted above, to date, there has not been any objections to the Settlement, including the reimbursement request

outlined in the Notice. In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Class. Accordingly, Lead Counsel respectfully submits that the costs and expenses incurred by Lead Counsel should be reimbursed.

## X.    COMPENSATORY AWARD REQUESTED FOR LEAD PLAINTIFF

89.    Lead Plaintiff Saleh Doron Gahtan seeks a compensatory award in the amount of $15,000. Lead Plaintiff has devoted substantial time and effort to the prosecution of this Action. Lead Counsel, who worked under his supervision and is familiar with his efforts, believe those requests are fair, reasonable, and adequate. The requested award to Lead Plaintiff is modest in light of his dedication and efforts spent working on the Action. Specifically, Lead Plaintiff Saleh Doron Gahtan: (i) analyzed whether to participate as a representative plaintiff, including the review of initiating documents, consideration of damage estimates, and consultation with counsel regarding the responsibilities of serving as a representative plaintiff; (ii) reviewed and discussed with Counsel the lead plaintiff moving papers; (iii) gathered case-related documents as requested by Counsel; (iv) reviewed and discussed with Counsel an amended and second amended complaint, including discussing the strategy to add claims in the amended and second amended complaint; (v) reviewed and discussed the motion to dismiss filed by Defendants and the response in opposition to the motion to dismiss filed by Counsel; (vi) participated in the discovery process, including by working with Counsel to respond to Defendants' discovery requests; (vii) prepared for deposition; (viii) discussed settlement authority, settlement negotiations, and the settlement with Counsel; (ix) reviewed the motion for preliminary approval and supporting papers; (x) consulted with Counsel regarding the motion to enforce the Settlement; and (xi) consulted with Counsel regarding the anticipated relief to be sought in: (i) Plaintiff's Motion for Final Approval of Class Action Settlement and (ii) Plaintiff's Motion for an Award of Attorneys' Fees,

Reimbursement of Litigation Expenses, and Compensatory Award for Plaintiff. *See generally* accompanying Declaration of Saleh Doron Gahtan. Given the contributions and the time and effort expended by Lead Plaintiff Saleh Doron Gahtan, the requested award of $15,000 is warranted and should be approved.

## XI.    CONCLUSION

90.    For the reasons set forth above and in the accompanying motions and supporting memoranda, I respectfully submit that: (a) the Settlement is fair, reasonable, and adequate and should be granted final approval; (b) the Plan of Allocation represents a fair method for allocating and distributing the Net Settlement Fund among eligible Class Members and should be approved; (c) final certification of the Settlement Class should be granted; (d) the Fee and Expense Application should be granted; and (e) Lead Plaintiff should be granted a compensatory award of $15,000.

91.    I declare under penalty of perjury of the laws of the United States of America and the State of Illinois that the foregoing is true and correct.

Executed this 18th day of November, 2024 at Chicago, Illinois.

/s/ *Joshua B. Silverman*_____
Joshua B. Silverman

31